UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| AMRO FARID,<br><br>Plaintiff,<br><br>v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE,<br><br>Defendants. | Civil Action No. _____ |

**COMPLAINT**
**(Jury Trial Requested)**

I. <u>Introduction</u>

1.     Amro Farid is the Alexander Crombie Humphreys Chair Professor of Economics in Engineering at Stevens Institute of Technology in Hoboken, New Jersey. He was appointed to this endowed chair tenure-track position as (Full) Professor in September 2022 after seven years as Associate Professor at Dartmouth College. Farid alleges that he was denied tenure at Dartmouth because of his national origin (Middle Eastern) and religion (Islam) and was subsequently retaliated against by Dartmouth for asserting discrimination in the tenure process in numerous ways, as detailed below. He seeks compensation for lost wages, emotional distress, reputational harm, and other damages to be proven at trial in excess of $5 million.

II. <u>Parties</u>

2.     Amro Farid is a resident of Lyme, New Hampshire and is Muslim, which he expresses in both private settings and publicly. His family originates from Egypt.

3. Trustees of Dartmouth College ("Dartmouth") is a non-profit corporation organized and existing under the laws of New Hampshire that maintains its principal place of business at 63 South Main Street, Suite 301, Hanover, New Hampshire 03755.

### III. Facts

#### Pre-Tenure Decision Discrimination

4. During and since his appointment to Thayer, Prof. Farid has experienced discrimination based on his religion and/or national origin in persistent ways.

5. Dartmouth failed again and again to follow its own policies and procedures during Prof. Farid's employment.

6. In 2015, Prof. Farid joined Dartmouth's faculty as an associate professor on the tenure-track at the Thayer School of Engineering. He had previously served as an assistant professor role at another university.

7. Although he was appointed as an associate professor, Dartmouth appointed Farid to a three-year term with the expectation that he would be appointed to a second three-year term with his tenure review beginning no later than the final year of his second three-year term. Thus, he was treated essentially as an assistant professor although ranked as an associate professor.

8. At Dartmouth, Farid led the Laboratory for Intelligent Integrated Networks of Engineering Systems (LIINES).

9. Soon after his appointment Prof. Farid was first offered a leadership position as a professor-advisor for a Muslim student organization by Rabbi Daveen Litwin, Dean of the Tucker Center for Spiritual Center. He was then discouraged to be involved with the Muslim student organization by Dean Joseph Helble and then fully excluded from the search committee for the advisor to the Muslim student organization.

10. In or around 2017, Dartmouth began a project to design new campus buildings and infrastructure using clean energy and integrated energy systems to reduce costs and environmental harm. The project required expertise directly within Prof. Farid's scope of expertise. However, while Prof. Farid asked to work on the project, Dartmouth ignored his entreaties and did not staff him on the project.

11. Around this same time, Dartmouth established the Irving Institute for Energy & Society at Dartmouth ("Irving Institute"). Prof. Farid was instrumental in securing the initial funding for the Irving Institute because he was the only engineering professor at Dartmouth who responded to an invitation to meet with the federal officials from the agency that sponsored the grants that ultimately funded the Irving Institute. After responding to this email, Prof. Farid attended a meeting at the United States Army Cold Regions Research and Engineering Laboratory (CRREL), where an agreement was reached to establish a research collaboration focused on engineering integrated energy systems for army bases. However, once the funding became available to CRREL, the new Director of the Irving Institute, Elizabeth Wilson, limited Prof. Farid to only a fraction of the research funds and assigned the bulk of it to other professors even though the funding was originally intended to be used for research in Prof. Farid's chief area of specialty, integrated energy systems.

12. Under the Faculty Handbook, a tenure-track faculty member who welcomes a new child receives an extension of his or her tenure clock of one year. This extension does not need a request but happens automatically. Prof. Farid and his wife, Prof. Khayal, had two children during his six-year tenure-track period but he did not receive any automatic extensions as a result.

13. In 2017, Prof. Farid had a family emergency involving his sister who lived in Oman and whose then ex-husband was abusing a legal process in that country to take advantage of her. She was essentially kidnapped. Prof. Farid had to take a leave from campus to help his sister. The reason for his leave was generally known among his colleagues in the Engineering School.

