UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Amro Farid,                                *
                                           *
        Plaintiff                          *
                                           *
        v.                                 *
                                           *          Civil Action No. 1:23-cv-00426-SM
Trustees of Dartmouth College,             *
                                           *
        Defendant                          *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

### Introduction

Now that discovery has concluded, it is clear: the plaintiff cannot demonstrate any trial-worthy factual dispute concerning his tenure denial, which was based solely on legitimate, non-discriminatory reasons relating to his teaching, the quality of the grant funding he had attracted, and similar legitimate reasons. Summary judgment is therefore required on the plaintiff's discrimination counts under both federal and state law.

Likewise, the plaintiff cannot produce the evidence required to show that the reasons advanced by the defendant, for the adverse actions he complains of following any protected conduct, were pretext for retaliation. Dartmouth correctly determined that funds received from the Department of Defense's Cold Regions Research and Engineering Laboratory ("CRREL"), should support research in New Hampshire, and so declined to transfer those funds out of state at the plaintiff's request. Likewise, Dartmouth followed its own policy, as required by federal law, when it opened and pursued research misconduct proceedings against the plaintiff based on the specific and credible allegations that one of his former graduate students brought forward within one month of the publication of one of his academic papers. The plaintiff cannot produce

1

evidence to show that Dartmouth's decisions in invoking or maintaining a research misconduct matter against the plaintiff were pretext for retaliation, nor can he produce evidence to permit an inference that there was any retaliatory motive for these decisions. The defendant, therefore, should be granted judgment as a matter of law on the federal and state retaliation claims.

Alternatively, because the plaintiff voluntarily resigned his position at Dartmouth to take a higher-paid position at the Stevens Institute of Technology, and where he has not made any calculation of these damages in his initial disclosures, nor provided any discovery, or expert opinions, to support an award of front pay or future lost earnings, those damages claims should be dismissed if there is a trial of any claim.

## Standard of Review

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. R. 56(a). "An issue is 'genuine' if a rational factfinder could resolve it in favor of either party, and a fact is 'material' if it has the capacity to change the outcome of the suit." *Rodríguez v. Encompass Health Rehab. Hosp. of San Juan, Inc.*, 126 F.4th 773, 779 (1st Cir. 2025); *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009).

Although facts and reasonable inferences are considered in the light most favorable to the non-moving party, that party nonetheless bears the burden to demonstrate that, "with respect to each issue on which []he would bear the burden of proof at trial. . . a trier of fact could reasonably resolve that issue in h[is] favor." *Borges v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is significantly probative." *Id.* (quotation and brackets omitted). "If the nonmovant fails to make this showing, then summary judgment is appropriate." *Id.*

In deciding this motion, the Court "must ignore conclusory allegations, improbable inferences, and unsupported speculation." *Taylor*, 576 F.3d at 24 (quotation omitted); *see also, e.g., Cocuzzo v. Trader Joe's E. Inc*., 121 F.4th 924, 930 (1st Cir. 2024) ("A plaintiff opposing summary judgment bears the burden of producing specific facts sufficient to defeat summary judgment." (Quotation omitted)).

Moreover, "[w]hile it is true that in the summary judgment context all *reasonable* inferences must be drawn in favor of the non-moving party, the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party." *Torrech-Hernandez v. GE*, 519 F.3d 41, 47 (1st Cir. 2008) (emphasis in original). "An inference is reasonable only if it can be drawn from the evidence without resort to speculation." *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir. 1996) (quotation omitted).

"Faced with a defendant's motion for summary judgment, a plaintiff must come forward with some evidence showing a genuine dispute of material fact if he wants to get in front of a jury. A plaintiff's failure to produce any evidentiary proof concerning one of the essential elements of his claim is grounds for summary judgment." *Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217, 226 (1st Cir. 2013).

## Undisputed Facts

The plaintiff joined the faculty of the Thayer School of Engineering at Dartmouth College ("Thayer") in 2015. He was hired as an Associate Professor on the tenure track. *See* Doc. 1 at ¶6; Doc. 6-1 at ¶6. According to the plaintiff, in 2016, Joseph Helble, then the Dean of Thayer, discouraged the plaintiff from participating in Al-Nur, a student Muslim group. Exh. 1 (excerpts of plaintiff's deposition transcript), at p. 21:6-23:8; Exh. 2 (plaintiff's responses to the

defendant's first interrogatories), at response 3, § iv, p. 3. The plaintiff further claims that in

2018, Professor Eugene Santos did not think that the plaintiff would be eligible to collaborate

with him on a research project that required American citizenship. Exh. 1 at p. 41:14-43:7. The

plaintiff conceded during his deposition that neither Dean Helble nor Professor Santos made any

other comments even arguably relating to his religion and/or national origin. *Id.* at p. 21:6-23:8;

25:5-:23, 41:14-43:7. He also confirmed that he had not been the subject of any other

disparaging or inappropriate comments on the basis of his national origin or religion during his

time at Dartmouth. *Id.* at p. 24:10-27:2, 39:3-43:7, 56:21-:25; Exh. 3 (Thayer faculty roster, with

notation by the plaintiff, marked as exhibit 4 to the plaintiff's deposition).

The plaintiff elected to apply for tenure in the 2020-2021 academic year. Exh. 4 (excerpts

of Alexis Abramson's deposition transcript), at p. 90:23-92:17. The plaintiff assembled his

tenure dossier and submitted it in the October 2020 timeframe. Doc. 1 at ¶24; Doc. 6-1 at ¶24.

As part of the tenure review process, the plaintiff requested that Professor Santos serve on the

two-person tenure review committee that assembles all of the required materials for the faculty to

review during its deliberations; Dartmouth acquiesced. Exh. 1 at p. 43:4-:7, 201:21-202:2; Exh. 5

(Handbook of the Faculty of Arts & Sciences) at p. 34-38.

