In the Matter Of:

## FARID vs TRUSTEES OF DARTMOUTH COLLEGE

23-cv-426-SM

---

## AMRO FARID

*January 10, 2025*

---



800.211.DEPO (3376)
EsquireSolutions.com

Case 1:23-cv-00426-SM   Document 37-2   Filed 04/30/25   Page 2 of 43

1              UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW HAMPSHIRE

3

4    AMRO FARID,

5              Plaintiff,

6    v.                              C.A. 23-cv-426-SM

7

8    TRUSTEES OF DARTMOUTH COLLEGE,

9              Defendant.

10

11   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13             VIDEO DEPOSITION OF

14                 AMRO FARID

15

16             January 10, 2025

17                9:10 a.m.

18

19             111 Amherst Street

20         Manchester, New Hampshire

21

22

23

24

25         Sharon Saalfield, CSR, RDR, CRR



```
 1                    APPEARANCES OF COUNSEL

 2

 3    On Behalf of the Plaintiff, Amro Farid:

 4         JOSEPH SULMAN, ESQ.
           LAW OFFICE OF JOSEPH SULMAN
 5         255 Bear Hill Road
           Waltham, Massachusetts 02451
 6         617.521.8600
           jsulman@sulmanlaw.com
 7
      On Behalf of the Defendant, Trustees of Dartmouth
 8    College:

 9         PIERRE A. CHABOT, ESQ.
           STEPHEN ZAHARIAS, ESQ.
10         DEVINE MILLIMET & BRANCH
           111 Amherst Street
11         Manchester, New Hampshire 03101
           603.669.1000
12         pchabot@devinemillimet.com
           szaharias@devinemillimet.com
13

14    Videographer:  Alex Jandrow

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                              INDEX

 2                                                    PAGE

 3     AMRO FARID

 4     By Mr. Chabot                                    8

 5                       INDEX TO EXHIBITS

 6     NUMBER               DESCRIPTION              PAGE

 7     Exhibit 1     Plaintiff's Answers to Defendant's

 8                   First Set of Interrogatories      11

 9     Exhibit 2     Complaint                         13

10     Exhibit 3     12/14/21 Letter                   29

11     Exhibit 4     Thayer School of Engineering

12                   Faculty Roster 2020/2021          39

13     Exhibit 5     5/19/20 Email Chain               46

14     Exhibit 6     2/22/16 Email with Attachment     89

15     Exhibit 7     12/12/24 Memorandum               94

16     Exhibit 8     8/11/23 Letter                    96

17     Exhibit 9     Dartmouth College Intellectual

18                   Property Agreement                97

19     Exhibit 10    U.S. Patent and Trademark Office

20                   Provisional Patent Application   100

21     Exhibit 11    Plaintiff's Supplemental Answers

22                   to Defendant's First Set of

23                   Interrogatories                  108

24     Exhibit 12    6/10/21 Note Regarding Video Call

25                   on 6/10/21                       129
```



```
 1                   INDEX TO EXHIBITS (Cont'd)

 2

 3    NUMBER              DESCRIPTION                    PAGE

 4    Exhibit 13    6/17/21 Note Regarding Video Call

 5                  on 6/17/21                          133

 6    Exhibit 14    7/09/21 Note Regarding In-Office

 7                  Visit on 7/09/21                    136

 8    Exhibit 15    6/24/21 Note Regarding Video Call

 9                  on 6/24/21                          142

10    Exhibit 16    10/01/21 Note Regarding Video Call

11                  on 10/01/21                         144

12    Exhibit 17    11/30/21 Note Regarding Video Call

13                  on 11/30/21                         147

14    Exhibit 18    1/06/22 Note Regarding Video Call

15                  on 1/06/22                          148

16    Exhibit 19    4/13/22 Note Regarding In-Office

17                  Visit on 4/13/22                    151

18    Exhibit 20    Undated Letter To Whom It May

19                  Concern from Erin Storm             158

20    Exhibit 21    8/06/15 Letter                      163

21    Exhibit 22    11/19/18 Letter                     166

22    Exhibit 23    5/19/20 Email Chain                 175

23    Exhibit 24    Document Entitled "Extenuating

24                  Circumstances"                      202

25    Exhibit 25    10/19/20 Letter                     202
```



 1              INDEX TO EXHIBITS (Cont'd)

 2    NUMBER          DESCRIPTION                    PAGE

 3    Exhibit 26      Amro M. Farid Curriculum Vitae

 4                    and Faculty Personal Record      211

 5    Exhibit 27      "A Tensor-Based Formulation of

 6                    Hetero-functional Graph Theory"  216

 7    Exhibit 28      "The Hetero-functional Graph

 8                    Theory Toolbox"                  222

 9    Exhibit 29      8/10/22 Email                    228

10    Exhibit 30      8/10/22 Email                    228

11    Exhibit 31      8/10/22 Email                    228

12    Exhibit 32      6/02/20 Email Chain              233

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1                    DEPOSITION OF AMRO FARID

2                         January 10, 2025

3

4            VIDEOGRAPHER:  We are now going on the

5     record.  This is the video-recorded deposition of

6     Amro Farid being taken in the matter of Farid versus

7     Trustees of Dartmouth College.  This deposition is

8     being held at 111 Amherst Street, Manchester, New

9     Hampshire, on January 10th, 2025.  The time is 9:10

10    a.m.  My name is Alex Jandrow.  I'm the videographer.

