1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Vol. I, Pages 1-213

Exhibits 1-47

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AMRO FARID

    vs.                                              23-cv-426-SM

TRUSTEES OF DARTMOUTH COLLEGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    DEPOSITION BY ZOOM OF ALEXIS ABRAMSON, a witness called on behalf of the Plaintiff, pursuant to the Rules of Civil Procedure, before Karen D. Pomeroy, Registered Diplomate Reporter and Licensed Court Reporter (No. 71) in and for the State of New Hampshire, at 20 Ledyard Lane, Hanover, New Hampshire, on Tuesday, March 25th, 2025, commencing at 10:01 a.m.

```
 1  APPEARANCES:
 2  JOSEPH L. SULMAN, ESQUIRE
 3  Law Office of Joseph L. Sulman
 4  255 Bear Hill Road, Suite 204
 5  Waltham, Massachusetts 02451
 6  For the Plaintiff
 7
 8
 9  STEPHEN ZAHARIAS, ESQUIRE
10  Devine Millimet
11  111 Amherst Street
12  Manchester, New Hampshire 03101
13  For the Defendant
14
15
16  Also Present:   Amro Farid
17
18
19
20
21
22
23
24
```

```
                         INDEX
DEPOSITION OF ALEXIS ABRAMSON                    PAGE
Examination by Mr. Sulman                         6


                       EXHIBITS
Number                                           Page
Exhibit 1    Columbia Climate School webpage      211
*Exhibit 2   May 2020 Khalilnejad Paper, 137 pp.  211
Exhibit 3    NSF Award Abstract, 6 pp.            211
Exhibit 4    6/14/19 Letter                       211
Exhibit 5    Members Named to Energy and
             Sustainability Advisory Groups       211
*Exhibit 6   2/11/20 Email Chain                  211
Exhibit 7    Handbook of the Faculty of
             Arts & Sciences, 121 pp.             211
Exhibit 8    Thayer School of Engineering
             Faculty Roster, 2020/2021            211
Exhibit 9    3/9/20 Email                         211
Exhibit 10   Expert Report on Student Evaluations
             of Teaching                          211
Exhibit 11   Evaluation of Teaching Document      211
Exhibit 12   Student Evaluations of Teaching      211
Exhibit 13   5/22/20 Email Chain                  211
Exhibit 14   6/16/20 Email                        211
Exhibit 15   6/19/20 Email Chain                  211
Exhibit 16   7/2/20 Email Chain                   211
Exhibit 17   2/14/22 Letter/Attachments, 242 pp.  211
Exhibit 18   Farid Research Statement, 16 pp.     211
Exhibit 19   7/8/20 Letter                        211
Exhibit 20   5/21/20 Faculty 180 Document         211
Exhibit 21   7/13/20 Email                        211
Exhibit 22   9/7/20 Email Chain                   211
Exhibit 23   9/11/20 Email                        211
Exhibit 24   10/19/20 Letter                      211
Exhibit 25   10/19/20 Curriculum Vitae &
             Faculty Personal Record, 70 pp.      211
*Exhibit 26  Funding Document, AF004661-4665      211
*Exhibit 27  3/225/20 Committee Review, 12 pp.    211
*Exhibit 29  3/24/21 Committee's Tenure Review of
             Associate Professor Farid, 18 pp.    211
*Exhibit 30  4/7/21 Thayer Faculty Mtg. Minutes   211
```

```
1   Number                                              Page
2   Exhibit 32   5/11/21 Letter                         211
    Exhibit 33   NSF 3/30/17 Dear Colleague Letter      211
3   Exhibit 34   4/20/21 Email Chain                    211
    *Exhibit 35  5/2/20 Memorandum, 7 pp.               211
4   Exhibit 36   6/4/21 Letter                          211
    Exhibit 37   9/20/21 Email Chain                    211
5   Exhibit 38   9/21/21 Email Chain                    211
    *Exhibit 39  Personal Total Compensation Stmt.      211
6   *Exhibit 40  3/30/22 Email Chain                    211
    Exhibit 41   2/22/21 Email Chain                    211
7   Exhibit 42   1/7/22 Email Chain                     211
    Exhibit 43   1/18/22 Email Chain                    211
8   Exhibit 44   1/27/22 Email Chain                    211
    Exhibit 45   1/20/22 Email Chain                    211
9   Exhibit 46   2/8/22 Email Chain                     211
    Exhibit 47   Research Misconduct Policy and
10               Procedures, 19 pp.                     211
11
12  *Denotes exhibits requested to be deemed confidential
13
14  The following page/line designations refer to
15  portions of testimony requested to be deemed
16  confidential:
17  21/18, 39/13, 40/3, 87/4, 103/22, 116/16, 118/3,
18  128/8, 131/14, 138/10, 182/5, 185/7, 188/14
19
20
21
22
23
24  Exhibits Attached
```

