CONFIDENTIAL

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Case 23-cv-426-SM

AMRO FARID,

          Plaintiff,

v.

Trustees of Dartmouth College,

          Defendant.

_____


REMOTE DEPOSITION
OF
DEAN MADDEN


Monday, March 10, 2025
10:13 a.m. - 3:17 p.m.


Taken Via Zoom Videoconferencing


Reported By:
Lauren R. Tozzi, RPR

CONFIDENTIAL

2

1    REMOTE APPEARANCES:

2

3    On behalf of the Plaintiff:

4

5        JOSEPH L. SULMAN, ESQUIRE
         Law Office of Joseph Sulman
6        255 Bear Hill Road, Suite 204
         Waltham, Massachusetts 02451
7        (617) 521-8600
         jsulman@sulmanlaw.com

8

9

10   On behalf of the Defendant:

11

12       PIERRE CHABOT, ESQUIRE
         Devine Millimet
13       111 Amherst Street
         Manchester, New Hampshire 03101
14       (603) 226-1000
         pchabot@devinemillimet.com

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL

3

1              INDEX OF EXAMINATION

2    WITNESS:  Dean Madden

3    EXAMINATION                                    PAGE

4    Direct Examination by Mr. Sulman                 7

5

6

7                    -   -   -

8            C O N F I D E N T I A L

9                    -   -   -

10   CONFIDENTIAL                                   PAGE

11                                              32-33

12                                            155-161

13

14                   -   -   -

15             E X H I B I T S

16                   -   -   -

17   NUMBER              DESCRIPTION             PAGE

18   1              Provost Office Web Page        19

19   2              Research Misconduct Policy     21

20   3              Authorhship Guidelines         23

21   4              2-22-22 Email                  38

22   5              2-7 Email                      41

23   6              3-12-22 Email                  51

24   7              3-23 Email                     56

CONFIDENTIAL

4

1                    E X H I B I T S

2                        -   -   -

3       NUMBER                 DESCRIPTION                PAGE

4       8              4-6-22 Email                       61

5       9                    Email                        67

6       10                   Email                        68

7       11              6-27 Email                        70

8       12             7-22-22 Email                      74

9       13             7-25 Draft Report                  75

10      14             8-10-24 Letter                     78

11      15             8-10-22 Email                      83

12      16             12-7-22 Email                      96

13      17               1-10 Email                      102

14      18             12-23 Email                       107

15      19             Farid/Frowein Emails              110

16      20             Frowein/Madden Emails             113

17      21               5-18 Emails                     116

18      22             Panel Discussion Notes            120

19      23             TDC-0012736                       124

20      24             Hedge/Frowein Emails              134

21      25             8-30-22 Email                     136

22      26             9-6-22 Email                      145

23      27             Grants Email                      148

24      28             1-17 Email                        157

CONFIDENTIAL

5

1                    P R O C E E D I N G S

2        Deposition taken before Lauren R. Tozzi, RPR,

3    Stenographic Reporter and Notary Public in and for

4    the Commonwealth of Massachusetts at Large, in the

5    above cause.

6                    S T I P U L A T I O N S

7        It is hereby stipulated by and between counsel

8    for the respective parties that all objections

9    except objections as to the form of the question and

10   motions to strike, shall be reserved until the time

11   of trial.  It is further stipulated that the witness

12   shall read and sign the deposition within (30) days

13   of receipt of the transcript.

14                        -   -   -

15           MR. SULMAN:  Are we going to agree to what we

16       agreed to last time?  Well, I'll just say:  Are we

17       going to agree to the stipulations that we agreed

18       to last time, which is that we'll waive the notary,

19       the witness will have 30 days to read and sign but,

20       as you said, the errata sheet will be presumed to

21       be notarized?

22           MR. CHABOT:  The witness will have 30 days to

23       correct the transcript.

24           MR. SULMAN:  Yep.

CONFIDENTIAL

6

1          MR. CHABOT:  Signature is waived.  The witness

2     can have longer if we agree by mutual written

3     agreement.

4          MR. SULMAN:  Yep.

5          MR. CHABOT:  And neither party is going to

6     object to the use of the transcript on the basis

7     that the court reporter is not sitting in the same

8     room.

9          MR. SULMAN:  That's right.

10         MR. CHABOT:  All objections except as to

11    privilege and the form of the question are reserved

12    until the time of trial.

13         MR. SULMAN:  That's right.

14         Okay.  Now we can swear the witness in.

15         THE COURT REPORTER:  Please raise your right

16    hand.

17         (Oath administered.)

18         THE WITNESS:  I do.

19 Thereupon,

20                    (DEAN MADDEN)

21 having been first duly sworn or affirmed, was examined

22 and testified as follows:

23                    DIRECT EXAMINATION

24 BY MR. SULMAN:

CONFIDENTIAL

7

1    Q    Good morning, sir.  Can you please state your

2  name for the record?

3    A    Yes, it's Dean Madden.

4    Q    And that's M-A-D-D-E-N?

5    A    That is correct.

6    Q    Okay.  And where are you located right now?

7    A    I am in my office in the Parkhurst

8  Administrative Building at Dartmouth College.

9    Q    Great.  Have you ever had your deposition

10  taken before?

11    A    I have not.

12    Q    Okay.  Well, let me just go over a couple of

13  ground rules to make it a little easier.  As you know, I

14  represent Amro Farid in a lawsuit against Dartmouth

15  College.  You are here as a witness, you know, partially

16  named as defendant.  You are here to answer some

17  questions about information you may or may not know.  So

18  it's important that you answer all the questions

19  truthfully to the best of your ability.