14. When Prof. Farid returned from his leave, he observed that his colleagues in the Engineering School treated him differently. They were less friendly, colder, and more distant. Subsequently, at least one colleague stated that he did not believe that he could work on a grant proposal with Prof. Farid because Prof. Farid was born in the Middle East, which was incorrect, as Prof. Farid was born in the United States (the grant required all grant recipients to be U.S.-born).

15. Upon information and belief, colleagues in the Engineering School have declined to collaborate with Prof. Farid on research projects, grant proposals, and other scholarship endeavors because of his religion and/or national origin.

16. In fact, although Prof. Farid collaborated with senior and experienced colleagues on grant proposals and research papers at other prestigious institutions across the country during his time at Dartmouth, including MIT, not a single tenured colleague in the Engineering School sought to collaborate with Prof. Farid on a research project or paper despite his invitations to do the same.

17. Prof. Farid received positive performance evaluations each year. The evaluations reflected areas for improvement and areas of positive performance but most importantly that he was on track for tenure.

18. In March 2020, when the COVID-19 pandemic began, Dartmouth granted all tenure-track professors a one-year extension on their tenure clock. As a result, Prof. Farid had two extra years on his tenure clock from his original six years that he had upon appointment in 2015, as Dartmouth had previously granted Prof. Farid a one-year extension on his tenure clock because of his leave to assist his sister.[1]

19. In the spring semester 2020, Prof. Farid began discussing his tenure case with Thayer Associate Dean Laura Ray and Dean Alexis Abramson. He had discussions with the Dean's office on his tenure case around the end of the academic year. Associate Dean Ray and Dean Abramson encouraged him to submit his dossier for tenure. This would have been the schedule for his tenure review had he not received two one-year extensions for tenure.

20. Under the Faculty Handbook, a tenure-track professor can submit for tenure review in his or her sixth year, and only can submit early in extraordinary circumstance. Because Prof. Farid was approaching his sixth year, he was not submitting early, but because he had received two one-year extensions, he was also not submitting for review at the end of his tenure clock; he still had two more years before he was required to submit for review. This fact is significant because a professor can only submit for tenure once; if he or she is denied tenure, the decision results in a terminal one-year appointment under the tenure review policy.

21. The tenure review policy in the Faculty Handbook has sections titled Guide to Candidate and Guide to Department or Program. The rule that a denial of tenure results in a terminal-year appointment only appears in the Guide to Department or Program section for assistant professors. It does not appear in the Guide to Candidate section for associate professors.

---

[1] However, he should have had another two years on his tenure clock as a result of having two children during that time period. *Supra* ¶15.

5

22. The tenure review policy also requires the Associate Dean to meet with a candidate applying for tenure at the beginning of the process to explain the procedures. Associate Dean Ray discussed the procedures with Prof. Farid but never explained that a denial of tenure results in a terminal appointment.

23. The tenure review policy requires that a candidate for tenure have a classroom visit during his or her tenure review year, recognizing that student evaluations are an imperfect measure of teaching effectiveness. In the 2020-2021 academic year, Prof. Farid taught remotely due to the COVID-19 pandemic, and while he invited members of his "review committee" to visit his Zoom classroom, none did.

24. Prof. Farid submitted his dossier for tenure in or around October 2020, unaware that by submitting prior to the end of his tenure clock, he did not have another opportunity to apply again if his submission was unsuccessful according to the tenure review policy.

25. On June 1, 2021, Dartmouth notified Prof. Farid that he was not awarded tenure and offered him a terminal year appointment.

26. One of the primary grounds for denying Prof. Farid tenure offered by Dartmouth, as explained to him by Dean Abramson, was his record of funding and research expenditures.

27. Assistant Professor Vikrant Vaze, who is non-Muslim and not of Arab-Egyptian national origin, was awarded promotion, tenure, and an endowed professorship in 2020 at Thayer despite having a similar record of funding and an inferior record of scholarly output compared to Prof. Farid.