As part of the tenure dossier that the plaintiff submitted, he provided a CV that listed,

*inter alia*, his grant funding. Exh. 6 (plaintiff deposition exh. 26 – CV); Exh. 1 at p. 211:18-

214:9. This referenced his largest grant, from the National Science Foundation ("NSF"). Exh. 6

at TDC-0003681-TDC-0003682. It omitted any reference to the "Eager" designation of this

grant, denoting a distinct type of research grant that is not as competitive as ordinary NSF grants.

Exh. 4, at p. 82:12-83:7, 84:3-85:8, 155:23-156:2, 156:17-157:14, 159:3-:16; Exh. 7 (April 7,

2021 Thayer meeting minutes), at TDC-0001382-TDC-0001383.

At its April 7, 2021, meeting, the tenured faculty at Thayer met to discuss the plaintiff's tenure case; the faculty discussed numerous concerns about the plaintiff's tenure submission before voting, including: (a) negative feedback from students concerning the plaintiff's teaching at Dartmouth; (b) poor teaching evaluations in general, which some faculty members described as "abysmal"; (c) an unusually high number of self-citations in the plaintiff's research papers; (d) concerns about the plaintiff's funding, including the plaintiff generally having only small grants and few peer-reviewed, competitive grants awarded to him; (e) the plaintiff's failure to identify the "EAGER" designation of his NSF grant;[1] and (e) that many of the outside evaluation letters that supported the plaintiff's tenure case came from professors who were frequent collaborators with the plaintiff. Exh. 7, at TDC-0001375-TDC-0001385; Exh. 8 (defendant's interrogatory responses), at response 8, p. 14.

Nobody so much as mentioned the plaintiff's religion or national origin during the faculty's deliberations. Exh. 7, *passim*. The faculty voted by secret ballot, with 18 faculty members voting against granting  tenure, 3 faculty members voting for tenure, and 3 faculty members abstaining. Exh. 9 (Letter from Alexis Abramson to the committee advisory to the president). Joseph Helble, who had allegedly discouraged the plaintiff from participating in Al-Nur five years earlier, was not present during the April 7 deliberations, nor did he vote on Professor Farid's tenure case. Exh. 7, *passim*; Exh. 1 at p. 28:16-:24. Alexis Abramson, the Dean of Thayer, then submitted the tenure case to the Committee Advisory to the President. She did

---

[1] This court can take judicial notice that NSF EAGER grant proposals are only reviewed internally by NSF, as opposed to being peer-reviewed and competitively awarded grants. *See* "Opportunities for Early-Career Researchers" by the U.S. National Science Foundation, *available at* https://www.nsf.gov/funding/early-career-researchers#early-concept-grants-for-exploratory-research-eager-c8f (last accessed April 30, 2025) (providing that "EAGER proposals are reviewed internally by NSF"); *Gent v. Cuna Mut. Ins. Soc'y*, 611 F.3d 79, 84, n.5 (1st Cir. 2010) (taking judicial notice of information on a government website).

not recommend denying the plaintiff's tenure application, but instead recommended giving the plaintiff an additional year to resubmit his tenure case. Exh. 9.[2] Nonetheless, the Committee Advisory to the President elected to follow the strong recommendation of the faculty, and denied tenure to the plaintiff. Exh. 10 (June 1, 2021 memorandum). This resulted in a one-year terminal appointment. Exh. 11 (June 4, 2021 Terminal Appointment Letter).

The plaintiff filed an internal appeal of his tenure denial alleging discrimination on the basis of religion and national origin in September, 2021, Doc. 1 at ¶¶ 33, 35,[3] and, on or about November 30, 2021, the plaintiff filed a Charge of Discrimination and retaliation with the New Hampshire Human Rights Commission, asserting that his tenure denial was discriminatory on the basis of his Muslim religion and his Arab-American national origin. Doc. 1 at ¶35, 42; Doc. 6-1 at ¶35, 42; Exh. 12 (New Hampshire Human Rights Commission Charge of Discrimination).

In March, 2022, while still employed at Dartmouth, the plaintiff applied for a tenure track position as a full professor at the Stevens Institute of Technology in New Jersey. Exh. 1 at p. 68:4-:20. He was offered the position, and, in September 2022, the plaintiff began work as the Alexander Crombie Humphreys Chair Professor of Economics in Engineering at the Stevens Institute of Technology – a position that he still holds. *Id*.; Exh. 2, at response 8, p. 4. Prior to his departure from Dartmouth, the plaintiff's yearly base salary was $140,425.00. Exh. 13 (plaintiff's total compensation statement from 2021). The plaintiff has conceded that his yearly salary at the Stevens Institute exceeded his salary at Dartmouth. Exhibit 1 at p. 74:4-75:14; Exh.

---

[2] This letter incorrectly includes a May 2, 2020 date. It was transmitted on May 2, 2021.
[3] The plaintiff also asserted that there were procedural issues that substantively affected the outcome of his tenure case, including that the Handbook of the Faculty of the Arts and Sciences did not sufficiently inform him that applying for tenure was an "up or out" proposition. Exh. 14 (May 17, 2021 letter from plaintiff's counsel). A Review Committee granted this appeal and as a result the plaintiff was offered the opportunity to reapply for tenure one year later. Exh. 15 (October 28, 2021 review committee decision).

2, at response 8, p. 4; Exh. 17 (plaintiff's supplemental initial disclosures), at p. 7-8.

After he was denied tenure and filed his internal tenure appeal, the plaintiff requested that Dartmouth subcontract a portion of the CRREL grant that had supported some of his work at Dartmouth, to the Massachusetts Institute of Technology. Exhibit 1 at p. 52:3-57:2. Then, in August, 2022, having filed both an internal appeal and a Human Rights Commission Charge of Discrimination, the plaintiff demanded a transfer of this same grant to his new employer, the Stevens Institute of Technology in New Jersey. *Id*. at p. 60:21-61:5.