11    And the court reporter is Sharon Saalfield.

12            Counsel will introduce themselves for the

13    record and the witness will be sworn.

14            MR. SULMAN:  This is Joseph Sulman, counsel

15    for the deponent, Amro Farid.

16            MR. CHABOT:  And this is Pierre Chabot of

17    Devine Millimet & Branch Professional Association.  I

18    represent Trustees of Dartmouth College.  Stephen

19    Zaharias, also counsel of record from this firm, is

20    joining me here today.

21            And before you swear the witness, I just

22    want to confirm, Joe, the usual stipulations.

23    Sometimes there's a misunderstanding about this so I

24    just want to make sure that we have the same

25    understanding, which is that notarization and
```



 1  signature of the transcript are waived.  Any errata

 2  to the transcript, however, have to be made by the

 3  deponent within 30 days of the date that the court

 4  reporter delivers the transcript by email to counsel

 5  for the plaintiff.  Errata should be notarized and

 6  signed.  Any extensions to any of these deadlines

 7  must be in writing and agreed upon by both parties.

 8  Email is a sufficient writing.  If no errata are

 9  served within 30 days or such longer time as counsel

10  may agree, the transcript will be considered to be

11  correct as transcribed and can be used for all

12  purposes it can lawfully be used under New Hampshire

13  law.

14         Objections, except those concerning the

15  form of questions or those asserting a lawful

16  privilege, are reserved until the time of the trial

17  in this matter.  And then counsel does not need to

18  articulate the specific form objection being

19  asserted, except on request of the examining

20  attorney.

21         Is that acceptable?

22         MR. SULMAN:  Yes, except that I'm not --

23  I'm not familiar with the requirement to notarize an

24  errata sheet.  I've never done that before.

25         MR. CHABOT:  Okay.



```
1              MR. SULMAN:  So that's not my practice.

2              MR. CHABOT:  Okay.  I am -- if you will say

3    on the record that any errata sheet that you deliver

4    to me may be treated as it is -- as if it is given

5    under oath, then I can live without a notarization.

6              MR. SULMAN:  Yes, it'll be treated as if

7    under oath.

8              MR. CHABOT:  Okay.  Thank you.

9              THE REPORTER:  And may I clarify?  Part of

10   what you said is that reading and signing will be

11   waived, but then you spoke about --

12             MR. CHABOT:  Of the transcript.  Reading

13   and signing of the transcript.  The errata sheet is a

14   different matter.

15             THE REPORTER:  Okay.  Thank you.

16                       AMRO FARID,

17    having been first duly sworn, testified as follows:

18                       EXAMINATION

19   BY MR. CHABOT:

20        Q.   And good morning, Dr. Farid.

21        A.   Good morning.

22        Q.   Before we get started, I just want to make

23   sure that if there's anything happening with you

24   today that would prevent you or impair you from

25   hearing, processing, or responding to my questions,
```



1  would you tell us about that now?

2       A.   There's nothing at the moment.

3       Q.   Okay.  Can you just walk us through your

4  educational background, starting with high school,

5  and just walk us through, where did you go to high

6  school?  Where did you go to college?  What degrees

7  do you have?

8       A.   I'm from Mansfield, Connecticut.  I went

9  to -- I went to Edwin O. Smith High School in Storrs,

10 Connecticut.  I graduated amongst the very top of my

11 class.  I went to MIT for my undergraduate training.

12 There I graduated with a degree in -- a Bachelor of

13 Science degree in mechanical engineering.  I also had

14 minors in economics, political science, and music.

15      After that I continued at MIT in the mechanical

16 engineering department for a Master of Science

17 degree.  At that point in time, I wanted to study

18 abroad, so I went and studied in Spain, in Madrid, at

19 the Universidad Complutense de Madrid, and --

20      Q.   Would you be able to spell that for the

21 court reporter?

22      A.   Oh, Universidad is spelled

23 U-N-I-V-E-R-S-I-D-A-D.  Complutense is spelled

24 C-O-M-P-L-U-T-E-N-S-E.  De, is D-E.  And then Madrid.

25 Madrid.



1   around 2016" is relevant to the tenure denial.

2        Q.   Okay.  Taking the last of those first, you

3   note here that Joseph Helble, who was at the time the

4   dean of the Thayer School; that is correct?

5        A.   He was the dean of engineering, yes.

6        Q.   Okay.  You say around 2016, he discouraged

7   you from participating in Al-Nur, correct?

8        A.   That's correct.

9        Q.   He didn't prevent you from participating in

10  Al-Nur, did he?

11            MR. SULMAN:  Objection.

12            You can answer.

13            THE WITNESS:  Can you restate the question?

14  BY MR. CHABOT:

15       Q.   He didn't prevent you from participating in

16  Al-Nur, did he?

17       A.   He gave as clear of a discouragement as

18  possible.

19       Q.   And what was that discouragement?  What

20  were the -- what did he tell you?

21       A.   He told me that he wouldn't want it to

22  distract me from my tenure case.

23       Q.   Did he tell you anything else at the time?

24       A.   Yes.

25       Q.   What did he tell you?



1    A.   Well, the meeting was an impromptu meeting

2  after hours.  I was in my office at the Thayer School

3  of Engineering in the Cummings building, and I had my

4  door open.  It was after 5:00.  And he just sort of

5  showed up.  And -- unannounced.  There wasn't a

6  scheduled meeting of any kind.  And, you know, came

7  by to see me, and I welcomed him into my office,

8  and -- the conversation was a long time ago.  The --

9  but the entirety of the conversation was around the

10  Al-Nur Muslim Student Association on campus, and the

11  situation of Muslim students on campus, and my -- my

12  involvement with them, the involvement of my wife,

13  Professor Inas Khayal, as well, and the need for a

14  Muslim chaplain, if you will, a Muslim student

15  advisor for this student group as is commonplace at

16  all of the other Ivy League universities.

17    Shall I continue?

18    Joe Helble.  When he had this conversation, he

19  told you that you could participate more fully in

20  Al-Nur after you went up for tenure, didn't he?

21    A.   He did say that, but that is different than

22  what he does for other faculty and other student

23  groups.

24    Q.   What is the basis for you saying so?

25    A.   For example, Doug Van Citters, who was an



 1    assistant professor at the time, had not yet gotten

 2    tenure, was active with the Dartmouth crew or rowing

 3    team, and was very much encouraged to be involved in

 4    their activities.  And, in general, there was an

 5    environment at Dartmouth and Thayer for faculty to be

 6    involved, encouraging an active, vibrant student

 7    life, and I felt I was doing that as a member of the

 8    faculty.

 9        Q.   When was it you say that Doug Van Citters

10    was encouraged to be involved with crew or rowing?

11    What time frame?

12        A.   As far as I know, the duration of his

13    assistant professorship.  I had had a number of

14    different conversations with him about his

15    involvement in crew because I'm also a former rower.

16        Q.   Professor Farid, were you aware -- going

17    back to your interrogatory answer in that paragraph

18    about the tenure denial.  And we'll get back to the

19    denial of energy system paragraph in a minute.  But I

20    want to focus on the tenure denial paragraph on

21    page 2.

22        A.   Yes.

23        Q.   You say that that decision or that denial

24    involved at least Alexis Abramson, Laura Ray, Lee

25    Lynd, the Thayer tenured faculty, Joseph Helble, CAP,



1  that's the committee advisory to the president?

2       A.   That's correct.

3       Q.   Philip Hanlon, who was the president of

4  Dartmouth College at the time?

5       A.   Yes.

6       Q.   And possibly more individuals, right?

7       A.   That's correct.

8       Q.   Okay.  I want to take each of those one at

9  a time.

10      With respect to Alexis Abramson, did she ever

11  make any inappropriate comment to you concerning your

12  national origin or religion?

13      A.   No.

14      Q.   Have you become aware in the course of this

15  case what her recommendation was to the Committee

16  Advisory to the President with respect to your tenure

17  application?

18      A.   No.

19      Q.   You haven't reviewed the discovery

20  materials that we've produced in that regard?

21      A.   Not yet.

22      Q.   Okay.  How about Laura Ray?  Has Laura Ray

23  ever made an inappropriate comment to you concerning

24  your religion or national origin?

25      A.   No.



1      Q.   How about Professor Lynd, Lee Lynd?  Has he

2  ever made an inappropriate comment to you respecting

3  your national origin or religion?

4      A.   No.

5      Q.   We'll cover the tenured faculty.  I have a

6  list that we'll go over later, but I'll skip over to

7  Joseph Helble.  Did he ever make an inappropriate

8  comment to you concerning your national origin or

9  your religion?

10     A.   I consider what we were just talking about

11 as in discouraging me from participating in the only

12 faith group that is within 100 miles as

13 inappropriate.

14     Q.   Anything else?

15     A.   No.

16     Q.   Okay.  I just -- forgive me.  Lawyers have

17 to do this sometimes.  So to reiterate, Joseph Helble

18 didn't make any inappropriate comments to you

19 concerning your national origin or religion except

20 when he discouraged you from participating in the

21 Al-Nur student group in approximately 2016; is

22 that -- did I characterize your testimony fairly?

23     A.   That's correct.

24     Q.   Thank you.  Do you know who was sitting on

25 the Committee Advisory to the President at the time



1    you applied for tenure?

2         A.   No.

3         Q.   To your knowledge, did anybody who served

4    on the Committee Advisory to the President make any

5    inappropriate comments to you concerning your

6    national origin or religion?

7         A.   I don't know who they are.

8         Q.   Okay.  How about President Hanlon?  Did

9    President Hanlon ever make any appropriate -- sorry,

10   strike that.

11        Did President Hanlon ever make any inappropriate

12   comments to you with respect to your national origin

13   or religion?

14        A.   No.

15        Q.   Are you aware of President Hanlon making

16   any inappropriate comments about -- let's start with

17   individuals who practice the Muslim faith.  Are you

18   aware of him ever making any inappropriate comment

19   with Muslims?

20        A.   No.

21        Q.   How about persons of Middle Eastern

22   national origin?

23        A.   No.

24        Q.   And, again, that was, to just to be clear,

25   you're not aware of President Hanlon making any



1   inappropriate comments about persons of Middle
2   Eastern national origin, correct?
3        A.   I'm not aware of any such statements.
4        Q.   Okay.  Did you highlight paragraph 14 in
5   the federal complaint?  I'm sorry, strike that.  I
6   was thinking of paragraph 16.
7        Did you highlight paragraph 16 in the federal
8   complaint?
9        A.   Yes, I did.
10       Q.   Okay.  Is the statement not a single
11  tenured colleague in the engineering school sought to
12  collaborate with you on a research project or paper
13  despite your invitations to do so, is that a
14  statement that you can adopt under oath here today?
15       A.   Yes.
16       Q.   And then looking at paragraph 16, I just
17  want to understand, and I want to make sure that the
18  jury can understand.  You considered the Thayer
19  School of Engineering to be a prestigious
20  institution, correct?
21       A.   Yes.
22       Q.   Thank you.
23       You don't know who, on the faculty, voted for or
24  against your tenure application, do you?
25       A.   No, I don't.



1    Q.    Do you -- did you ever become aware of the

2    vote tally?

3    A.    No.

4    Q.    So you were not aware, as you sit here

5    today, whether the vote was overwhelmingly negative

6    or overwhelmingly positive?

7    A.    I have no idea what the result was other

8    than binary yes or no.

9    Q.    Okay.  Are you aware that Joe Helble did

10   not vote on your tenure case?

11   A.    I --

12   Q.    Strike that.  Are you aware whether Joe

13   Helble voted on your tenure case?

14   A.    I am not aware because I'm not supposed to

15   know.

16   Q.    You were at the meeting where they

17   deliberated on your tenure case before you were

18   dismissed, were you not?

19   A.    I was at the meeting, at the faculty

20   meeting.  I was at the faculty meeting where -- I was

21   at the faculty meeting before the tenure review of

22   myself and maybe another promotion was discussed.

23   Q.    Was Mr. Helble in attendance?

24   A.    No.

25   Q.    The Al-Nur issue back in 2016, did