5

1              STIPULATIONS
2        It is stipulated by and between counsel for
3    the respective parties that the deposition
4    transcript is to be read and signed by the
5    deponent under the pains and penalties of
6    perjury; and that the sealing and filing thereof
7    are waived; and that all objections, except as to
8    form, and motions to strike are reserved until
9    the time of trial; and that the witness may be
10   sworn remotely.
11                  * * *
12       MR. ZAHARIAS:  Joe, before we start, I just
13   want to make sure that we're agreeing on the same
14   stipulations that we had with respect to
15   Professor Farid's deposition.
16       MR. SULMAN:  Yes.  I was going to say that.
17       The parties have agreed to certain
18   stipulations not only for Professor Farid's but
19   for all -- well, actually, not for
20   Professor Farid's, because that was in person
21   actually.
22       We're going with the stipulations that we've
23   used for all of the Zoom depositions, which is
24   that the -- the witness will have 30 days to read

6

1      and sign, we'll waive the notary and agree that
2      we'll assume that the notary is -- as if it was
3      sworn, and we -- we agree that the witness --
4      both parties agree that the witness can be sworn
5      remotely and the -- and the -- we'll agree that
6      all objections except to form and motions to
7      strike will be reserved until the time of trial.
8          Is that agreeable?
9          MR. ZAHARIAS:  Yes.
10         MR. SULMAN:  Okay.
11                 ALEXIS ABRAMSON,
12     having been duly remotely sworn by the
13     reporter, was deposed and testified as
14     follows:
15                    EXAMINATION
16  BY MR. SULMAN:
17  Q.  Good morning.  Can you state your name for the
18      record.
19  A.  Alexis Abramson.
20  Q.  Okay.  And, Ms. Abramson, where are you located
21      right now?
22  A.  In Hanover, New Hampshire.
23  Q.  Okay.  Are you at the -- are you at Dartmouth's
24      location?

82

1  Q. Well, what I'm saying is is there a standard
2     definition, or is what you're saying what you
3     believe to be the generally accepted
4     definition?
5        MR. ZAHARIAS: Objection. Form.
6  A. I don't know if there's a standard definition; so
7     I suppose I would say it's what I believe to be
8     a -- the definition given my experience in the
9     field.
10 BY MR. SULMAN:
11 Q. Well, let me ask you about some examples.
12        Is an NSF EAGER grant a competitively awarded
13     grant?
14 A. My understanding is that doesn't go through a
15     solicitation process nor a peer review; so no.
16 Q. And why -- what is that understanding based on?
17 A. My experience as an academic for 25 years.
18 Q. Have you talked to anyone at NSF that told you
19     that EAGER grants don't go through competitive --
20     don't go through peer review?
21 A. Yes, I actually had an EAGER grant early on in my
22     career. It did not go through competitive
23     review.
24        That's my understanding that an EAGER grant

83

1    does not.  I don't know if that's written down,
2    but obviously I learned that somewhere along the
3    way.
4  Q. What about NSF CAREER grant?
5  A. Yes.  That's a solicitation, and it goes through
6    a peer review; so that would be a competitively
7    awarded grant.
8  Q. So the fact that there's a solicitation is what
9    makes it be peer review?
10 A. There could be solicitations at some agencies
11   that don't have peer reviews, but most of the
12   time, yes, a solicitation also includes a peer
13   review, which then leads to the awarding.
14 Q. I guess what I'm wondering is can't there be peer
15   review without solicitation?
16 A. I suppose that could happen too if a program
17   officer decided to send a proposal that didn't
18   come through a solicitation out for review by
19   some people.
20      I think a program officer could choose to do
21   that.
22 Q. And do all NSF EAGER grants not have -- not go
23   through solicitations?
24 A. I think you'd have to ask NSF for the specifics