20         Is there anything today, other than typical

21  memory issues, medical issues, medication or anything at

22  all, other than medical -- other than memory issues,

23  that may make it difficult to answer questions?

24         MR. CHABOT:  I'm just going to object to the

CONFIDENTIAL

21

1  Exhibit 2 to your deposition in the chat function?

2      A    Okay.  I have it.

3           (Exhibit Number 2 was electronically marked

4      for identification.)

5  BY MR. SULMAN:

6      Q    This is Dartmouth College's Research

7  Misconduct Policy and Procedures approved on June 10th,

8  2005; correct?

9      A    I would have to -- it appears to be.

10     Q    Okay.  And was this the policy that was in

11 effect through at least last year at some point?

12     A    Yes, if this is the original one that was in

13 effect in 2005, that was the one that was relevant at

14 the time.

15     Q    Okay.

16     A    Or until the most recent revisions, which were

17 about a year ago.

18     Q    Okay.  Why was this updated last year?

19     A    Well, there were a couple of issues that we

20 had discovered.  One was that it had unnecessary

21 references to the gender of certain roles, you know,

22 antiquated language from the period when it was defined

23 using: "He," or "Is," or "Her," or "She," or "Hers,"

24 and we have been trying to remove those kinds of

CONFIDENTIAL

23

1    for identification.)

2        THE WITNESS:  Okay.  I have it.

3 BY MR. SULMAN:

4    Q    Now, Exhibit 2 is a document entitled,

5 Authorship Guidelines; correct?

6    A    Sorry, Exhibit 2?

7    Q    Sorry, Exhibit 3.  Sorry, Exhibit 3?  Sorry.

8    A    Yes, yep.  Sorry.  Yes, it is entitled the

9 Authorship Guidelines.

10    Q    And is this the authorship guidelines or

11 policy of Dartmouth College?

12    A    It appears to be, yes.

13    Q    Okay.  So a couple of minutes ago, I was

14 asking you about how the provost office reviews or

15 addresses an allegation of possible misconduct involving

16 research of a professor; do you recall that?

17    A    Yes.

18    Q    And I referred to an authorship policy and

19 research misconduct policy; correct?

20    A    Yes.

21    Q    Are those policies, what are Exhibit 2 and

22 Exhibit 3, in your deposition?

23    A    Again, without studying them closely, they

24 appear to be, yes.

CONFIDENTIAL

24

1    Q    Okay.  At least as of the time of the Amro

2  Farid investigation; correct?

3              MR. CHABOT:  Object to the form.

4    A    Yes.

5  BY MR. SULMAN:

6    Q    And part of the provost role in this is to, is

7  determining which of these policies apply when somebody

8  makes an allegation concerning research involving a

9  professor; correct?

10    A    As -- yes, which or both.

11    Q    Both?

12    A    Right.

13    Q    Since you became vice provost of research, on

14  how many occasions have you been involved in addressing

15  an allegation concerning a possible inappropriate

16  conduct involving a professor's research?

17              MR. CHABOT:  I'm going to objection to the

18        form.  You can answer.

19    A    It's hard for me to give an exact count, but I

20  would say probably around a dozen cases.

21  BY MR. SULMAN:

22    Q    And when you say, "Around a dozen," do you

23  mean a dozen cases where the provost has delegated to

24  you that same responsibility?

CONFIDENTIAL

28

1  also undergone training which, again, I would suggest

2  you ask her about in more detail but, you know, as our

3  director of research integrity, she has an essential

4  role and, you know, provides advice to me and to others

5  in the office as we are developing our response to these

6  issues when they arise.

7      Q    Was the authorship guidelines already in place

8  when you became vice provost?

9          MR. CHABOT:  Objection to the form.  Go ahead.

10     A    Yes, they were.

11  BY MR. SULMAN:

12     Q    Was it already in its current form?

13     A    I believe there are -- yes, I believe that's

14  the case.  Again, without detailed analysis of the text,

15  yeah.

16     Q    Did you receive any training on how to

17  determine -- strike that.

18          Did you receive any training on how to

19  distinguish between an authorship dispute and an

20  allegation of research misconduct?

21          MR. CHABOT:  I'm going to object to the form.

22     You can answer.

23     A    So as part of the same process that I was

24  describing before, Professor Wybourne and I worked on,

CONFIDENTIAL

29

1  you know, talked about the interplay between these

2  policies.  And I would say that, on my own, I have also

3  spent some time looking into the boundaries and overlap

4  between these policies.

5  BY MR. SULMAN:

6      Q    Did you do that before Mr. Farid, the

7  allegation against Professor Farid?

8      A    Yes.

9      Q    And what independent research, and I don't

10  mean that in a -- any broad term.  I just mean that

11  loosely.  What independent research did you do?

12          MR. CHABOT:  Object to the form.

13      A    So this issue of authorship and plagiarism is

14  a complex issue, and there are a number of resources

15  that are available online, including descriptions from

16  the Office of Research Integrity, and the Department of

17  Health and Human Services, and guidance from the NSF and

18  other offices.  In addition, the professional societies

19  have, you know, various statements of publication ethics

20  and guidelines and, you know, those, we have consulted

21  those as well.

22  BY MR. SULMAN:

23      Q    Did you consult those for other specific cases

24  involving professors or just for your general knowledge?