28. Another ground for denying Prof. Farid tenure was teaching effectiveness. However, Dartmouth only used student evaluations of teaching (SET) to evaluate Prof. Farid's teaching effectiveness. As recently as May 2018, and since then, Thayer recognized in a

6

presentation to faculty that SETS may not adequately measure the effectiveness of teaching and often carry inherent bias. Thayer faculty received a similar presentation during a faculty meeting on June 2, 2021, explaining that SETs are inherently unreliable and rife with implicit bias.

29. According to Dartmouth Professor Scott Pauls, the Director of the Department for the Center of Learning: "SETs exhibit bias in all sorts of ways and therefore are not reliable comparative instruments *even when comparing an instructor to themselves!*" (Emphasis in original.) Prof. Pauls stated: "The literature is just about as close to unanimous as it can be on the point that personnel decisions should be based on more than just a faculty member's course evaluations."

30. When Prof. Farid's classroom has been observed, he has received positive reviews that do not match his student evaluations. The classroom observations were passed onto his tenure committee. This is why he felt it was particularly important for the "review committee" to make a virtual visit to his Zoom classroom during the 2020-2021 academic year.

31. The denial of tenure to Prof. Farid also resulted from numerous procedural errors in the processing of his tenure case that would not have occurred but for his national origin and/or religion, and/or from reviewing his case with more scrutiny than it otherwise would have been due to his national origin and/or religion.

32. In short, Prof. Farid alleges that Dartmouth denied tenure to him due to procedural errors and/or based on substantive grounds because of impermissible discriminatory factors.

33. On September 1, 2021, Prof. Farid filed an internal appeal challenging the procedural errors of his tenure case with Dartmouth College.

34. On October 28, the Dartmouth Review Committee[2] issued a decision on Prof Farid's procedural appeal, unanimously finding that "procedural errors occurred that could reasonably have affected [Prof Farid's] tenure case." Specifically, the Review Committee found that the Associate Dean did not explain the ramifications of applying for tenure when Prof. Farid did, that a new set of tenure procedures specific to Thayer were not clearly defined, that the conference between Dean Abramson and Prof. Farid on procedural errors did not occur as requested, and that Prof. Farid was treated like an assistant professor rather than an associate professor.

Post-Tenure Decision Retaliation

35. After having his tenure case denied, Farid filed internal appeals of his tenure denial alleging discrimination based on religion and national origin.

36. Before filing his internal appeal, and prior to his departure, Prof. Farid requested that Dartmouth sub-contract his ARIIES grant to the Massachusetts Institute of Technology, where he had an appointment as a visiting professor, because he did not have any graduate students or postdocs in his lab to work on the project.[3] Dartmouth denied the request.

37. When Prof. Farid left Dartmouth to join the faculty at Stevens, he requested that Dartmouth transfer the ARIIES grant to Stevens. Dartmouth denied the request as well.

38. Universities commonly subcontract research funds to alleviate capacity constraints and/or transfer their research funds for soon-to-be departing professors to new universities or research institutions.

---

[2] This Review Committee is a distinct committee from the "review committee" involved in the tenure process. It is convened for the purpose of hearing appeals related to tenure review. The "review committee" in the tenure process gathers information to pass onto the "tenure committee."

[3] Prof. Farid did not have any graduate students or postdocs because his tenure denial meant that he could not hire postdocs or attract graduate students to his lab because of his terminal year.

39. Dartmouth retaliated against Professor Farid for engaging in the protected activity of grieving discrimination by denying Professor Farid's requests to subcontract the research funds to MIT or transfer the funds to Stevens so he could continue the ARIIES project.

40. Dartmouth denied Farid's requests to subcontract the research funds to MIT or transfer the funds to Stevens so he could continue the ARIIES project in retaliation for his asserting claims of discrimination.

41. Dartmouth's denials of Professor Farid's subcontract and transfer requests exhibited the defendant's retaliatory animus because the defendant did not have another professor with the expertise to continue working on ARIIES and did not intend to continue the project, even though it was contractually bound with CRREL either to complete the project or to return the project funds.