Dartmouth declined both requests to transfer the CRREL funding to these two out-of-state institutions, as it determined that the purpose of the congressionally-awarded CRREL grant was to support research at Dartmouth, or at the very least in the State of New Hampshire. Exh. 8, at Interrogatories Nos. 10-11 on p. 15-18; Exh. 18 (excerpts of Dean Madden's deposition transcript) at p. 138:16-142:12, 151:2-152:13. Dartmouth permitted the plaintiff to transfer other federal research funds as requested. Exh. 1 at p. 62:10-63:4.

The plaintiff was the respondent in research misconduct proceedings beginning in January, 2022, which were brought by a former graduate student in his laboratory, Prabhat Hegde. Beginning in the Fall of 2019, the plaintiff began working with Mr. Hegde. Exh. 19 (final investigation committee report, dated December 12, 2024), at p. 6. In early November 2020, Mr. Hegde began working on a research project that would ultimately result in the publication of a paper called *A Profit-Maximizing Security-Constrained IV-AC Optimal Power Flow Model & Global Solution* ("IV-ACOPF Paper"). *Id*. Mr. Hegde performed significant work on the research project from early November 2020 through February 2021, exchanging dozens of messages with the plaintiff concerning the substance of the research, and performing significant drafting to advance the manuscript of the IV-ACOPF Paper during this time. *Id*. at p. 1-10, 13-19, 24-25.

The plaintiff was very critical of the pace and quality of Mr. Hegde's work, and in January, 2021, noted that he would have to "relegate [Mr. Hegde] out of the first author position" on the IV-ACOPF paper. Exh. 20 (January 11, 2021 email). Mr. Hegde continued to work on the research and manuscript, but ultimately left the plaintiff's laboratory in March 2021. Exh. 19, at p. 6. In October 2021, the plaintiff submitted the IV-ACOPF paper for publication. Exh. 21 (IV-ACOPF Paper), at TDC-0008268. The journal published the paper on December 27, 2021. *Id*. Mr. Hedge was not credited as an author in any position, and his work on the paper was not even acknowledged. *Id*. at TDC-0008268-0008285. On January 18, 2022, Mr. Hegde submitted a complaint to Dean Alexis Abramson, alleging that the plaintiff had committed research misconduct by publishing the IV-ACOPF paper without any attribution to Mr. Hegde. Exh. 22 (Prabhat Hegde's January 18, 2022 complaint, Dean Madden Depo. Exh. 4); Exh. 18, at p. 33:7-35:19, 38:3-39:23.

Dartmouth's Research Misconduct Policy and Procedures (the "RMP") govern the resolution of complaints of research misconduct, including allegations of plagiarism. Exh. 23 (RMP, Exh. 2 to Dean Madden depo.); Exh. 18, at p. 21:3-:14; *see* Doc. 1 at ¶54; Doc. 6-1 at ¶54. Pursuant to the plain language of the RMP, the Provost or his designee, here Vice Provost for Research, Dean Madden, performs a preliminary assessment of the allegations to determine whether, if true, they implicate the definition of "research misconduct," and whether they are sufficiently credible and specific to warrant an Inquiry. Exh. 23 at p. 10-12. Dean Madden, who was not aware of Professor Farid's tenure appeal or his lawsuit, reviewed the allegations, and prepared a recommendation for Alexis Abramson, the "responsible Dean," to approve. Exh. 18 at p. 86:8-87:12; 34:8-37:15; Exh. 40 (April 11, 2022 email to plaintiff). The next step under the RMP involves the creation of an Inquiry Panel. Exh. 23 at p. 12-15. In this case, an Inquiry Panel

was formed, consisting of three Dartmouth Professors, none of whom voted on the plaintiff's tenure case, or who were otherwise in or implicated by Professor Farid's tenure appeal or his HRC complaint. Exh. 18 at p. 68:3-:10; Exh. 24 (Exh. 10 to Dean Madden depo).[4] The Inquiry Panel is independent, and the Provost (or his designee, here Dean Madden) can only accept their recommendation, or request a revision—the Provost or designee does not have the ability to simply reject the Panel's recommendation. Exh. 18 at p. 101:21-102:15. In this case, the Inquiry Panel determined that there was a reasonable basis to conclude that the conduct alleged by Mr. Hegde fell within the definition of "research misconduct" under the RMP, and that preliminary information-gathering and fact-finding indicated that the allegations may have substance. Exh. 25 (Exh. 13 to Dean Madden depo - July 25, 2022 Draft Inquiry Panel Report). The Inquiry Panel recommended that an Investigation be conducted. *Id.*

Vice Provost Madden concurred with this recommendation, and worked with his staff to assemble an Investigation Committee, consisting of Andrew Campbell (A Professor in Dartmouth's Computer Science Department), Prasad Jayanti (another Dartmouth Computer Science faculty member) and Kenneth Loparo, an Energy Systems Engineering professor from Case Western Reserve University. *See* Exh. 19 (final investigation committee report), at p. 2. The Investigation Committee reviewed significant evidence, interviewed Mr. Hegde about his allegations, and met on multiple dates to discuss the matter, with minutes of those meetings generally recorded. *Id.* at p. 1-14. Meetings of this Investigation Committee began in August, 2023, and continued through March, 2024. Exh. 26 (August 2, 2023 Investigation Committee notes); Exh. 27 (March 8, 2024 Investigation Committee notes).

Because Mr. Hegde had been paid out of NSF grant funds when he was performing some

---

[4] The Court can cross-reference the list of faculty who voted on the plaintiff's tenure case to confirm that the Inquiry Panel did not include any of the same faculty members.

of the work at issue, Dartmouth was required to give notice to NSF about the inquiry and the decision that an investigation was warranted. Exh. 8, response 13, pp. 19-21. NSF concurred that an investigation was required, and delegated the responsibility for the investigation process to Dartmouth. Exh. 28 (NSF letter, July 5, 2023).