```
 1   should continue to proceed with my research,

 2   teaching, and service.

 3              MR. CHABOT:  I'm going to mark what we'll

 4   call Exhibit 4 here.

 5              (Exhibit 4 marked for identification.)

 6   BY MR. CHABOT:

 7       Q.   I'm just going to first ask, Dr. Farid,

 8   whether you recognize this document?

 9       A.   No.  This is the first time I see this

10   document.

11       Q.   Okay.  I will represent to you that this

12   was the faculty roster for the academic year where

13   your tenure vote -- where your tenure application was

14   considered.

15       The year that you applied for tenure, only

16   tenured faculty members were permitted to vote on

17   your application, correct?  Strike that.

18       Only full professors were permitted to vote on

19   your tenure application; is that correct?

20       A.   That's false.

21       Q.   Okay.  With respect to your tenure

22   application, was it full professors and tenured

23   associate professors who voted?

24       A.   During that year, Dean Abramson had

25   initiated a process to change the policies and
```



1    procedures in the faculty handbook, including

2    promotion and tenure, and one of the things that was

3    discussed, and she initiated, was to have -- was to

4    have associate professors with tenure vote on

5    associate professors without tenure as a new change

6    while my tenure review was actually still going on.

7         Q.   Did the other associate professors, the

8    tenured associate professors, vote on your

9    application, to your knowledge?

10        A.   I wasn't in the room, and so I can't say

11   for certain.  And I have not looked at the -- the

12   evidence produced in discovery whether it has been or

13   has not, but what I can say is that in that -- it was

14   discussed.  The point of having associate professors

15   with tenure voting for the year that I was up for

16   tenure, that was discussed several times, and, in the

17   end, people supported that idea.

18        Q.   Can you take your blue highlighter there --

19   I see that you have it near at hand already -- and I

20   would like you to highlight the name of any professor

21   or associate professor whoever said anything

22   inappropriate to you concerning your national origin

23   or religion.  Again, just those first two that --

24   professors and associate professors.  You don't need

25   to worry about assistant professors or the research

1  and instruction line.

2      I'm sorry, Dr. Farid, are you finished or are

3  you thinking?

4      A.   I'm recalling.

5      Q.   Okay.  That's fine.

6           MR. SULMAN:  Take your time.

7  BY MR. CHABOT:

8      Q.   Are you all set?

9      A.   Yes.

10     Q.   Can you just -- for the record, so I don't

11 have to reach over and grab your exhibit, can you

12 tell me which names you highlighted?

13     A.   Professor Eugene Santos.

14     Q.   Can you please recount for me every

15 inappropriate comment Professor Santos ever made to

16 you about your national origin or your religion?

17     A.   Well, this was approximately 2018.

18 Professor Santos and I shared McLane room 232 as a

19 shared laboratory facility, so the LIINES, the

20 laboratory for intelligent integrated networks of

21 engineering systems that I lead, had the middle

22 section of that shared space, and Professor Santos's

23 laboratory was just to the left, if you have your

24 back to the windows.

25     I was -- I was in the lab, and I was -- I



1  thought I'd reach out to Professor Santos, who had

2  come in, and invite him to collaborate.  We had a

3  conversation about the possibilities of doing

4  research around systems engineering and systems

5  science.  And -- and he told me that he -- much of

6  the work that -- much of the -- many of the projects

7  that he does require American citizenship, and so he

8  didn't think I was going to be eligible for

9  collaborating with him.

10       Now, this is strange, of course, because I am an

11  American citizen.  I was born in Brooklyn, New York.

12  I've always been an American citizen.  And so I

13  questioned -- I questioned him on that.  I said, you

14  know, "Gene, you know I'm American, right?"  And he's

15  like, "No, I thought you were Emirati."  And I

16  have -- you know, the only way I can imagine that he

17  came to the conclusion that I was Emirati is because

18  I had worked in the United Arab Emirates four years

19  earlier, but now it's 2018, three years on to the

20  faculty, and I'm working right beside you.  It struck

21  me as odd.

22       Q.   Is that the extent of any inappropriate

23  comment that Professor Santos made about your

24  national origin or religion?

25       A.   I have related the event.



1    Q.   Okay.  And there's no other events to

2   relate, correct?

3    A.   No.

4    Q.   And then, two years later, you asked to

5   have Professor Santos serve on your tenure review

6   committee, correct?

7    A.   Correct.

8    Q.   At some point prior to your reappointment

9   in 2018, somebody at the Thayer School made it clear

10  to you that it seemed likely you were going to need

11  to use all six years available to you in order to

12  build a successful tenure case; is that correct?

13   A.   Could you say that again?

14   Q.   Sure.  One of your allegations in that

15  interrogatory response number 3 involves Dr. Helble

16  telling you that -- orally telling you that you could

17  have, you know, potentially a four-year tenure track,

18  and you seem to take issue with the fact that he

19  didn't honor that.  Am I -- is that fair?  You can

20  look at Exhibit 1 if you like, the interrogatory

21  responses.

22   A.   This is 3.  This is 4.

23   Q.   Thank you for keeping good order there.

24   A.   So you're referring me to Exhibit 1, and

25  which paragraph?



1    A.   With -- around the first two weeks of

2  September '21.