1   around how they always or sometimes run those
2   processes.
3 Q. So your NSF EAGER grant did not go through a
4   solicitation?
5 A. Mine did not go through a solicitation; as far as
6   I know, did not go through a peer review, but I'm
7   also basing it on multitudes of conversations
8   I've had with program officers or other faculty
9   researchers about NSF EAGER grants.
10 Q. Okay. Were you aware that Professor Amro Farid
11   had an NSF EAGER grant?
12 A. I did not know that, I believe, until the faculty
13   discussion during his tenure-review case.
14 Q. Okay. And did you split -- did you -- did you do
15   a --
16 A. Or around that time, I should say.
17 Q. Did you do an inquiry to look at whether or not
18   there was a solicitation associated with his
19   grant?
20 A. Sorry. Can you say that again.
21 Q. Did you do any inquiry or research to determine
22   whether or not there was a solicitation with his
23   EAGER grant?
24 A. So after it was brought to my attention, I looked

85

1      it up and noticed it was an EAGER grant.  I
2      didn't know that at the time.  I thought it was a
3      regular NSF grant.  I did not investigate further
4      to find out if there was a solicitation because I
5      assumed there was not.
6 Q. Okay.  So did you believe that that grant was not
7      competitively funded?
8 A. That's right.
9 Q. And is it your recollection that you had this
10     conversation with Professor Farid about the
11     different types of funding as part of his
12     supplemental review in 2020?
13 A. Yes.
14 Q. Okay.
15 A. I don't think we specifically touched on NSF
16     EAGER grants, but yes.
17 Q. I've sent you Exhibit 15 in your deposition.  Let
18     me know when you have it open.
19 A. Okay.
20 Q. Okay.  This is an email exchange between you and
21     Professor Farid on June 19th, 2020.
22        Could you read it to yourself, please.
23 A. Okay.  Okay.
24 Q. And you say -- you first say it's good to speak

90

1    Professor Farid dated February 14th, 2022.
2        I just want you to turn your attention to
3    page 16 of the PDF.  It has page 11 on the actual
4    document on the bottom.
5        Let me know when you're there.
6  A.  Okay.  I'm on page 16.
7  Q.  Okay.  Is that your signature next to the signed
8    and dated February 11th, 2022?
9  A.  It looks like my signature.
10 Q.  Okay.  Do you recall signing a response to
11    charges of discrimination brought by
12    Professor Farid at the New Hampshire Commission
13    for Human Rights?
14 A.  I do recall this under advisement of counsel;
15    walking through this and then signing this
16    document.
17 Q.  Okay.  Thank you.  Can you turn to paragraph
18    33 -- I'm sorry.  Paragraph 23, which is on page
19    58 of the document; page 10 of the PDF.
20 A.  Yes.
21 Q.  Are you there?
22 A.  Yes.
23 Q.  Okay.  This document says Respondent admits that
24    Professor Farid discussed his tenure case with

1    Associate Dean Laura Ray and Dean Alexis Abramson
2    in the Spring of 2020, around the end of the
3    academic year; correct?
4  A. Yes.
5  Q. Okay. And the third sentence, can you read the
6    third sentence, please.
7  A. Respondent denies? That sentence?
8  Q. Yes.
9  A. Respondent denies that complainant was encouraged
10    to submit his dossier for consideration for
11    tenure, but admits that Dean Abramson indicated
12    that she believed that complainant had a strong
13    tenure case during these discussions, prior to
14    learning about weaknesses in his application that
15    were not apparent at the time.
16 Q. Thank you. And you didn't ask anyone to make
17    changes to that paragraph when it was written;
18    did you?
19       MR. ZAHARIAS: Objection to the extent that
20    the question seeks any privileged communications.
21 A. No.
22 BY MR. SULMAN:
23 Q. Okay. When -- as of July 2020, did you know that
24    Professor Farid had two more years on his tenure

1      track?
2  A.  Yes, I believe I did.
3  Q.  Okay.  Did you have any discussions with
4      Professor Farid about the tenure process and what
5      would happen if he was denied tenure?
6  A.  I don't recall if I went -- I'm sure we talked
7      about the tenure process.  I don't recall the
8      specifics.
9  Q.  So just -- and I just need to -- if you don't
10     recall, you don't recall it.
11         Can you say whether or not you advised
12     Professor Farid that if he was denied tenure, he
13     would enter his terminal year?
14 A.  I don't recall.
15 Q.  Do you know sitting here today whether Laura Ray
16     advised Professor Farid of that fact?
17 A.  You'd have to ask her.
18 Q.  I just sent you Exhibit 18.  Let me know when you
19     have it.
20 A.  Okay.  It's open.
21 Q.  Okay.  Do you recognize this as Professor Farid's
22     research statement?
23 A.  I can't say that I recognize it.  It's been a
24     while since I reviewed it.