CONFIDENTIAL

33

1   preliminary inquiry phase or preliminary assessment
2   phase.  I'm sorry.
3   BY MR. SULMAN:
4        Q    Did Professor Welch's case proceed past the
5   preliminary inquiry phase?
6        A    Yes.
7        Q    When did you first learn about any allegations
8   by a student brought against Amro Farid?
9        A    So I first heard about this through an, I
10  believe it was actually an email exchange, initially,
11  with the dean of the Thayer School and the provost.
12       Q    Who was the provost at the time?
13       A    I have to admit, I'm a little blurry on the
14  timeline.  It could have been Joe Helble or it could
15  have been Dave Kotz.
16       Q    And what did you learn?
17       A    Well, I understood --
18       Q    Sorry, strike that.
19       A    Yeah.
20       Q    Do you recall, as best you can, when you
21  learned it?
22       A    I want to say that it was in early 2021.  Or,
23  no, early 2022.  Sorry.
24       Q    Early in the year?

CONFIDENTIAL

34

1     A     Early in the year.

2     Q     I'll represent to you, based on the emails,

3     the year was 2022?

4     A     2022, yes.

5     Q     But your recollection is early in the year?

6     A     Yes.  Quite early, probably January or

7     February of that year.

8     Q     What did you learn?

9     A     Well, the initial, the initial understanding

10    was that there was a disagreement about the authorship

11    of a manuscript that had been raised, and that the

12    student, Mr. Hegde, had objected to his removal or his

13    noninclusion on a manuscript.

14    Q     And you first learned this, you believe, in an

15    email?

16    A     Yes.

17    Q     And was there any action item to follow up on

18    your part after this?

19          MR. CHABOT:  Object to the form.  You can

20    answer.

21    A     So, typically, the step there is to, as I

22    said, interrogate the individual policies.  So I did

23    have a conversation with Mr. Hegde, to get a better

24    sense of the nature of the complaint that he was making

CONFIDENTIAL

35

1    or the allegations.  He -- and, in fact, we suggested to

2    him that he reach out and attempt to resolve this issue

3    through direct discussions with Dr. Farid.  And I was

4    not a part of those further discussions, but that is

5    actually under the authorship guideline, the standard

6    operating procedure that is used to attempt to resolve

7    disagreements about authorship.

8            In parallel, the allegations appeared that

9    they could meet the test of plagiarism, and for that

10   reason, we explored a preliminary assessment under the

11   research misconduct policy.

12   BY MR. SULMAN:

13       Q    When you say, "We," who is we?

14       A    Well, so the preliminary assessment is done by

15   the provost or their designee, and the dean of the

16   school that is for the dean of the school that is

17   effected.  So in this case, that was Alexis Abramson as

18   the dean of Thayer, and me, as the designee of the

19   provost.

20       Q    And did you review the research misconduct

21   policy, yourself, or did you review it in conjunction

22   with Dean Abramson?

23       A    When you say did we review it, ourselves, I --

24       Q    I guess, explain to me the process of

CONFIDENTIAL

36

1    reviewing --

2          A    Yeah.

3          Q    -- the research misconduct policy?

4          A    So, in reviewing, doing the preliminary

5    assessment.

6          Q    You said that in this case, you also -- in

7    this case, the research misconduct policy was also

8    reviewed.  Explain to me the process and who reviewed

9    the research misconduct policy in this case?

10              MR. CHABOT:  Objection to the form.

11         A    Yeah, I'm not trying to be difficult.  I just

12   want to make sure I'm understanding.  So we don't -- we

13   don't review the policy in the sense of trying to change

14   the policy or --

15   BY MR. SULMAN:

16         Q    No, I'm sorry.  You said --

17              MR. CHABOT:  Are you going to let him finish,

18         Joe?

19              MR. SULMAN:  I thought he was finished.

20         Sorry.

21         A    No, it would be helpful.  I'm done.  Yeah,

22   sorry.

23   BY MR. SULMAN:

24         Q    I didn't mean review the policy, in terms of

CONFIDENTIAL

37

1    changing.  You used the word, "Interrogate the policy."

2    So in that sense --

3         A    Yeah.

4         Q    -- whether it's interrogate the policy or

5    whatever you do, who -- and what was the process in

6    looking at the policy to determine whether it applied to

7    the allegation brought by Mr. Hegde?

8         A    Got it.  Yeah, so I actually did prepare a

9    summary of the cases or the allegations, as I understood

10   them, and forwarded that to Dean Abramson, and asked for

11   her concurrence or disagreement with the recommendation

12   that this did fall within the gamut of the research

13   misconduct policy, and that the allegations were

14   sufficiently specific and credible to permit an inquiry

15   to take place.

16        Q    Okay.  I just want to make sure I understand

17   that.  You said you sent a summary of allegations and

18   then a recommendation to Dean Abramson?

19        A    This is the way we usually do this, is that

20   I'll, I know, because it's a joint discussion, but

21   someone has to take the lead and that's typically me,

22   given the responsibilities of the office or, Henrike

23   Frowein, if she has been the designated designee.  So in

24   this case I prepared a summary and kind of outlined the

CONFIDENTIAL

38

1   ways in which I believe this met the requirements of the

2   preliminary assessment.

3       Q    Dean Madden, I have just sent you Exhibit 4 in

4   your deposition.  Let me know when you have it open?

5       A    Okay.  Yeah.

6            (Exhibit Number 4 was electronically marked

7       for identification.)

8   BY MR. SULMAN:

9       Q    This is an email from Alexis Abramson to you

10  and David Kotz?

11      A    Yeah.

12      Q    February 2nd, 2022.  Subject line is,

13  "Forward:  Research misconduct complaint."  Take a

14  moment to read it and let me know, is this how you

15  believe that you first learned about the allegation from

16  Prabhat Hegde?

17      A    Yes.  Yeah, this is -- I think this looks like

18  the first, like it would have been the first email I

19  would have received about this.