Retaliation: Defamation

42. On or about November 30, 2021, Farid filed a Charge of Discrimination and retaliation based on national origin and religion against Dartmouth dually with the New Hampshire Human Rights Commission (NHHRC) and with the United States Equal Employment Opportunity Commission (EEOC), alleging violation of New Hampshire Law Against Discrimination, RSA 354-A:7, and Title VII of the Civil Rights Act of 1964. **Exhibit A**.

43. Shortly after he filed his complaint. Prof. Farid authored a groundbreaking research paper titled "A Profit-Maximizing Security-Constrained IV-AC Optimal Power Flow (IV-ACOPF) Model & Global Solution," which first appeared in a Tier 1 research journal on December 27, 2021.

44. On or about January 27, 2022, Prof. Farid was informed that a former graduate student assistant named Prabhat Hegde, who had voluntarily resigned from his lab approximately

one year earlier, had complained to Dartmouth that he was not given authorship credit for the published IV-ACOPF paper. In his initial complaint to Dartmouth, Hegde wrote: "I am respectfully requesting that my name be included in the authorship of the IV-ACOPF paper."

45. Dartmouth purported to offer Professor Farid the opportunity to "facilitate a discussion to help resolve the matter."

46. Instead of facilitating a discussion to resolve the matter, Dartmouth opened a formal research misconduct inquiry led by the Provost's office – the same office against which Professor Farid had recently claimed discrimination based on religion and/or national origin in denying him tenure.

47. Dartmouth has official "Authorship Guidelines" to "help authors be aware of their responsibilities." The Authorship Guidelines direct individuals to attempt to resolve authorship disputes themselves in the first instance or, if that is not possible, via a third-party such as the Dean, Provost, or Department Chair.

48. The Authorship Guidelines explicitly state that the criteria for authorship "should be based on the accepted practice in the particular discipline and the *guidelines of the specific publisher / journal*." (Emphasis added.)

49. Prof. Farid published the IV-ACOPF Paper in the Tier 1 journal IEEE Access.

50. The criterial for authorship in IEEE Access are:

   i. Made a significant intellectual contribution to the theoretical development, system or experimental design, prototype development, and/or the analysis and interpretation of data associated with the work contained in the article;

   ii. Contributed to drafting the article or reviewing and/or revising it for intellectual content;

   iii. Approved the final version of the article as accepted for publication, including references.

51. Hegde acknowledges that he did not approve the final version of the article and thus did not meet the final criterion for authorship in IEEE Access.

52. When notifying Prof. Farid of Hegde's allegation, the college offered Prof. Farid the opportunity to "facilitate a discussion to help resolve the matter." Despite Prof. Farid's agreement, and contrary to the Authorship Guidelines, no such discussion was organized.

53. Instead of facilitating a discussion to resolve the matter, Dartmouth opened a formal research misconduct inquiry, recharacterizing Hegde's claim of authorship into an allegation of plagiarism.

54. Dartmouth has adopted a Research Misconduct Policy and Procedure ("Research Misconduct Policy") to govern allegations and investigations of research misconduct in the form of plagiarism, fabrication, and falsification by professors and students. The Research Misconduct Policy and Procedure does not address authorship disputes.

55. Dartmouth purposefully or recklessly failed to follow the Research Misconduct Policy in significant and numerous ways in processing the allegation against Prof. Farid.

56. The criteria for proving authorship are distinct from those for proving plagiarism and are therefore distinct scholarly and legal concepts.

57. Research misconduct allegations can potentially lead to severe, career-ending repercussions for professors, if proven.

58. Upon information and belief, Dartmouth opened the research misconduct inquiry because it knew that Hegde's claim of authorship was meritless.

59. Upon information and belief, Dartmouth's formal research misconduct inquiry was caused by Prof. Farid's recent claim that Dartmouth and certain individuals were biased in denying his tenure and engaging in subsequent retaliation.