Although his interview was repeatedly requested, the plaintiff refused to participate in an interview with the Investigation Committee, instead offering a 3-line note from a physician's assistant claiming an inability to participate "authentically" in an interview. Exh. 29 (note from Erin Storm, PA, marked as exhibit 20 to the plaintiff's deposition); Exh.1, at p. 158:1-:15. The defendant, through its ADA/504 office, sought further information about this request, but the plaintiff refused to provide same. Exh. 19, at p. 13. Instead of an interview, Professor Farid submitted a 311-page document purporting to be a "definitive analysis" of the IV-ACOPF Paper's development. *Id*. at p. 3, 13. Professor Farid offered to answer written questions about this analysis, but he never agreed to sit for an interview. *Id*. at p. 13; Exh. 30 (excerpts of Ken Loparo's deposition transcript), at p. 82:16-83:5.

In the spring to summer of 2024, the Investigation Committee disbanded. Exh. 19, at p. 3-4, 7; Exh. 30, at p. 89:4-97:22, 112:17-113:3; Exh. 27. The Investigation Committee members at the time were concerned about the manner in which the plaintiff had interacted with them, including his failure to sit for an interview, and his submission of a mostly incomprehensible 311-page document in "lieu of" an interview. Exh. 30 at p. 89:18-91:17; Exh. 31 (excerpts of Prasad Jayanti's depo), at p. 78:18-88:3; Exh. 32 (excerpts of Andrew Campbell's depo), at p. 65:18-70:6. The committee members, by this time, had learned about the existence of this lawsuit, and they were concerned that they could become targets of the litigation. *Id.* They were additionally concerned about the way that the plaintiff had interacted with his former graduate

student, including the plaintiff's lawyer's transmission of a demand letter and a draft lawsuit to the complainant, at his home. *E.g.* Exh 31, at p. 84:16-88:3; Exh. 19, at p. 3.

Two committee members who resigned – Professors Jayanti and Campbell – never returned to the committee. Exh. 19, at p. 3-4, 7. Professor Loparo eventually agreed to return to the Investigation Committee in the summer of 2024. *Id.*; Exh. 30, at p. 89:4-97:22, 112:17-113:3. Mark Barnes, a partner at Ropes & Gray LLP, and a former Senior Research Officer and Senior Associate Provost for Research at Harvard University, who serves on the faculty at Yale Law School, was then appointed to the Investigation Committee. Exh. 19, at p. 3-4.

As reconstituted, the Investigation Committee continued its review. On October 18, 2024, the committee issued a draft report that contained their initial conclusions. Exh. 33 (draft Investigation Committee report). The draft report was provided to both the plaintiff and to Mr. Hegde for comments, and they both provided responses thereto. Exh. 19, at p. 21-24. The Investigation Committee considered these responses, and then the committee issued a final report on December 12, 2024. *Id.*

The final report from the Investigation Committee concluded that the plaintiff did <u>not</u> commit research misconduct as defined by the policy based on an academic distinction between "plagiarism" and "authorship disputes." *Id.* at p. 1, 24-25. This distinction is not universally observed, and Dartmouth's policy does not require that authorship disputes be decided separately from claims of research misconduct. Exh. 18, at p. 23:10-24:12, 28:7-29:21, 34:8-35:19. Despite the decision by the Investigation Committee that the evidence did not ultimately support a claim of plagiarism, the Committee ultimately found that:

> Prof. Farid's conduct in regard to denying authorship credit to Mr. Hegde, or at least acknowledging that Mr. Hegde contributed to the Paper, was inappropriate and unprofessional in regard to his responsibilities and role as a Dartmouth faculty member and mentor. . . . Prof. Farid's behavior toward his student [was] reprehensible and his

> submission of a collaborative work without proper authorship attribution or acknowledgement [was] a breach of professional ethics. The Committee believes that Mr. Hegde deserves authorship credit, or an acknowledgement at the least, for his months of hard work and overall contribution to the Manuscript and Paper. . . . Additionally, this Committee refers the allegation that Prof. Farid retaliated against Mr. Hegde for Mr. Hegde's filing of his Complaint—by removing Mr. Hegde from additional academic papers on which Mr. Hegde contributed—to the Provost's Office for additional review.

Exh. 19, at p. 1, 24.

The Committee recommended the Provost consider numerous responses to the conduct it learned about during its investigation, including limiting Professor Farid's future appointments and his ability to conduct sponsored research in conjunction with Dartmouth faculty members; it also recommended that the Provost consider contacting the Journals where the plaintiff had published pieces where Mr. Hegde deserved further credit. *Id*. at p. 14-19, 24-25. These recommendations, while not specifically called for by the RMP, are in keeping with the way that Research Misconduct Investigation Committees operate at other universities. Exh. 34 (excerpts of Mark Barnes' depo), at p. 189:14-204:5.[5] These recommendations were made to David Kotz, the Provost of Dartmouth College. Exh. 19, at p. 1.

Provost Kotz did not recall being involved in Professor Farid's tenure denial, but he confirmed that the Provost, though invited to attend meetings of the Committee Advisory to the President, has no vote, and no formal role, in tenure decisions, including appeals. Exh. 35 (excerpts of David Kotz's depo), at p. 11:19-13:19.

In addition to the RMP, the defendant also publishes authorship guidelines, which specifically refer to the RMP. Exh. 37 (Dartmouth's authorship guidelines, Exh. 3 to Dean Madden's depo), at p. 1; Exh. 18, at p. 23:7-:12. Among other things, Dartmouth's authorship

---

[5] Professor Barnes was disclosed as a percipient expert by the defendant on November 8, 2024. Exh. 36 (defendant's preliminary expert disclosure), at p. 3. His testimony that the Research Misconduct Investigation was conducted similarly to other Research Misconduct proceedings should, therefore, be admissible.

guidelines vest the Provost with authority to settle disputes over authorship issues. Exh. 37, p. 2.