3    Q.   Okay.  And at that time, what was -- you

4  asked to transfer those funds to the Massachusetts

5  Institute of Technology, MIT, correct?

6    A.   False.

7    Q.   Okay.  Where did you ask to transfer those

8  funds in the fall of 2021?

9    A.   I was not asking for -- to transfer at all.

10  I was asking to subcontract.

11    Q.   Okay.  I will go ahead and assume that

12  there is an important difference, and I will just

13  adopt your nomenclature.  You asked to subcontract

14  the funds --

15    A.   There's a -- there's a -- there's a

16  tremendous difference between the two, and it's

17  imperative that the -- that both counsels and the

18  jury understand the difference.

19    Q.   What does Roman numeral 2 say?  Can you

20  read those words again?

21    A.   Denial of transfer/subcontract of CRREL

22  funding.

23    Q.   It uses both terms there, does it not?

24    A.   Yes, it does.

25    Q.   Okay.  And you say the denial of transfer



1  and subcontract of CRREL funding occurred in the fall

2  of 2021 in your answer, right?

3      A.   That could have been written more

4  accurately or more correctly.  The denial of the

5  subcontract of CRREL funding occurred in fall 2021.

6  The transfer would -- the request for transfer would

7  not occur until August of 2022.

8      Q.   Okay.  So with respect to the request to

9  subcontract the CRREL funding --

10      A.   Yes.

11      Q.   -- in approximately September 2021 --

12      A.   Yes.

13      Q.   -- that request was to, I guess, issue a

14  subcontract so that you could use the funding at the

15  Massachusetts Institute of Technology.  Is that a

16  better characterization?

17      A.   Well, I would not -- I would not have the

18  ability to use the funding myself because I'm not a

19  principal investigator at MIT, but I would be able to

20  carry out the work using the human resources

21  available at MIT through the subcontract.

22      Q.   When were you first appointed as a visiting

23  professor at the Massachusetts Institute of

24  Technology?

25      A.   Sometime in the fall of 2021.  I've had



1    appointments at MIT since fall of 2010.

2         Q.    Okay.   So if I told you that your

3    appointment as a visiting professor at MIT was

4    approximately November 29th or 30th, 2021, would that

5    be in the realm of reason?

6         A.    Somewhere in there.   I don't have the exact

7    start date.

8         Q.    It was certainly after you made the request

9    for the subcontract of CRREL funding to MIT, right?

10        A.    The subcontract -- when I am asking for a

11   subcontract, I am asking in my capacity as a

12   Dartmouth professor, and not as a visiting professor

13   at MIT.   It's actually entirely irrelevant that I

14   would be a professor -- visiting professor at MIT

15   because I -- because visiting professors are not

16   principal investigators.   So I'm -- it's not like I'm

17   transferring it to myself or -- sorry, subcontracting

18   it to myself.   That's not the case.   It's being

19   subcontracted to Professor Kamal Youcef-Toumi.

20        Q.    And that is Y-O-U-C-E-F, dash?

21        A.    Dash, T-O-U-M-I.

22        Q.    Thank you.   And Kamal is K-A-M-A-L?

23        A.    That's right.

24        Q.    You say here, the next line, that this

25   denial of subcontract that occurred in fall 2021 that



1  involved Elizabeth Wilson and David Coates.  Do you

2  see that?

3      A.   That's right.

4      Q.   What is your understanding of Elizabeth

5  Wilson's role in deciding not to subcontract funds?

6      A.   Well, perhaps most importantly, she's the

7  one who relayed the information that the -- that the

8  subcontract could not go -- could not go forward, so

9  that's probably the most important role that she

10  played.

11      Q.   Do you have any basis to say that Elizabeth

12  Wilson harbored any animus against you on the basis

13  of your national origin or your religion?

14      A.   No.

15      Q.   Okay.  Now, the other person you described

16  there is David Coates.  What was your understanding

17  of -- David Coates was the provost of Dartmouth at

18  this time; is that right?

19      A.   That's right.

20      Q.   What was -- what is -- strike that.

21      What is your understanding of Provost Coates'

22  role -- Coates' role in the decision not to

23  subcontract funds to MIT?

24      A.   Well, when Professor Wilson relayed the

25  decision that the subcontract would not -- would not



 1  go forward, she referred to the provost's office

 2  repeatedly, and so the provost at the time is, you

 3  know, Professor Provost Coates, and so I can only

 4  assume that it was his decision.  She also

 5  specifically mentioned Dean Madden, who is also in

 6  the provost's office.  I believe his title is vice

 7  provost of research.  And so both of them, as far as

 8  I can tell from Professor Wilson's -- my meeting with

 9  her, were the ones who ultimately made the decision.

10       Q.   You don't have any direct knowledge that

11  Dr. Coates personally played any role in that

12  decision, do you?

13       A.   As is customary in universities, people

14  refer to the office taking an action rather than an

15  individual taking an action, and so in this case,

16  Professor Wilson said "The provost's office took this

17  action," and then I asked multiple times who, and --

18  and she did mention once also Dean Madden.

19       Q.   But she didn't mention David Coates?

20       A.   No.

21       Q.   Thank you.  Have you ever had any

22  interaction with David Coates that would make you

23  think that he harbored any animus against you on the

24  basis of your national origin or religion?

25       A.   No.



1      And, by the way, Dean Madden, Dean is his first

2  name, not his title.

3      Q.   Thank you for the clarification.  Dean

4  Madden is a professor, but he works in the provost's

5  office.  He is not an academic dean.