1      meetings when we talked about his research
2      funding and the type of proposals he should be
3      submitting and things like that; so I do recall
4      having those conversations with him.
5          I didn't realize the specifics around like
6      the NSF EAGER grant or what the CRREL grant
7      really meant until, you know, this discussion in
8      large part.
9  Q.  So this discussion was the first time you
10     realized that the CRREL grant wasn't competitive?
11 A.  No, I'm not saying that.  I think there were some
12     things that were said during the discussion that
13     helped me see it in a different way, but I'm not
14     saying I didn't understand what it was.  I did.
15         But that's the purpose of the discussion is
16     to hear other people's views and to -- they --
17     you know, so you're not just limited by your own.
18         So I'm just saying the discussion sort of
19     opened up a different perspective for me.
20 Q.  What specifically in this discussion opened up
21     you to things that you did not realize before
22     about Professor Farid's research funding?
23 A.  Well, one thing the -- probably the most
24     prominent thing was the missing EAGER label on

1       the NSF grant and how it was unfortunate that
2       that wasn't included on his CV.
3  Q.   Anything else?
4  A.   I mean, I'd have to go back and reread all the
5       minutes to see if I could jog my memory.  I think
6       it's just hard for me to remember.
7  Q.   Well, you know, Exhibit 30's in front of you now;
8       so if you want, you can take your time to read
9       the minutes.  There's three or four pages of
10      minutes.
11 A.   Okay.  You'd like me to read that?  Take the time
12      to do that?
13 Q.   Yeah.
14 A.   Okay.
15 Q.   Again, just let me know when you're done.
16 A.   Okay.  Can you ask the question again then.
17 Q.   Yes.  So what comment, if any, during the faculty
18      discussion on Amro Farid's tenure case caused you
19      to re-evaluate your understanding of his funding
20      record?
21 A.   So I don't know that I -- I fully re-evaluated
22      his funding record.
23          I mean, I had -- I felt it was strong with
24      reservations, and so that -- I think I still

157

1  had -- I would say the NSF EAGER, pointing that
2  out, I do recall that being a surprise when I
3  didn't know, and so I would say that was the most
4  significant new piece of information.
5      I think John Zhang's comment about -- he was
6  an NSF program manager, also kind of influenced,
7  you know, my thoughts on -- on -- he also agreed
8  that there should be more competitively awarded
9  peer-reviewed kind of proposals; so I think I
10 could just speak to that in that way in
11 particular.
12     One thing I'll say is I guess I hadn't
13 quantified the amount in a way that some of the
14 faculty were presenting it.
15 Q. I'm sending you what is marked as Exhibit 32.
16 Let me know when you have it open.
17 A. Okay.  It's open.
18 Q. Exhibit 32 is a May 11th, 2021, letter from
19 Professor Farid to yourself where he says he'd
20 like to thank you for making use of the 2021
21 tenure review meeting to discuss external funding
22 over the last six years.
23 A. Hm-hmm.  Yes.
24 Q. Do you recall meeting with him to discuss

1            Did you believe that he tried to conceal
2       something?
3   A.  Well, that was part of the faculty discussion was
4       around the fact that why didn't he include it on
5       his CV was the question.
6   Q.  Well, you say "it."  What is the "it" you're
7       saying --
8   A.  The word EAGER.
9   Q.  And why is that word EAGER significant?
10  A.  Because most people who are familiar with NSF
11      funding would know that an EAGER grant is not
12      competitively awarded.
13  Q.  So it's your -- it's your belief that, as a
14      general matter of practice, NSF EAGER grants are
15      not competitively awarded?
16  A.  That's correct.
17          MR. ZAHARIAS:  Objection.
18  BY MR. SULMAN:
19  Q.  Okay.  Okay.  In the third paragraph here that
20      begins Beyond the CRREL funding, he writes here
21      Beyond the CRREL funding, I have shown -- I have
22      also shown an ability to compete head to head
23      with peers and win.  For example, my project
24      entitled "SSDIM:  Synthetic and Simulated Data