20      Q    And forwarded the email from Mr. Hegde to

21  Alexis Abramson on January 18th, 2022; correct?

22      A    Yes.

23      Q    And this confirms that David Kotz was the

24  provost at that time; correct?

CONFIDENTIAL

39

1      A    Yes, that's correct.

2      Q    Okay.  When you reviewed the research

3 misconduct policy in January, February of 2022, you also

4 reviewed Mr. Hegde's January 18, 2022 email to

5 Ms. Abramson; correct?

6      A    Yes.

7      Q    That was his complaint; correct?

8      A    Well, that was part of his complaint.

9      Q    Well, what was also his -- what was the rest

10 of his complaint?

11     A    Well, I guess there were, you know, it was

12 extended during the conversation that I had with him and

13 he provided some additional detail about the -- his

14 perspective on the disagreement.

15     Q    Okay.  In his email, he writes in the second

16 paragraph that he notices that there was a publication

17 that was published as a single-author paper without any

18 attribution or acknowledgment to him, that he had

19 significantly contributed on; correct?

20     A    Yes.

21     Q    Okay.  And he asked for his name to be

22 included on that as an authorship; correct?

23     A    Yes, he did.

24     Q    But he didn't mention plagiarism in his email;

CONFIDENTIAL

63

1  question.  My question was:  By this email, are you

2  telling him that you are adding his allegation about the

3  tensor-based paper to the inquiry on Professor Farid's

4  other paper?

5          MR. CHABOT:  Object to the form, but you can

6      answer.

7      A    Yes.  I mean, yes.

8  BY MR. SULMAN:

9      Q    Okay.  And this was sent on April 2nd.  By

10 that date, you had Ms. Abramson's email that was part of

11 Exhibit 7; correct?  If you want to open up Exhibit 7,

12 you can.

13     A    Yes.

14     Q    Okay.  And so you had seen where Mr. Hegde

15 says he concedes that the bulk of the work on the

16 tensor-based formulation paper was done by Professor

17 Farid and the students involved primarily focused on

18 verifying the mathematics in the paper; correct?

19     A    Yes.

20     Q    Based on that concession, you still believed

21 his allegation rose to the level of possible research

22 misconduct?

23     A    Yeah, actually, it's a really important point.

24 It's actually not my decision or any of the provosts'

CONFIDENTIAL

64

1   decision in this process to, beyond the preliminary

2   assessment, make a decision as to whether or not a piece

3   of evidence is relevant.  That is really the purview of

4   the panel and in the case of the inquiry and the

5   committee in the case of an investigation.  So our

6   standard procedure is to, would not be to filter out

7   potentially-relevant issues based on our assessment of

8   whether or not they rise to the level of significance.

9           I'll add one thing which is, if we received an

10  allegation of some other form of professional misconduct

11  that was not relevant to the research misconduct

12  process, that we would not forward.  You know, like

13  human subjects compliance issue, as an example.

14          But if something potentially falls into this

15  space, once we are past the preliminary assessment

16  phase, institutional leadership is not supposed to be --

17  it's supposed to be very differential to the

18  decision-making of the inquiry panel and the

19  investigation committee.  I hope that's helpful.

20      Q    How does -- how does refusing to acknowledge

21  students who verify mathematics in the paper fall under

22  the definition of research misconduct?

23          MR. CHABOT:  Objection to the form.

24      A    Yeah.  And this is a decision that would be

CONFIDENTIAL

65

1    made by the inquiry panel as to whether or not the

2    magnitude of that contribution in that field would

3    typically rise to the level that would receive either

4    authorship, or acknowledgment, or some other form of

5    credit.

6    BY MR. SULMAN:

7         Q    Sure.  Before it gets to the inquiry phase,

8    there's a preliminary assessment phase; is that correct?

9         A    Correct.

10         Q    And at that phase, you determine whether

11    inquiry is warranted; correct?

12         A    That's right.

13         Q    And part of that is determining whether the

14    allegation falls within the definition of research

15    misconduct; correct?

16         A    That's correct.

17         Q    Okay.  So did you make any determination as to

18    whether or not the allegations brought by Mr. Hegde and

19    that Dean Abramson relayed in Exhibit 7, fell under the

20    definition of research misconduct?

21         A    Potentially, yes.

22         Q    And how did those potentially fall under the

23    definition of research misconduct?

24         A    Well, there was work that was performed,

CONFIDENTIAL

66

1   whether that would fall, I think in the definition of

2   plagiarism under the item results, and that we need to

3   have the inquiry panel assess whether or not, and then

4   ultimately an investigation committee, assess whether or

5   not it rises to the level that, you know, meets the test

6   of plagiarism and then, separately, research misconduct.

7       Q    So the students verifying Professor Farid's

8   work is, you consider that the students' work?

9            MR. CHABOT:  Object to the form.

10      A    Well, research that's collaborative, that

11  involves someone doing work as part of the process,

12  whether it's verification or experiments at someone

13  else's direction, can in some circumstances, be

14  appropriately acknowledged by a credit on a manuscript.

15  BY MR. SULMAN:

16      Q    Who did you select -- strike that.

17           Who did the provost office select for the

18      inquiry panel?

19      A    So we selected a panel of three faculty

20  members and I believe you have their names.  Sekhar

21  Ramanathan was the chair of the panel.

22      Q    And who are the other two?

23      A    I have to ask you to share the document with

24  me or refer to my notes for that.

CONFIDENTIAL

67

1          MR. SULMAN:  I just sent you Exhibit 9.

2          (Exhibit Number 9 was electronically marked

3     for identification.)