60.     On February 14, 2022, before officially opening a research misconduct inquiry, Dartmouth informed the New Hampshire Human Rights Commission that it "anticipated" discovering evidence of "misconduct" by Prof. Farid that might serve as a defense to his claims of discrimination and retaliation. Upon information and belief, the "misconduct" referenced by Dartmouth is the alleged research misconduct.

61.     By February 14, 2022, Dartmouth had already predisposed itself to concluding that Prof. Farid had, in fact, committed research misconduct by informing the investigating agency that such a conclusion would serve as a basis for its defense against the claims of discrimination and retaliation.

62.     Less than two months later, on April 11, 2022, the Office of Research Integrity (ORI) at Dartmouth informed Prof. Farid, *on behalf of the Provost's office*, that it was opening a Research Misconduct Inquiry of plagiarism related to the student's complaint of authorship.

63.     The next day, Dartmouth inquired with Prof. Farid, through counsel, about his interest in settling his claims brought in this matter.

64.     According to the Research Misconduct Policy, the Provost and responsible Dean shall consult with one another and determine whether an Inquiry is warranted within fifteen days of receiving a report of possible research misconduct "***without notice to any of the parties involved.***" (emphasis added).

65.     According to the Research Misconduct Policy, Dartmouth must ensure that "[r]easonable precautions are taken to avoid bias and real or apparent conflicts of interest on the part of those involved in conducting the Inquiry or Investigation." This must include steps "to ensure that the ***Provost***, members of Inquiry Panels and Investigation Committees, and experts

have no bias and no personal, professional or financial conflict of interest with the Respondent, Complainant, or the case in question." (Emphasis added.)

66. The Provost's office did not recuse itself from involvement in the review of the research misconduct allegations.

67. On May 4, 2022, ORI informed Prof. Farid that a Research Misconduct Inquiry Panel had been appointed to conduct "preliminary information gathering and fact-finding" to determine whether the allegations of research misconduct involving Prof. Farid's published paper warranted further investigation.

68. Under the Research Misconduct Policy, once Dartmouth determines that an inquiry is warranted, the Provost is required to collect and secure all "Relevant Research Records."

69. Relevant Research Records would have included working drafts of the paper that were in the control of Hegde.

70. The working drafts of the published manuscript are found in an online, cloud-based repository on Overleaf.com (the "Overleaf repository").

71. Prof. Farid, like many academic researchers, uses Overleaf.com to collaborate with his students and other researchers. Overleaf.com, as it describes itself, is a "collaborative cloud-based LaTeX editor used for writing, editing, and publishing scientific documents."

72. Drafting research manuscripts on Overleaf.com allows researchers to collaborate while monitoring changes to a manuscript in real time according to the user who made the changes. The repository maintains a record of each subsequent modification.[4]

---

[4] Screenshots from an Overleaf repository are attached as **Exhibit D**.

13

73. When he was a graduate student in Prof. Farid's LIINES lab, Hegde established the Overleaf repository and designated himself as the repository's sole owner, while granting access to Prof. Farid (with Prof. Farid's knowledge). At some point after the research misconduct allegations were made, Hegde rescinded Prof. Farid's access to the Overleaf repository. Prof. Farid therefore could no longer access any draft manuscripts.

74. At some later point, Hegde transferred ownership of the Overleaf repository to Dartmouth without restoring Prof. Farid's access.

75. Dartmouth has refused, despite requests, to provide access to the Overleaf repository containing the working drafts of the published manuscript to Prof. Farid.

76. Dartmouth knowingly and willfully refused to comply with its own Research Misconduct Policy by failing to provide Prof. Farid with access to the Overleaf Repository and other Relevant Research Records.

77. Dartmouth appointed its panel for the preliminary inquiry on May 4, 2022.

78. Under the Research Misconduct Policy, the preliminary inquiry into the allegations must be completed within sixty (60) calendar days of the appointment of the panel charged with determining whether to recommend opening a formal investigation, unless circumstances clearly warrant a longer period and the Provost approves an extension.

79. According to the Research Misconduct Policy, the preliminary inquiry is not complete until the Provost determines that a formal investigation is warranted.

80. On or about November 9, 2022, Farid amended his charge of discrimination with NHHRCC to add an additional claim of retaliation against Dartmouth.