The plaintiff did not appeal the final Investigation Committee report, and so on February 12, 2025, Provost Kotz sent a letter to the plaintiff confirming that Dartmouth would accept the conclusion of the Investigation Committee that no research misconduct technically occurred. Exh. 38 (February 12, 2025 letter from David Kotz). The Provost also informed the plaintiff that "Dartmouth has determined that Prabhat Hegde deserves credit as an additional author on" two papers that had been considered the research misconduct proceedings. *Id*. The Provost requested that the plaintiff contact *IEEE Access* to facilitate the addition of Mr. Hegde as an author on the two papers. *Id*. The plaintiff responded on February 21, 2025. Exh. 39 (letter from the plaintiff dated February 21, 2025). The plaintiff has still not provided Mr. Hegde with authorship credit on either paper, and has not acknowledged his work on any of these papers.

## Argument

### I.    Introduction.

When, as here, there is no direct proof of any discrimination, the plaintiff must "resort to the three-stage burden-shifting framework set forth in *McDonnell Douglas*." *Rodriguez-Cuervos v. Wal-Mart Stores, Inc.*, 181 F.3d 15, 19 (1st Cir. 1999). "Under this framework, the plaintiff shoulders the initial burden of adducing a prima facie case of unlawful discrimination. This includes a showing that: (1) plaintiff is a member of a protected class; (2) plaintiff's employer took an adverse employment action against him; (3) plaintiff was qualified for the employment he held; and (4) plaintiff's position remained open or was filled by a person whose qualifications were similar to his." *Id*.[6]

---

[6] The prima facie case for retaliation claims is similar, requiring the plaintiff to show that: (1) he engaged in protected conduct; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected conduct and the adverse action. *See Hernandez-Torres v. Intercontinental Trading*, 158 F.3d 43, 47 (1st Cir. 1998).

"Once a plaintiff establishes a prima facie case, the burden shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its adverse employment action." *Id.*

"In the third and final stage, the burden devolves upon the plaintiff to prove that the reasons advanced by the defendant-employer constitute mere pretext for unlawful discrimination." *Id.* "To meet this burden, the plaintiff must prove not only that the reason articulated by the employer was a sham, but also that its true reason was plaintiff's [religion] or national origin." *Id.* In other words, the plaintiff is "required to elucidate specific facts which would enable a jury to find that the reason given by the defendant for the adverse employment action is not only a sham, but a sham intended to cover up the employer's real motive." *Quintana-Dieppa v. Dep't of the Army*, 2025 U.S. App. LEXIS 4362, *21-22 (1st Cir. 2025) (quotations omitted).

"[E]vidence that would provide a supportable basis for reaching a different conclusion than the employer did with respect to its stated basis for the employment action does not suffice for a plaintiff to defeat summary judgment on the ground that the employer's stated basis was pretextual. . . . Rather, [the plaintiff] must present evidence from which a reasonable jury could supportably conclude that the employer's explanation is not just wrong, but that it is so implausible that the employer more likely than not does not believe it." *Id.* at *22 (quotations omitted). Thin evidence of pretext is not sufficient to defeat summary judgment. *Id.* at *27.

II.    **The plaintiff's discrimination claims fail because the plaintiff has no evidence to prove that the legitimate reasons for his tenure denial were pretext for discrimination.**

For purposes of this motion, the defendant is assuming that the plaintiff can meet his burden to make out a *prima facie* case of discrimination. However, the tenured faculty at

Dartmouth voted overwhelmingly against awarding the plaintiff tenure for multiple legitimate and non-discriminatory reasons. The plaintiff's case therefore founders at the pretext stage of the *McDonnell-Douglas* burden-shifting analysis. Only 3 faculty members voted in favor of awarding tenure to the plaintiff, while 18 faculty voted against tenure (and 3 abstained). At the faculty meeting held on April 7, 2021, the tenured faculty discussed the plaintiff's tenure submission in detail and raised numerous concerns, including critical comments and negative feedback from students concerning the plaintiff's teaching; "abysmal" teaching evaluations; an unusually high number of self-citations in the plaintiff's research papers; concerns about the plaintiff's funding; the plaintiff's failure to identify his main grant as an "EAGER" grant in his CV; and more.

The plaintiff's religion and national origin were never mentioned during any of the faculty's deliberations concerning the plaintiff's tenure submission. Dartmouth has offered more than sufficient evidence of its non-discriminatory reasons for the plaintiff's tenure denial, and so "the presumption of discrimination created by the prima facie case drops away and the burden of production shifts back to the plaintiff to show that the employer's stated nondiscriminatory reason was a pretext for discrimination." *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430 (1st Cir. 2000). "At this final stage of the *McDonnell Douglas-Burdine-Hicks* framework, this burden merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination." *Id.* (quotation and brackets omitted).

The plaintiff must adduce sufficient to show that the defendant's articulated reasons for the adverse decisions were "a cover-up for a discriminatory decision." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 6 (1st Cir. 2000) (quotations omitted). To meet this burden, the plaintiff must "persuade the factfinder that []he experienced unlawful

discrimination at the hands of h[is] employer . . . by presenting sufficient evidence to show both

that the employer's articulated reason for [the tenure denial was] a pretext and that the true

reason was discriminatory." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 34 (1st Cir. 2001)

(quotation and brackets omitted). The plaintiff has no evidence to make this showing.

The plaintiff's only allegations that he ever experienced anything remotely connected to

his national origin or religion were that: (a) five years before he was denied tenure, Dean Joseph

Helble allegedly discouraged him from participating in Al-Nur, a Muslim student group; and (b)

three years before he was denied tenure, Professor Eugene Santos allegedly told the plaintiff that

he did not think that he would be eligible to collaborate with him on a research project that

required proof of American citizenship. Even assuming that these events occurred as the plaintiff

asserts, neither creates a trial-worthy fact issue in connection with the 2021 tenure denial.