6      A.   But he is the vice provost of research as

7  well.

8      Q.   You mention -- and this is now on page 3.

9  You say the only other professor for whom Dartmouth

10  denied a transfer or subcontract concerning this

11  grant was only a co-PI for a very small portion of

12  the project.

13      Do you see that?

14      A.   Yes.

15      Q.   Is that talking about the CRREL grant, the

16  Cold Research -- sorry.  The Cold Regions Research

17  and Engineering Laboratory?

18      A.   Yes.

19      Q.   Who, to your knowledge, requested a sub

20  award -- I'm sorry a subcontract of any portion of

21  the CRREL grant and received it?  You mentioned

22  somebody was denied the ability to subcontract some

23  of those funds.  Did anybody successfully subcontract

24  any funds from this grant that you're aware of?

25      A.   I'm not aware of anyone -- excuse me.  I



1   if I hadn't already spoken to her.  And she told me

2   that subcontracts at Thayer and Dartmouth are

3   commonplace, and she was not aware of any reason why

4   a subcontract would not be approved.

5        Q.   You're answering a slightly different

6   question than I'm asking, though.  What I'm asking is

7   are you aware of anybody who has successfully

8   subcontracted funds from the same type of grant as

9   the CRREL grant?

10       A.   My role at the Thayer School of Engineering

11  does not afford me the privilege of knowing about

12  other people's grants.  It's not something I'm

13  allowed to have information or access to.

14       Q.   How about at Stevens Institute of

15  Technology?  Did you -- the Stevens Institute of

16  Technology allow you access to that kind of

17  information there?

18       A.   Other people's grants?

19       Q.   Yeah.

20       A.   No.

21       Q.   Now, a transfer, right?  Because you did

22  request a transfer of these same funds to the Stevens

23  Institute of Technology?

24       A.   Yes.

25       Q.   I think you said that was -- forgive me --



1       A.    August 2022.

2       Q.    -- August 2022.  The same month you

3    announced your resignation from the Thayer School of

4    Engineering, correct?

5       A.    Yes.

6       Q.    Are you aware of anybody who has been

7    permitted to transfer funds from the type of grant --

8    the same type of grant as the CRREL grant?

9       A.    The -- I find it difficult to answer the

10   question because I'm not -- I don't understand what

11   you mean by "the CRREL type of grant."

12      Q.    Okay.

13      A.    Right?

14      Q.    Okay.  That's a fair -- that's a fair

15   characterization.  Now, you did say earlier that your

16   role at Thayer and your role at Stevens Institute of

17   Technology didn't allow you access to information

18   about other people's grants, correct?

19      A.    That's correct.  Myself and --

20      Q.    Okay.

21      A.    -- any other, you know, faculty like

22   myself.

23      Q.    Would you characterize the CRREL grant as

24   one that was competitively awarded?

25      A.    Yes.



1      Q.   Okay.  What is the basis for that?

2      A.   There was a broad agency announcement with

3  a solicitation requesting proposals for funding.

4      Q.   Okay.  And that's -- that is the basis that

5  you say that this was competitively awarded funding?

6      A.   All of the -- all of the research funding

7  where there is a solicitation and professors need to

8  submit proposals to answer an open call, yes, I would

9  call that competitive.

10     Q.   Okay.  You list -- back in Exhibit 1, was

11  anybody other than -- at least to your knowledge, was

12  this the same group, Elizabeth Wilson and David

13  Coates, who was involved in denying your request to

14  transfer the CRREL funds to the Stevens Institute of

15  Technology?

16     A.   I made the request to transfer the CRREL

17  funding in writing.  I believe that in that email,

18  Jodi Harrington and Jill Mortali were the recipients

19  of the email, so -- so it was really being made to

20  Jill Mortali.  I made a similar request for my NSF

21  funding.  The NSF transfer went through successfully,

22  but I never got a -- I never got a response, again,

23  as far as I recall, I never got a response that said,

24  "We will not be transferring it," and there was not

25  an explanation from Jill Mortali's office of



1   sponsored programs.

2        Q.   But you were able to transfer the NSF

3   funding, correct?

4        A.   That's right.

5        Q.   Was that the NSF EAGER grant that you still

6   have open at the Stevens Institute of Technology?

7        A.   It is the NSF EAGER SSDIM project that I

8   had opened at Stevens Institute of Technology.  It's

9   now since closed.

10       Q.   When did it close?

11       A.   As far as I recall, September 2023.

12       Q.   Did you request the transfer of any other

13  funding at the time, August 2022, when you announced

14  your resignation from the Thayer School of

15  Engineering?

16       A.   Those are the only two federally funded

17  projects that I had, and so I requested both.

18       Q.   Have you ever had any personal interactions

19  with Jill Mortali?

20       A.   We've shared many emails.

21       Q.   Okay.

22       A.   But I actually -- I don't believe I've met

23  her in person.

24       Q.   Do you have any basis to say that Jill

25  Mortali harbors any animus against you because of



1       A.   No.

2       Q.   You began looking for employment at the

3    Stevens Institute of Technology -- strike that.

4       You applied for employment at the Stevens

5    Institute of Technology in March of 2022, correct?

6       A.   Approximately that time, that's correct.

7       Q.   And they did ultimately offer you a tenured

8    faculty position there, correct?

9       A.   Verbally.

10      Q.   I mean, verbally just means with words, so

11   I would agree --

12      A.   Orally.

13      Q.   Okay.  They gave you a written offer letter