4          THE WITNESS:  Okay.

5  BY MR. SULMAN:

6     Q    Is this an email where they are telling

7  Director Farid, announcing to him that the research

8  misconduct policy -- strike that.

9          Is this an email telling Professor Farid that

10  the initial inquiry was opened?

11          MR. CHABOT:  Object to the form.

12     A    Just reviewing the email, please.  This is not

13  from me.  Yes.

14  BY MR. SULMAN:

15     Q    And, in general, was Director Frowein the main

16  point of contact with Professor Farid or were you?

17     A    It was Ms. Frowein.

18     Q    Is that just standard practice or was there a

19  reason for that?

20     A    No, it's standard practice.

21     Q    I have sent you Exhibit 10 through the chat

22  box.  Let me know when you have it open?

23     A    Okay.  I have it open.

24          (Exhibit Number 10 was electronically marked

CONFIDENTIAL

68

1    for identification.)

2  BY MR. SULMAN:

3       Q    Okay.  This is an email from Director Frowein

4  to Francis Magilligan, Peter Mucha?

5       A    Mucha, yep.

6       Q    And Professor Ramanathan?

7       A    Ramanathan, yes.

8       Q    Ramanathan.  Excuse me.

9       A    No, it's fine.

10      Q    Were those the members of the panel?

11      A    Yes, they were.

12      Q    Can you tell me why you chose those three

13 individuals to be on the panel?

14           THE WITNESS:  Yeah.  So --

15           MR. CHABOT:  Object to the form.  You can go.

16      A    Yeah.  So, I mean, according to our standard

17 criteria, we are looking for individuals who are, you

18 know, either have some familiarity with the area, the

19 discipline at issue, broadly defined, don't have other

20 conflicts of interest with the -- with either the

21 complainant or respondent as outlined in the research

22 misconduct policies and procedures.

23 BY MR. SULMAN:

24      Q    Was there anybody other than these three that

CONFIDENTIAL

75

1      Q     Did you draft it?

2      A     I did not.

3      Q     Okay.  Did you edit it?

4      A     I may have seen it.  I don't recall.

5      Q     Well, regardless of whether you have seen it

6  or not, do you know if you made or suggested any changes

7  to it?

8           MR. CHABOT:  Object to the form.

9      A     I really don't.

10  BY MR. SULMAN:

11     Q     I sent you Exhibit 13.  This is a similar

12  document.  It appears to be a similar document to

13  Exhibit 12, a draft inquiry report dated July 25th,

14  2022, from the same authors to yourself and Provost

15  Kotz.

16           Do you know any changes that were made between

17  the draft on July 22nd and the draft of July 25th,

18  without looking at it?

19     A     I would have to review them briefly.

20           (Exhibit Number 13 was electronically marked

21      for identification.)

22  BY MR. SULMAN:

23     Q     I mean, I'm wondering if, based on your

24  memory, you recall any?

CONFIDENTIAL

76

1        A      I do not.

2        Q      Okay.  Stepping back for a moment, can you

3    tell me what is the process of drafting an inquiry

4    report during an investigation under the research

5    misconduct policy?

6             MR. CHABOT:  Object to the form.

7        A      Yeah.  So it can take a number of forms.  In

8    general, I mean, I think the bedrock principle here is

9    that the decision on the content of the report is the --

10   is the purview of the faculty members on the panel or in

11   the case of the investigation, the committee.  And they

12   may, in some cases, draft the report themselves.  They

13   may also ask me, in some cases, or Director Frowein or

14   another designee, in theory, of the provost, to provide

15   an initial draft based on the conversation with them and

16   then they would have the final editing authority and

17   decision-making rights about that, about the draft,

18   which, you know, basically, they would finalize as their

19   report.

20   BY MR. SULMAN:

21       Q      And is there a general practice in terms of

22   who does the initial draft?

23       A      I mean, I think it is most typically done by

24   Director Frowein if she's been involved in the case all

CONFIDENTIAL

86

1   email, did you know at any point during this

2   investigation process, that Professor Farid made an

3   allegation that the investigation was in some way

4   retaliatory?

5       A    I don't have any firsthand knowledge of him

6   making an assertion that this specific process was

7   retaliatory.

8       Q    As of the time that the inquiry report was

9   issued, did you know that Professor Farid had a lawsuit

10  underway concerning his -- his tenure denial?

11      A    So, I -- yes.  I mean, he had referred to that

12  lawsuit in his response to the inquiry panel draft.

13      Q    Prior to receiving the inquiry panel response

14  from Professor Farid, were you aware that he had some

15  sort of litigation regarding his tenure denial?

16      A    I was aware that there was a conflict about

17  this.  I'm not sure when I first -- if this was when I

18  first learned there was an actual lawsuit pending.  I

19  wasn't involved in the lawsuit.

20      Q    Okay.  But fair to say that before receiving

21  Professor Farid's response to the inquiry report, you

22  were aware there was a conflict related to his tenure,

23  you are just not sure if you aware that it had risen to

24  the level of litigation?

CONFIDENTIAL

87

1           MR. CHABOT:  Object to the form.

2       A    That's correct.  Actually, I guess I should

3  say, I knew there was a conflict around his, some aspect

4  of his appointment but, you know, whether it was his

5  tenure or something else, even that was not -- was not

6  clear to me.  And I would say that, in general, we

7  had -- we had discussed early in the process the fact

8  that I would stay out of discussions relating to any

9  other processes that might be -- might not be relevant

10  to the research and misconduct process, in order to try

11  to minimize the possibility of any sort of interaction

12  between these two processes.