81. On May 2, 2023, nearly one year into the preliminary inquiry, the Office of Research Integrity (ORI) informed Prof. Farid that the Provost had opened a formal investigation into the charges of research misconduct.

82. ORI also announced that it had appointed a panel of outside professors to an investigation committee.

83. The Research Misconduct Policy requires that members of the investigation committee "do not have real or apparent conflicts of interest in the case [and] are unbiased."

84. The Office of Provost appointed professors with significant ties to Dean Abramson, the Thayer School of Engineering Dean against whom Farid has alleged discriminatory animus, and ties to the Provost.[5]

85. The above discriminatory actions, including but not limited to denying Prof. Farid tenure based on his religion and/or national origin, violate New Hampshire Law Against Discrimination, RSA354-A:7, and Title VII of the Civil Rights Act of 1964, causing significant damages in the form of lost wages, emotional distress, reputational harm, and other losses.

86. The above retaliatory actions, including but not limited to denying Prof. Farid transfer of his funds, interfering with his contractual and business relationships, purposefully or recklessly failing to comply with its Research Misconduct Policy and validating frivolous complaints of authorship into formal charges of plagiarism, violate New Hampshire Law Against

---

[5] The leadership of the Thayer School of Engineering at Dartmouth has a track record of using frivolous claims of research misconduct against disfavored, rival professors. Former Vice Provost and Thayer Professor Tillman Gerngross published an article in 2019 accusing an MIT professor of research misconduct, leading to a three-year misconduct investigation that ended with exoneration. *See Gagged and blindsided: how an allegation of research misconduct affected our lab*, Anne Gulland, NATURE, Aug. 25, 2023, *at* https://www.nature.com/articles/d41586-023-02711-5.

Discrimination, RSA354-A:7, and Title VII of the Civil Rights Act of 1964, causing significant damages in the form of lost wages, emotional distress, reputational harm, and other losses.

### Administrative Exhaustion

87. On or about August 21, 2023, the HRC closed its investigation in response to receiving notice of Professor Farid's intent to exercise his statutory right to file a civil action. **Exhibit B**.

88. On or about August 23, 2023, the EEOC issued Professor Farid a Notice of Right to Sue. Professor Farid files the instant action within 90 days of receiving said Notice of Right to Sue, as required. **Exhibit C**.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## COUNT I

### (Discrimination Based on Religion and/or National Origin in Violation of Title VII)

89. Plaintiff incorporates and restates the allegations contained in Paragraphs 1-88.

90. Plaintiff is Muslim, and his family originates in Egypt.

91. Plaintiff performed his job at Dartmouth at all times at an acceptable level.

92. Defendant denied Plaintiff tenure based on his religion and/or national origin, thereby discriminating against him in the terms and conditions of his employment based on his religion and/or national origin.

93. As a direct and proximate result of the defendant's discrimination in violation of Title VII, the plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, lost employment benefits, lost earning capacity, emotional distress, humiliation, inconvenience and loss of enjoyment of life. The plaintiff is further entitled to punitive damages based on the defendant's actions done with malice and/or with reckless disregard for his federally protected rights, in addition to attorney's fees and costs.

## COUNT II
### (Discrimination Because of Religion and/or National Origin in Violation of RSA 354-A:7)

94. Plaintiff incorporates and restates the allegations contained in Paragraphs 1-93.

95. Plaintiff is Muslim, and his family originates in Egypt.

96. Plaintiff performed his job at Dartmouth at all times at an acceptable level.

97. Defendant denied Plaintiff tenure because of his religion and/or national origin, thereby discriminating against him in the terms and conditions of his employment based on his religion and/or national origin.

98.     As a direct and proximate result of the defendant's discrimination in violation of RSA 354-A:7, the plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, lost employment benefits, lost earning capacity, emotional distress, humiliation, inconvenience and loss of enjoyment of life.  The plaintiff is further entitled to enhanced compensatory damages pursuant to RSA 354-A:21-a based on the defendant's willful and/or reckless disregard of the plaintiff's rights under RSA 354-A, in addition to attorney's fees and costs.