The lack of temporal proximity between these events and the tenure denial is critical. *See*

*Quintana-Dieppa v. Dep't of the Army*, 2025 U.S. App. LEXIS 4362, *28 (1st Cir. 2025) (even a

"three- or four-month period between the two events would suffice to establish the causal link

required"); *Calero-Cerezo v. United States DOJ*, 355 F.3d 6, 25 (1st Cir. 2004) ("Three and four

month periods have been held insufficient to establish a causal connection based on temporal

proximity."). Moreover, the plaintiff confirmed during his deposition that neither Dean Helble

nor Professor Santos ever made any other arguably inappropriate comments to the plaintiff

concerning his religion or national origin.

Moreover, the two individuals who even allegedly made any type of reference to the

plaintiff's national origin or religion did not make the disputed decisions. It is undisputed that

Dr. Helble was not a participant in the vote to deny the plaintiff tenure, and he was not even

present when the Thayer faculty deliberated. Stray remarks of the nature that he was alleged to

have made cannot, therefore, ground a discrimination claim. *See, e.g., Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002) ("stray workplace remarks, as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus" (quotation omitted)); *McMillan v. Massachusetts SPCA*, 140 F.3d 288, 301 (1st Cir. 1998) (probative value of stray remarks "is circumscribed if they were made in a situation temporally remote from the date of the employment decision . . . or if they were not related to the employment decision in question or were made by nondecisionmakers"). The same is true of Professor Santos; although Professor Santos participated in the tenure deliberation, there were at least 17 other professors at Thayer who voted against the plaintiff's tenure case in April, 2021, approximately three years after Professor Santos allegedly questioned whether the plaintiff was a United States citizen.[7]

The plaintiff will likely argue that the promotion of other professors at Dartmouth, who were non-Muslim and not of Arab-Egyptian national origin, can suffice to show that he experienced discrimination. This position is based only on conclusory allegations, speculation, and improbable inferences. Despite the volume of discovery he has been afforded, the plaintiff has no evidence to show that he was similarly situated with any non-Muslim, non-Arab faculty member who was granted tenure. *See, e.g., Quinones v. Houser Buick*, 436 F.3d 284, 289 (1st Cir. 2006). The comparators that the plaintiff identifies at Thayer did not have the problems with their teaching or funding that plagued the plaintiff's submission. *See, e.g., González-Bermúdez v. Abbott Labs. P.R. Inc.*, 990 F.3d 37, 44 (1st Cir. 2021) (to "be probative of discriminatory animus, a claim of disparate treatment must rest on proof that the proposed analogue is similarly

---

[7] The vote of the Thayer faculty is conducted by secret ballot and there is no record of who voted which way.

situated in material respects. . . . Though the comparison cases need not be perfect replicas, . . .

they must be similar enough that apples are compared to apples" (quotations omitted)).

Although the plaintiff is expected to quibble with the rationale advanced by Dartmouth

for denying him tenure, and is likely to submit evidence to reargue his tenure case on the merits,

it is "not the function of the courts to sit as super-tenure committees." *Villanueva v. Wellesley

College*, 930 F.2d 124, 129 (1st Cir. 1991) (quotation omitted). When challenging tenure denials,

a plaintiff must demonstrate that the "defendant's articulated reasons for denying tenure were

obviously weak or implausible . . . The essential words here are 'obviously' and 'manifestly.'"

*Id*. (quotation omitted). "A court may not simply substitute its own views concerning the

plaintiff's qualifications for those of the properly instituted authorities; the evidence must be of

such strength and quality as to permit a reasonable finding that the denial of tenure was

'obviously' or 'manifestly' unsupported." *Id*. (quotation omitted).

Here, the Thayer faculty's overwhelming decision to deny tenure to the plaintiff was

based solely upon legitimate, non-discriminatory reasons disclosed in the discovery materials

that Dartmouth has provided. There is no evidence that any of the reasons the faculty fvoted

against tenure had anything to do with the plaintiff's religion or national origin. Despite the tens

of thousands of pages of documents exchanged in discovery, dozens of interrogatories, and

eleven depositions, the plaintiff cannot point to any evidence sufficient to show that any non-

Muslim, non-Arab-Egyptian applicant who was granted tenure at Dartmouth was similarly

situated to him.

The First Circuit has been clear that "not even thin evidence of pretext by itself can defeat

summary judgment." *Quintana-Dieppa*, 2025 U.S. App. LEXIS 4362 at *27 (quotation omitted).

The plaintiff has a high burden to demonstrate pretext in connection with his tenure denial, and

he cannot supply evidence to meet this burden. As a result, the defendant should be entitled to summary judgment in its favor on the federal and state counts of discrimination in the Complaint (Counts I and II). *See Massaquoi v. 20 Maitland St. Operations LLC*, 2018 U.S. Dist. LEXIS 201064, *6-7 (D.N.H. 2018) ("there is nothing in RSA 354-A or New Hampshire case law precluding a joint analysis, [and] the court will address the state and federal claims together using the Title VII standard").

### III.    The plaintiff cannot produce evidence to show that any of Dartmouth's allegedly retaliatory actions were pretext for retaliation.

The plaintiff's retaliation claims are analyzed under the same burden-shifting scheme as his discrimination claims. *See, e.g., L'Etoile v. New Eng. Finish Sys.*, 2008 U.S. Dist. LEXIS 67214, *22 (D.N.H. 2008) (the "burden-shifting framework used to resolve employment discrimination claims under Title VII is also used to resolve retaliation claims"). The plaintiff's retaliation claims in this case must fail because the plaintiff cannot demonstrate that Dartmouth decided not to transfer CRREL funds, or that it pursued a research misconduct case against the plaintiff, as pretext for retaliation.