14   at some point in August of 2022, correct?

15      A.   It was either right at the end of July or

16   right at the beginning of August.

17      Q.   Okay.  July or August 2022 they put an

18   offer in writing, and that offered contained salary

19   terms, correct?

20      A.   Correct.

21      Q.   And it outlined the benefits that would be

22   provided to you, correct?

23      A.   Correct.

24      Q.   And it outlined your teaching obligations,

25   presumably?



1  did not -- because Dartmouth didn't transfer the
2  CRREL money?
3        A.   No.
4        Q.   Okay.  What is your current annual salary
5  at the Stevens Institute of Technology?
6        A.   I just got a -- I just got a raise.  I'm
7  not sure the exact figure.  Somewhere around
8  $190,000.
9        Q.   Is that a 12-month or a nine-month
10 position?
11       A.   That is a nine-month position.
12       Q.   Do you -- do you have any opportunities at
13 Stevens to earn additional money during the three
14 months off?
15       A.   Yes.
16       Q.   Do you avail yourself of those
17 opportunities?
18       A.   Yes.
19       Q.   Approximately, how many weeks during those
20 additional three months do you work?
21       A.   I use them all.
22       Q.   Okay.  Are you permitted to use all --
23 forgive me -- all 12 weeks, approximately, under the
24 terms of your agreement with Stevens?
25       A.   Yeah, three months.  25 percent FTE.



 1  Full-time equivalent is FTE.

 2      Q.   So is that an additional -- you basically

 3  made your pro rata salary for all of those additional

 4  weeks that you work over the summer?  Strike that.

 5      I'm not sure it is even the -- are the three

 6  months off during the summer at Stevens Institute of

 7  Technology, is that how that works?

 8      A.   I have the -- I have the option of securing

 9  additional salary during the summer or the

10  remaining 25 percent of my salary either directly

11  through Stevens or indirectly.

12      Q.   Okay.  And, again --

13      A.   Or -- sorry.  Directly through Stevens or

14  directly to my person.

15      Q.   Okay.  You own a limited liability company,

16  correct?  You're the -- you're at least a -- one

17  owner --

18      A.   That's correct.

19      Q.   -- of the membership shares in Engineering

20  Systems Analytics, LLC?

21      A.   That's correct.

22      Q.   And you've held yourself out in the public

23  as the chief executive officer of Engineering Systems

24  Analytics?

25      A.   That's correct.



 1        Q.   Okay.  Dr. Farid, at one point when the

 2   research misconduct investigation committee was

 3   requesting a live interview with you, you provided a

 4   note that said you weren't able to participate.

 5        Do you remember that?

 6        A.   I do.  The note was from Erin Storm.

 7             MR. SULMAN:  Wait for a question.

 8             THE WITNESS:  Yeah.

 9             MR. CHABOT:  This will be Exhibit 20.

10             (Exhibit 20 marked for identification.)

11   BY MR. CHABOT:

12        Q.   Is that the note from Erin Storm that you

13   just referenced?

14        A.   Yes.  It's a note from Erin Storm who was

15   acting as my medical practitioner at the time.

16        Q.   Okay.  What were the medical conditions

17   that impaired your ability to adequately and

18   authentically participate in the interview that was

19   requested?

20             MR. SULMAN:  Objection.

21             You can answer.

22             THE WITNESS:  I met with Erin Storm and I

23   elaborated the -- how Dartmouth had been mistreating

24   me through a tenure denial, a research misconduct

25   inquiry, the research misconduct investigation, and



1    to ask him for his input concerning your progress

2    towards tenure.

3         A.   I had done that -- I had done that prior to

4    this email already.

5         Q.   Okay.  And what was his feedback at that

6    time?

7         A.   I generally got the sense that I was doing

8    fine, except for ENGS 22 as the hang-up.

9         Q.   Professor Lynd did tell you that that could

10   be a hang-up?

11        A.   He didn't use that word.

12        Q.   I'm paraphrasing using your terminology.

13        A.   Yeah, yeah.  He told me that the student

14   evaluations of ENGS 22 would certainly be looked

15   at -- would be looked at negatively, but if you show,

16   you know, improvement in the student evaluations,

17   then it should be okay.  And that's what I did show.

18        Q.   Again, until fall of 2020, correct?

19        A.   In the middle of COVID with a brand-new

20   teaching format, yes.

21        Q.   You requested to have Gene Santos and John

22   Zhang serve as sort of your two-person tenure review

23   committee, correct?

24        A.   Correct.

25        Q.   Okay.  And that request was honored,



1  correct?

2       A.   Yes.  Are we moving on from Exhibit 23?

3       Q.   We are moving on from Exhibit 23.

4       A.   Okay, thank you.

5            MR. SULMAN:  Do you have the time check?

6            VIDEOGRAPHER:  Five hours, 54 minutes.

7            MR. CHABOT:  Thank you.  Mark Exhibit 24.

8            (Exhibit 24 marked for identification.)

9  BY MR. CHABOT:

10      Q.   I want to ask whether you recognize the

11 document first, Professor Farid.

12      A.   This -- this document, I'm guessing, is

13 being taken out of -- out of the context of an email

14 that I had sent to Dean Abramson.  Like, there's no

15 mark that, you know, I wrote this.  I believe I wrote

16 this.  I haven't seen this document in a long time.

17 But it's being taken out of context of a much larger

18 email.

19           MR. CHABOT:  I'll mark Exhibit 25.  You may

20 want to look at these together.

21           (Exhibit 25 marked for identification.)

22 BY MR. CHABOT:

23      Q.   You can take whatever time you need to read

24 this, Professor Farid, but I just direct your

25 attention to paragraph 9 on the second page.  See if