13      Q    What --

14      A    Which is our standard practice.

15      Q    Okay.

16      A    Sorry.

17      Q    And who did you have those discussions with?

18      A    So that was with Dave Kotz, actually, early in

19  the process, that he had said that there was some issue

20  and we did not go into it further, about a dispute, and

21  we just agreed that we would keep this as separate as we

22  possibly could.

23      Q    And can you tell me everything you recall

24  about that discussion with David Kotz; what did he tell

CONFIDENTIAL

91

1    provide it.

2         THE WITNESS:  So I guess I need to ask for

3    some guidance, because it is possible that we were

4    consulting with the Office of General Counsel, but

5    I do not recall specifically the details of what we

6    consulted on and what we did not.

7         MR. CHABOT:  Okay, that's fine.  It sounds

8    like you can answer to the extent you have a

9    memory.

10        A    Okay.  So I think the key point here is that

11   the process we designed and operationalized was, by its

12   nature, constructed in a way that could not, really

13   could not be retaliatory.

14   BY MR. SULMAN:

15        Q    Why do you say that?

16        A    Well, we have a legal obligation, in addition

17   to a moral obligation, to pursue allegations of research

18   misconduct according to our policy.  It's not optional

19   for us and, therefore, it can't be -- if one is

20   compelled to do something, legally, it isn't a decision

21   that one could make which would get a concept of a

22   retaliatory decision.

23        Q    And you felt, correct me if I'm wrong, but by

24   your testimony, you felt that your assessment of

CONFIDENTIAL

92

1  Mr. Hegde's allegations compelled you to open this

2  investigation?

3      A    That's correct, yes.

4      Q    There was no other choice?

5      A    I really don't think there was.

6      Q    And is that your answer in regards to his

7  subsequent allegation concerning the tensor-based

8  formulation paper?

9          MR. CHABOT:  Object to the form.

10     A    Well, we would have to -- we would need to

11 bring that into the investigation committee stage for

12 sure, because of the mandate that we need to pursue all

13 leads.

14 BY MR. SULMAN:

15     Q    But doesn't the lead also need to fall under

16 the research misconduct policy?

17     A    Once one proceeds to an investigation, if it

18 comes to that, the investigation committee is charged to

19 be aware of anything that may fall under the definition

20 of the research misconduct policy.  So we are aware of

21 any related research misconduct-specific allegations.

22 We need to make sure they are aware of those as well and

23 investigating them fully, and anything else that may be,

24 that in the literature, published literature, that may

CONFIDENTIAL

93

1  indicate that there's a pattern of behavior that goes

2  beyond the particular instances.

3      Q    This allegation regarding the tensor-based

4  formulation was brought forward by Mr. Hegde during the

5  inquiry phase?

6      A    That's correct.

7      Q    So you are talking about, you would have

8  brought it forward to the inquiry panel; correct?

9      A    Well, we would bring it forward to the inquiry

10  panel if that was necessary for them to reach their

11  decision, and then it certainly would need to have been

12  reviewed by the investigation committee if a decision

13  was made to then move ahead with an investigation.

14      Q    Well, the allegation was brought forward by

15  Mr. Hegde at the time of the inquiry?

16      A    That's correct.

17      Q    So was that allegation brought forward to the

18  inquiry panel?

19      A    I believe it was shared with them, yes.

20  Again, you know, I think it's really important to

21  understand that we have an obligation to investigate or

22  to do at least a preliminary assessment and then make

23  sure that any allegations of research misconduct are

24  dealt with.  So if a new allegation that could fall

CONFIDENTIAL

94

1   within research misconduct appears to us in relationship

2   to an ongoing case, we really have one of two choices,

3   which is to start a de novo process, with a preliminary

4   assessment from scratch and start a separate inquiry

5   panel; or, and this is what we more typically do, is to

6   merge the subsequent allegation into the ongoing process

7   to make sure that -- and in reality there are two

8   reasons for it.  One is we don't want multiple

9   investigation committees each having to try to pursue

10  overlapping sets of, you know, data.  And we also want

11  to make -- honestly, to keep the process as streamlined

12  as possible for all participants, consistent with the

13  regulations.

14      Q    When was Professor Farid informed that the

15  tensor-based formulation allegation was sent to the

16  inquiry panel?

17      A    I am not certain of that.  That would be

18  something that would have been managed by Director

19  Frowein.

20      Q    You oversaw the investigation; right?

21      A    That's correct.

22      Q    You oversaw it with professor Frowein;

23  correct?

24          MR. CHABOT:  Object to the form.

CONFIDENTIAL

101

1    not happened yet?

2            MR. CHABOT:  Object to the form.

3        A    Okay.  So let me be specific here.  So the

4    respondent is informed when the decision has been

5    finalized if the provost accepts or designee accepts the

6    report of the inquiry panel.  That is the point of at

7    which the respondent is informed that the process is

8    moving to the next -- well, I need to walk back even a

9    little further.  If the inquiry has recommended that an

10   investigation proceed and the provost has, you know, or

11   designee has accepted it, that's the point at which the

12   respondent would be notified that the decision on the

13   inquiry is final, and that an investigation is going to

14   be opened.

15   BY MR. SULMAN:

16       Q    And that can take place before the committee

17   members are identified?

18       A    Well, before the committee members are, you

19   know, kind of officially appointed into a role on the

20   committee, yes.

21       Q    And you predicted my next question.  The final

22   decision as to whether or not to move from the step of

23   inquiry to an investigation, that is the provost or the

24   designee who makes that decision; correct?