## COUNT III
### (Retaliation in Violation of Title VII)

99.     Plaintiff incorporates and restates the allegations contained in Paragraphs 1-98.

100.    The plaintiff engaged in protected activity within the meaning of Title VII, grieving to the defendant his belief that the defendant had discriminated against him based on his religion and/or his national origin.  The plaintiff also engaged in protected activity by filing a Charge of Discrimination with the New Hampshire Commission for Human Rights and the United States Equal Employment Opportunity Commission.

101.    The defendant subjected the plaintiff to adverse employment actions in retaliation against the plaintiff for his protected activities, denying Professor Farid an opportunity to continue a research project, improperly interfering with his contractual and business relationships, and exhibiting bias against Professor Farid in an investigation of allegations of research misconduct to as to contribute to taint Professor Farid's reputation.

102.    As a direct and proximate result of the defendant's retaliation in violation of Title VII, the plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, lost employment benefits, lost earning capacity, emotional distress, humiliation, inconvenience and loss of enjoyment of life.  The plaintiff is further entitled to punitive damages

based on the defendant's actions done with malice and/or with reckless disregard for his federally protected rights, in addition to attorney's fees and costs.

## COUNT IV

### (Retaliation in Violation of RSA 354-A:19)

103.  Plaintiff incorporates and restates the allegations contained in Paragraphs 1-102.

104.  The plaintiff engaged in protected activity within the meaning of RSA 354-A, grieving to the defendant his belief that the defendant had discriminated against him based on his religion and/or his national origin.  The plaintiff also engaged in protected activity by filing a Charge of Discrimination with the New Hampshire Commission for Human Rights and the United States Equal Employment Opportunity Commission.

105.  The defendant subjected the plaintiff to adverse employment actions in retaliation against the plaintiff for his protected activities, denying Professor Farid an opportunity to continue a research project, improperly interfering with his contractual and business relationships, and exhibiting bias against Professor Farid in an investigation of allegations of research misconduct to as to contribute to taint Professor Farid's reputation.

106.  As a direct and proximate result of the defendant's retaliation in violation of RSA 354-A, the plaintiff has suffered and continues to suffer damages, including but not limited to lost wages, lost employment benefits, lost earning capacity, emotional distress, humiliation, inconvenience and loss of enjoyment of life.  The plaintiff is further entitled to punitive damages based on the defendant's actions done with malice and/or with reckless disregard for his federally protected rights, in addition to attorney's fees and costs.

WHEREFORE, Plaintiff prays this Honorable Court:

A. Schedule this matter for trial by jury, and after trial;

B. Find the defendant liable for discrimination in violation of Title VII and RSA 354-A;

C. Find the defendant liable for retaliation in violation of Title VII and RSA 354-A;

D. Award the plaintiff damages for lost wages, lost employment benefits, and lost earning capacity;

E. Award the plaintiff damages for emotional distress, humiliation, inconvenience and loss of enjoyment of life;

F. Award the plaintiff punitive damages;

G. Award the plaintiff enhanced compensatory damages;

H. Award the plaintiff reasonable attorney's fees;

I. Award the plaintiff interest and costs; and

J. Grant such other and further relief as is just and equitable.

Respectfully submitted,
AMRO FARID
By his attorneys,

Date: September 11, 2023        By:   /s/ Benjamin T. King
                                      Benjamin T. King, NH Bar #12888
                                      DOUGLAS, LEONARD & GARVEY, P.C.
                                      14 South Street, Suite 5
                                      Concord, NH 03301
                                      (603) 224-1988
                                      benjamin@nhlawoffice.com

                                and

Date: September 11, 2023        By:   /s/ Joseph L. Sulman
                                      Joseph L. Sulman, MA BBO #663635
                                      (*pro hac vice* admission forthcoming)
                                      LAW OFFICE OF JOSEPH L. SULMAN
                                      255 Bear Hill Road, Suite 204
                                      Waltham, MA 02451
                                      (617) 521-8600
                                      jsulman@sulmanlaw.com