### A.    The plaintiff cannot produce any evidence that Dartmouth's decision to retain CRREL funding in New Hampshire was pretext for retaliation, nor that it was causally connected to any protected conduct.

The reason that Dartmouth declined the plaintiff's request to transfer or otherwise subcontract the CRREL funding to MIT or Stevens Institute of Technology was made clear. Senator Shaheen was instrumental in obtaining the CRREL funding through the Senate appropriation process, CRREL is located in Hanover, New Hampshire, and the purpose of the grant was to support research in New Hampshire. The institutions to which the plaintiff requested the CRREL funding be transferred or subcontracted (Stevens Institute or MIT) were

both located outside of New Hampshire,[8] and so Dartmouth appropriately decided to retain the funds. The decision had nothing to do with retaliating against the plaintiff. Exh. 18 at p. 138:16-142:12, 153:9-:22. As the plaintiff conceded at his deposition, Dartmouth permitted the transfer of his NSF EAGER grant to the Stevens Institute. The CRREL grant was the only other grant that the plaintiff still had open at Dartmouth while he worked there. Exhibit 1 at p. 62:10-63:17.

Dartmouth has been consistent in its explanation relating to the CRREL funding. *Cf., e.g., L'Etoile*, 2008 U.S. Dist. LEXIS 67214 at *25-26 ("shifting explanations for an employer's challenged action can demonstrate pretext"). Moreover, the plaintiff has not provided any evidence that he was treated any differently from similarly situated employees with respect to the CRREL funding or any other similar project. Exh. 8 at response 10 and response 11; Exh. 18, at p. 138:16-142:12, 153:9-:22; *Cf., e.g., Garcia v. Bristol-Myers Squibb Co.*, 535 F.3d 23, 31 (1st Cir. 2008) (explaining that a plaintiff can demonstrate pretext by "producing evidence that plaintiff was treated differently from similarly situated employees").

There is *no* evidence to show that the reason given for the refusal to transfer/subcontract the CRREL funding was "false, and that retaliation was the real reason" as is required. *Lang v. Wal-Mart Stores East, L.P.*, 813 F.3d 447, 459 (1st Cir. 2016) (brackets and quotation omitted). The plaintiff has not, for example, adduced any expert testimony, or evidence of comparable grant funds being transferred to other institutions when faculty departed Dartmouth, to even raise any inference that the fund transfer denial was improper. The plaintiff cannot meet his burden to point to "specific facts that would demonstrate to a reasonable jury that" Dartmouth's stated

---

[8] This court can take judicial notice of the fact that Stevens Institute is located in New Jersey, while MIT is located in Massachusetts. *See Industrias Metalicas Marva v. Lausell*, 1997 U.S. Dist. LEXIS 13773, *23, n.9 ("The Court may consider on a motion for summary judgment that of which it could take judicial notice at trial. . . . The Court may take judicial notice of facts commonly known.").

reasons here were a "sham or pretext intended to cover up [Dartmouth's] retaliatory motive." *Kinzer v. Whole Foods Mkt., Inc.*, 99 F.4th 105, 118 (1st Cir. 2024) (quotations omitted). Accordingly, summary judgment is required on the portion of the plaintiff's retaliation claim arising out of the decision not to transfer the CRREL funds.

**B.    The research misconduct process was mandatory, and the plaintiff cannot offer competent evidence to show that it was pretext for retaliation, or that the process was causally connected to any protected conduct.**

"Unlike a substantive discrimination claim, a retaliation claim cannot rest on evidence that a plaintiff's protected activity was merely one of the employer's motivations for an adverse action." *Stratton v. Bentley Univ.*, 113 F.4th 25, 44 (1st Cir. 2024). Rather, retaliation claims "require proof that the protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* (quotation omitted). Although "similar evidence can support causation and pretext," *Fournier v. Massachusetts*, 2021 U.S. App. LEXIS 27676, *10, n.3 (1st Cir. 2021), a plaintiff is required to "show that their employer would not have taken the adverse action but for a desire to retaliate[.]" *Stratton*, 113 F.4th at 44. *See also Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 251 (4th Cir. 2015) (the "causation standards for establishing a prima facie retaliation case and proving pretext are not identical. Rather, the burden for establishing causation at the prima facie stage is less onerous." (Quotation omitted)). Here, the plaintiff can make no such showing.

Dean Madden, the Vice Provost for Research, initially assessed Mr. Hegde's complaint, determined that his allegations, if proven, would fall within the policy's definition of "research misconduct," and that the complaint was sufficiently credible and detailed so that evidence of Research Misconduct could be identified. He recommended, and Alexis Abramson concurred, that an Inquiry was required. Then, a separate three-person Inquiry Panel determined that an

Investigation was required. Then, a separate Investigation Committee, ultimately composed of individuals entirely outside of Dartmouth, issued a report concluding that the plaintiff's conduct did not amount to research misconduct, but noting several serious concerns for the Provost to follow up on. The Provost, David Kotz, has followed up, and has requested that Professor Farid issue a corrigendum to the *IEEE Access* article, to ensure that the complainant is credited as an author, among other things.

The defendant, and the *two* independent faculty committees who looked into the research misconduct claims, followed their internal process, despite numerous difficulties. Having provided voluminous discovery and having offered all of the Investigation Committee members, plus Vice Provost Madden and Provost Kotz, for depositions, there is no evidence that the plaintiff can offer to tie his protected conduct—appealing his adverse tenure decision or filing a claim at the New Hampshire Human Rights Commission—and any portion of the research misconduct process.