```
 1  and retaliation.
 2  BY MR. CHABOT:
 3      Q.   Again, without asking for or trying to
 4  locate the version of the arts and sciences handbook
 5  or the Thayer handbook that was in force in 2016 when
 6  you say that Dean Helble told you that you couldn't
 7  get parental leave because Professor Khayal was also
 8  taking it?
 9      A.   I tried to access the arts and sciences and
10  the Thayer faculty handbook, and those were what
11  were, you know, publicly available through, like, a
12  Google search.
13      Q.   Didn't ask anybody for older copies?
14      A.   I wasn't aware of changes being made.
15      Q.   So you didn't ask for any older copies?
16      A.   I did not ask for copies of something that
17  I'm not aware of.
18           MR. CHABOT:  We'll mark Exhibit 26.
19           (Exhibit 26 marked for identification.)
20           THE WITNESS:  All right.
21  BY MR. CHABOT:
22      Q.   I assume that you're fairly conversant with
23  your curriculum vitae and your faculty personal
24  record, right?
25      A.   Yes.
```



1   Q.   This March 28th, 2021, version, do you have

2   any reason to dispute that this was the version that

3   you submitted to the tenured faculty to consider

4   along with your tenure application?  I can ask a

5   better question.

6       Did you submit this version of your curriculum

7   vitae and faculty personal record to the tenured

8   faculty at the Thayer School of Engineering as part

9   of your tenure application?

10          MR. SULMAN:  If you need to look it over,

11  look it over.

12          THE WITNESS:  So I'm looking at the date.

13  I know that this date is automatically generated.  So

14  it would reflect -- before I even look at its

15  contents, right, it would -- it would reflect that I

16  write my CV in something called "lay tech," so it

17  means that this document was turned into a PDF format

18  in -- on March -- March 28th, 2021.

19          Now --

20  BY MR. CHABOT:

21      Q.   The faculty deliberation on your tenure

22  vote, that was April 7th, 2021, correct?

23      A.   I don't believe I've answered your prior

24  question, sir.

25      Q.   Okay.  What I'm trying to ask is whether --



1  do you know or not, one way or the other --

2      A.   Yeah.

3      Q.   -- whether this is the version of your

4  curriculum vitae that was used and relied upon by the

5  Thayer School of Engineering's faculty in considering

6  your tenure application?

7           MR. SULMAN:  Objection.

8           You can answer.

9           THE WITNESS:  I'm trying to answer your

10  question.  I have to go back through my email records

11  and see when it was that I sent materials to the

12  tenure review committee.  We just spoke -- we just

13  spoke, in Exhibit 25, about me sending this document

14  on October 19th, 2020, and it says, in my last

15  correspondence to you on October 5th, 2020, I sent

16  you my faculty personal record, which is this

17  document on October 5th form -- October 4th -- sorry,

18  October 5th, 2020.

19           I know, from recollection, that I did send

20  an updated version, and at least once, maybe twice.

21  I don't recall.  I know for sure once.  And I don't

22  know what is the date of that submission.  It strikes

23  me as rather close to when the faculty vote was,

24  March 28th, 2021.

25  BY MR. CHABOT:



1    Q.   Is it important to you to make sure that

2    your curriculum vitae was thorough and accurate?

3    A.   I -- I did the very best I could to make it

4    as accurate as possible.

5    Q.   Okay.  And you knew, at least with the

6    versions that you submitted to the tenured faculty,

7    that they would be relying upon that curriculum vitae

8    in considering your tenure application, correct?

9    A.   That's correct.

10   Q.   I'd like to take a look at page 19 very

11   quickly.  And I just want to look at item number 5.

12   Do you see item number 5?

13   A.   Yes.

14   Q.   And that refers to a paper called a

15   tensor-based formulation of the heterofunctional --

16   of heterofunctional graph theory, correct?

17   A.   Correct.

18   Q.   And it notes that -- so this is in the

19   section journal papers under review, correct?  So

20   this is something that you have submitted?

21   A.   Yes.

22   Q.   And in that submission, Prabhat Hegde is

23   included as the third author, correct?  Was he

24   included as the third author in that submission?

25   A.   No, he was not.