CONFIDENTIAL

1    A    Yes, that's -- well, they make the decision

2  whether or not -- okay.  Let me be clear.  They make the

3  decision whether or not to accept the report of the

4  inquiry panel.  So they don't -- they don't actually

5  have -- it's a subtle point in the research misconduct

6  policy, but the provost can either accept the report or

7  can request a revision, but it's actually, they can't

8  simply decide to set the whole process aside.

9    Q    Understood.  There's a panel that's appointed

10  that makes a decision, but it's ultimately a

11  recommendation to the provost?

12    A    That's correct, but the provost can either

13  accept it or request that the panel revisit.  Like,

14  there isn't the option to simply say:  Yep, thank you.

15  We are not moving ahead.

16        MR. SULMAN:  Okay.  I have delivered Exhibit

17     17 to you.  Let me know when you have it open.

18        (Exhibit Number 17 was electronically marked

19     for identification.)

20        THE WITNESS:  Okay.  I have it open.

21  BY MR. SULMAN:

22    Q    I'm referring to your email to Director

23  Frowein and Alexis Abramson at the bottom of the first

24  page on January 10th at 5:23 p.m.

CONFIDENTIAL

138

1  it's very important for us as an institution to make

2  sure that we are not transferring grants as a sort of

3  transfer of responsibility for an ongoing process, and

4  so we need to generally be careful around kind of

5  transitions when people are switching employment while

6  an investigation is ongoing.

7          So that's a general context.  What the

8  specific question is that Dr. Frowein wanted to look

9  into, I'm not aware of what her specific question was.

10  I'd have to refer you to her for that but, in general,

11  it is a time when we do need to be mindful of our

12  continuing obligations to continue, for example, a

13  research misconduct process or another process, even if

14  someone has left and even if a grant is transferring.

15  BY MR. SULMAN:

16      Q    Are you aware that Dr. Farid specifically

17  requested his funding from CRREL to be transferred to

18  the Steven's Institute?

19          MR. CHABOT:  Object to the form.

20      A    Okay.  I did hear about that, about that

21  request.

22  BY MR. SULMAN:

23      Q    Okay.  Were you involved in reviewing that

24  request?

CONFIDENTIAL

139

1      A      Yes, I participated in discussions around

2  that.

3      Q      Okay.  And were you involved in the decision

4  to deny that request?

5      A      Yes.

6      Q      Okay.  And why was that request denied?

7      A      So, as I said at the beginning, there are

8  fairly-well established principals for transferring

9  investigator-initiated grants.  So these are grants in

10  which a professor or other eligible principal

11  investigators submits an application on behalf of

12  Dartmouth, their idea directly to a funding agency to an

13  open call and then, you know, receives an award after

14  peer review and administrative approval by the funding

15  agency.  In general, those grants will transfer.  With

16  the faculty member, there's pretty well-established

17  process between universities when someone changes

18  employment.  That process does not apply to grants that

19  are awarded directly to the institution for specific

20  institutional or other purpose in which a faculty member

21  then may be a participant.  And in our opinion, that was

22  the case with this grant that came in in conjunction

23  with CRREL.  So the funding to CRREL had been requested

24  and supported by Dartmouth, in part to bring research

CONFIDENTIAL

1  activity to New Hampshire, both to UNH and Dartmouth in

2  collaborations with CRREL.  That purpose of the grant

3  would not be fulfilled if it was -- if the funding was

4  then transferred to a completely different institution.

5       Q    You don't deny that Professor Farid was a

6  principal investigator under that grant; correct?

7            MR. CHABOT:  Object to the form.

8       A    So he was a -- he was the PI on a pilot

9  project that was funded by that grant, but he was not

10  the PI of the overarching appropriation.

11 BY MR. SULMAN:

12      Q    No, but he was not requesting the overall

13 appropriation to be transferred.  He was requesting his

14 portion to be transferred; correct?

15           MR. CHABOT:  Object to the form.

16      A    Yes.  And I will say with confidence, when

17 people are awarded pilot grants or some sub-grants out

18 of a larger current project award that came to

19 Dartmouth, it would be very unusual for us to transfer

20 that funding out of state or even out of the

21 institution.  I run an institute that issues pilot

22 awards, and it's actually the funding is specifically

23 restricted to a subset of states and that's the idea of

24 the mechanism.  And we are not allowed, you know, the

CONFIDENTIAL

141

1   funding is not allowed to go to states that are not part

2   of that funding mechanisms.  So there are often

3   constraints on the transfers of funds for sub-awards,

4   even if the individual is the PI on that pilot.

5   BY MR. SULMAN:

6       Q    When you say, "Not allowed to," not allowed to

7   what?

8       A    Well, in the case of the CRREL award, it was

9   not consistent with the spirit in which the

10  appropriation was made.

11      Q    So you are saying not allowed to by, you are

12  not referring to any law or rule, you are talking about

13  by the spirit, right, what the people who want -- asked

14  for the award, originally envisioned it as; is that --

15          MR. CHABOT:  Objection.  Sorry, Joe.

16      A    Yes, it's the terms under which that

17  appropriation was requested and granted.

18  BY MR. SULMAN:

19      Q    All right.  You keep on saying, "Terms," so

20  I'm not sure.  I'm not trying to be difficult?

21      A    Yeah.

22      Q    In terms of a written document or you also

23  said, "Spirit?"