There can be no genuine dispute that the Inquiry Panel was composed of faculty entirely outside of Thayer, and the final Investigation Committee was composed of two individuals who were not employed at Dartmouth. Each of the independent committees operated independently and came to their own conclusions. No agent or representative of Dartmouth played any role in making any adverse determinations against the plaintiff. "[T]o defeat summary judgment, a plaintiff must point to *some* evidence of retaliation by a pertinent decisionmaker," and in this case, given the process that was followed, he simply cannot do so. *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997).

Furthermore, it is undisputed that Dartmouth is obliged by federal law to promulgate and follow policies to respond to allegations of research misconduct because of the federal funds it

receives in support of its research. *See, e.g.*, 42 U.S.C. § 1870(a) & (c); 45 C.F.R. §§ 689.4(d). Despite any conclusory assertion that the research misconduct process here was somehow retaliatory, once Mr. Hegde made a specific and credible allegation, the defendant had no choice but to follow the steps in its RMP. Additionally, the defendant could not elect to override the Inquiry Panel that advanced the matter to an Investigation in July, 2022, Exh. 18, at p. 101:21-102:15, and so *could not* have proceeded without a full investigation.

Given the specific allegations that Mr. Hegde raised, the process that the defendant followed, and the identity of the individuals who each independently determined that the process had to be advanced or concluded as it was, the plaintiff cannot point to any evidence that the process was "in fact a pretext for retaliating." *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 857 (1st Cir. 2008) (quotation omitted). Likewise, the plaintiff has no proof to show that Dartmouth "would not have taken the adverse action but for a desire to retaliate," as would be required to survive summary judgment. *Stratton*, 113 F.4th at 44; *Randlett*, 118 F.3d at 862.

## IV.    If any of the plaintiff's claims survive, he should be precluded from seeking front pay and/or future lost earnings.

To the extent that any of the plaintiff's claims survive, the plaintiff should not be permitted to seek any front pay or future lost earnings. He never provided any calculation of front pay or future lost earnings as required by the Rules. *See* Exh. 17; *ee* F.R.C.P. 26(a)(1)(a)(iii). The plaintiff's initial disclosures merely list the category of damages that he is seeking, and this should be dispositive, particularly where discovery is now closed. *See, e.g., West v. Bell Helicopter Textron, Inc.*, 967 F. Supp. 2d 479, 499 (D.N.H. 2013); *AVX Corp. v. Cabot Corp.*, 251 F.R.D. 70, 76 (D. Mass. 2008); *Ayanna v. Dechert, LLP*, 2011 U.S. Dist. LEXIS 121470, *2 (D. Mass. 2011).

Here, there is no dispute: while still employed at Dartmouth, the plaintiff secured a

higher-paying job at the Stevens Institute of Technology.[9] Moreover, Dartmouth has sought, and been denied, discovery about the plaintiff's other business ventures, and so the plaintiff cannot now seek any front pay damages relating to these ventures. Exh. 41 (defendant's fourth set of requests to produce documents propounded on January 23, 2025), at Request No. 1 on p. 4.[10] Accordingly, there is no legitimate basis for an award of any front pay, as the plaintiff never lost any income. *See, e.g., Torres v. Caribbean Forms Mfr.*, 286 F. Supp. 2d 209, 221 (D.P.R. 2003).

The same logic applies to any claim for future lost earnings. Although some degree of speculation may be inherent with respect to forecasting alleged lost future earnings, the First Circuit has explained that "[f]orecasting future losses necessarily requires the trier to sift through the **projections of experts**, gauge the credibility of witnesses, and draw reasonable inferences from the facts." *Nevor v. Moneypenny Holdings, LLC*, 842 F.3d 113, 119 (1st Cir. 2016) (emphasis added). Here, the plaintiff never produced any expert disclosure, despite filing a motion to permit late expert disclosures by February 28, 2025 (after he missed his initial disclosure deadline in September, 2024). *See West*, 967 F. Supp. 2d at 500 ("A plaintiff cannot recover future economic damages without expert testimony or other competent evidence discounting those damages to net present value."). Nor has the plaintiff disclosed any calculation of alleged lost future earnings in his initial disclosures, nor disclosed any other information that could support a claim for future lost earnings. Any claim for lost future earnings here would be a matter of pure speculation, and so the plaintiff should be precluded from seeking lost future earnings as a component of damages. *See, e.g., Kassel v. Gannett Co.*, 875 F.2d 935, 950 (1st

---

[9] The plaintiff has conceded the same in his supplemental initial disclosures. "Plaintiff earns a higher salary in his current employment than he earned in his final year of employment at Dartmouth." Exh. 17, at p. 8.

[10] No substantive response or objections have been received from the plaintiff's counsel as to this set of requests to produce documents.

Cir. 1989).

## Conclusion

The plaintiff cannot provide sufficient evidence to show that the legitimate reasons provided for Dartmouth's actions were in any way a sham, or that they were intended to cover up an improper motive of discrimination or retaliation. Since the plaintiff cannot satisfy these burdens, summary judgment should be granted with respect to the plaintiff's claims of discrimination and retaliation under Title VII and RSA 354-A. If any of the plaintiff's claims survive this motion, he should be precluded from seeking damages for front pay or lost future earnings, given his failure to disclose or produce in discovery any evidence to bear out such claims.

Respectfully submitted,

TRUSTEES OF DARTMOUTH COLLEGE

By its attorneys,

DEVINE, MILLIMET & BRANCH, PA

Date: April 30, 2025          /s/ Pierre Chabot_____
                              Pierre Chabot, Esq., No. 17606
                              Stephen Zaharias, Esq., No. 265814
                              111 Amherst Street
                              Manchester, NH 03101
                              603-695-8780
                              pchabot@devinemillimet.com
                              szaharias@devinemillimet.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this date, the foregoing pleading was filed in the Court's electronic filing system and, thus, electronically served upon all counsel of record, including plaintiff's counsel, through the ECF system.

Date: April 30, 2025          /s/ Pierre Chabot_____
                              Pierre Chabot, Esq.