24      A    Yeah.

CONFIDENTIAL

142

1    Q    So these are kind of different things, in my
2    view, so I'm just trying to understand your answer?
3              MR. CHABOT:  Form.
4    A    So I would have to actually refer you to the
5    Office of Sponsored Projects if we are going to talk
6    about exactly the details about sort of the legal
7    structure of the contract, which was administered by
8    CRREL and sent to Dartmouth as a sub-award.  But, in
9    general as a principal, the status as a principal
10   investigator on a pilot award is not something where
11   there is sort of a well-established expectation that a
12   grant would transfer to another institution.
13   BY MR. SULMAN:
14   Q    Forgive my ignorance, but when -- what is a
15   pilot award in comparison to a typical research grant?
16   A    Yeah.  So, again, as I was describing sort of
17   a true -- the principal investigator who starts an
18   investigator-initiated award has an idea and applies it
19   directly to the funding agency to pitch that idea which
20   is then reviewed by peers and then a funding decision is
21   made.  So we, as potentially all universities, have a
22   clear understanding that it's reasonable for a faculty
23   member to take that over with them when they transfer,
24   because that award was individually reviewed using the

CONFIDENTIAL

151

1      A     I do not.

2      Q     Was it before or after the decision -- the

3    announcement was relayed to him regarding the

4    investigation committee?

5      A     I'm not sure as to the time, relative

6    timelines.  I mean, I would say that the research

7    misconduct, the status of it, in terms of a

8    recommendation regarding the inquiry panel was not --

9    does not have a dispositive role in whether or not that

10   grant should have transferred.

11     Q     In your view, they are totally unrelated?

12           MR. CHABOT:  Object to the form.

13     A     So, in my view, the presence, the ongoing

14   status of a research misconduct process is related to

15   our reporting obligations, but the specific stage that

16   we are at, short of completion, there's -- that's not --

17   that's not the -- that's not really central to the

18   decision.

19   BY MR. SULMAN:

20     Q     When you say, "That's not really central to

21   the decision," what do you mean by that?

22     A     Well, it's just, I mean, I was describing, you

23   know, a couple of questions back, the really fundamental

24   decision around whether to transfer the CRREL funding

CONFIDENTIAL

152

1  was a question of our, you know, obligations under

2  the -- under the terms of which the appropriation was

3  provided and the mechanisms by which the funds were then

4  allocated to internal researchers; not the, sort of,

5  the research misconduct process.

6          The timing of the decision and our making sure

7  that if we did have reporting obligations, we could

8  execute them, the timing of the decision, you know,

9  would have, you know, did depend to some extent when we

10  had concluded the research misconduct process, right.

11  So that there are two separate issues here.  One is the

12  reporting issue, the other is the issue around whether

13  or not it was appropriate to transfer the funds.

14      Q    So then was -- we looked at an exhibit where

15  the decision to open the research misconduct

16  investigation was relayed to Professor Farid on May 2nd,

17  2023; do you recall that?

18      A    Yes, I do.

19          MR. CHABOT:  Object to the form.

20  BY MR. SULMAN:

21      Q    Okay.  If that's when the decision to open the

22  investigation was relayed to Professor Farid, was it --

23  is it your recollection that the timing of the denial of

24  the CRREL transfer would have been relayed to him around

CONFIDENTIAL

153

1    that same time?

2        A    Again, I really don't recall the temporal

3    relationships there.

4    BY MR. SULMAN:

5        Q    Okay.

6        A    Sorry, but I just don't know the timeline.

7        Q    No, that's okay.

8        A    Yeah.

9        Q    But, that the investigation being open then,

10   that timing would have coincided with the CRREL funding

11   being denied because they are related?

12           MR. CHABOT:  Object to the form.

13       A    Oh, no.  Actually, they are not.  In the sense

14   that the, as I was trying to describe, the decision as

15   to whether or not the CRREL funding should be

16   transferred, could be resolved independently of whether

17   or not a research misconduct investigation was ongoing.

18   Because, really, it relied, the whether or not, not the

19   time, but the whether or not funds should be -- were

20   eligible to be transferred, depended on the nature of

21   the award, not on the -- not on the research misconduct

22   process.

23   BY MR. SULMAN:

24       Q    Okay.  So can you clarify what you were --

DEPOSITION ERRATA SHEET

Witness:        Dean Madden

Date:            March 10, 2025


I, Dean Madden, have read the transcript of my testimony on March 10, 2025, in the matter of *Amro Farid v. Trustees of Dartmouth College*, and the same is true and correct, to the best of my knowledge and understanding, with the exception of the changes noted below:

| Pg/Line | Reads | Should read |
|---|---|---|
| 7:15 | partially | not |
| 10:22 | proforma | pro forma |
| 11:01 | proforma | pro forma |
| 11:03 | 2022 | 2002 |
| 11:04 | 2022 | 2002 |
| 11:05 | 2022 | 2002 |
| 11:18 | 2022 | 2002 |
| 32:18 | Gill | Gil |
| 43:11 | test -- text | text |
| 44:09-:13 | And what did Mr. Hegde allege that led you to believe that his allegations—strike that. What did Mr. Hegde allege that led you believe that Professor Farid possibly—misconduct possibly fell under this definition. | Q: And what did Mr. Hegde allege that led you to believe that his allegations—strike that. What did Mr. Hegde allege that led you believe that Professor Farid possibly—misconduct possibly fell under this definition. |
| 51:23 | allegations | instructions |
| 62:12 | touch or any | any |
| 64:17 | differential | deferential |
| 67:07 | Director | Professor |
| 84:07 | walker | Walker |
| 105:23 | fall in | follow |
| 114:21 | date of loss | date |
| 131:21 | governments | governance |
| 142:18 | has an idea and applies it | has an idea and applies |

I verify that the foregoing statement is true under penalty of perjury.


Dated: April __, 2025

Dean R. Madden