1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AMRO FARID

     vs.                                    23-cv-426-SM

TRUSTEES OF DARTMOUTH COLLEGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


    DEPOSITION BY ZOOM OF KENNETH LOPARO, a witness called on behalf of the Plaintiff, pursuant to the Rules of Civil Procedure, before Karen D. Pomeroy, Registered Diplomate Reporter and Licensed Court Reporter (No. 71) in and for the State of New Hampshire, ███████████████████████████████████████████████████████████████████ commencing at 10:00 a.m.

```
                                                              2
 1   APPEARANCES:
 2   JOSEPH L. SULMAN, ESQUIRE
 3   Law Office of Joseph L. Sulman
 4   255 Bear Hill Road, Suite 204
 5   Waltham, Massachusetts 02451
 6   For the Plaintiff
 7
 8
 9   PIERRE CHABOT, ESQUIRE
10   Devine Millimet
11   111 Amherst Street
12   Manchester, New Hampshire 03101
13   For the Defendant
14
15
16   Also Present:   Amro Farid
17
18
19
20
21
22
23
24
```

1                        INDEX
2  DEPOSITION OF KENNETH LOPARO                         PAGE
3  Examination by Mr. Sulman                            4
4
5
6
7
8
9
10
11
12                       EXHIBITS
13 Number                                               Page
14 Exhibit 1   Loparo ISSACS Webpage                    194
   Exhibit 2   A Profit-Maximizing Security-
15             Constrained IV-AC Optimal Power
               Flow Model & Global Solution             194
16 Exhibit 3   7/21/23 Email Chain                      194
   Exhibit 4   Screenshot of IV-ACOPF Full Paper        194
17 Exhibit 5   10/15/23 Farid Submission, 310 pp.       194
   Exhibit 6   10/26/23 Email Chain                     194
18 Exhibit 7   Research Misconduct Policy and
               Procedures                               194
19 Exhibit 8   4/10/22 Letter                           194
   Exhibit 9   10/18/24 Draft Report                    194
20 Exhibit 10  Exhibits to Draft Investigation
               Report-Farid                             194
21 Exhibit 11  WhatsApp Document, 64 pp.                194
   Exhibit 12  11/18/24 Letter                          194
22 Exhibit 13  12/12/24 Final Report                    194
23
24 Exhibits Attached

4

```
 1                    STIPULATIONS
 2        It is stipulated by and between counsel for
 3    the respective parties that the deposition
 4    transcript is to be read and signed by the
 5    deponent under the pains and penalties of
 6    perjury; and that the sealing and filing thereof
 7    are waived; and that all objections, except as to
 8    form, and motions to strike are reserved until
 9    the time of trial; and that the witness may be
10    sworn remotely.
11                       * * *
12                   KENNETH LOPARO,
13    having been duly remotely sworn by the
14    reporter, was deposed and testified as
15    follows:
16                    EXAMINATION
17  BY MR. SULMAN:
18  Q.  Good morning, sir.
19  A.  Good morning.
20  Q.  Can you please state your name for the record.
21  A.  You're going to have to speak more clearly, Joe.
22        I have a hearing problem, and you're coming
23    in garbled; so try to speak more clearly if you
24    can.
```

```
                                                                    5
 1   Q.   Can you please state your name for the record.
 2   A.   Yes.  Kenneth, middle name is Alan, Loparo,
 3        L-o-p-a-r-o.
 4   Q.   Sir, where are you located today?
 5   A.   I can't understand you.  What did you say?
 6   Q.   Where are you located today?
 7   A.   ████████████████████████████████████████████████
          ████████████████████████████████████████████████
 9   Q.   Okay.  Are you at your office?
10   A.   I'm at home.
11   Q.   At home.  Okay.  And do you have any documents
12        that you'll be looking at today in front of
13        you?
14   A.   I'm sorry?  Do I have any documents?  No.
15   Q.   Do you have any documents in front of you that
16        you'll be looking at?
17   A.   No.
18   Q.   Okay.  Do you have any documents on the computer
19        that you'll be looking at in front of you?
20   A.   No.
21   Q.   Okay.  Great.  Have you ever had your deposition
22        taken before?
23   A.   I have.
24   Q.   Okay.  When was the last time?
```

82

1  A.  I believe so.
2  Q.  Okay.  Under Section B, it says -- I'm going to
3      begin with the first -- the No. 1.
4          It says In conducting the investigation, the
5      investigation committee shall.
6  A.  Yeah.
7  Q.  Interview each respondent, complainant, and any
8      other available person who's been reasonably
9      identified as having information regarding any
10     relevant aspect of the investigation, including
11     witnesses identified by the respondent, and
12     maintain detailed records.
13 A.  I see it.
14 Q.  Did I read that correctly?
15 A.  I believe you did.
16 Q.  Okay.  What persons did the committee interview
17     during its investigation process of Mr. Hegde's
18     allegations?
19 A.  I couldn't understand your question.
20 Q.  What persons did the committee interview during
21     its investigation process concerning Mr. Hegde's
22     allegations?
23 A.  We interviewed Prabhat.
24 Q.  Anyone else?

83

1  A.   And we tried to interview Professor Farid.
2  Q.   Did you try to interview anyone else?
3  A.   Well, we asked, several times, to have an
4       interview, which that policy says we're entitled
5       to.
6  Q.   My question is did you try to interview anyone
7       else?
8  A.   No, not that I'm aware of.
9  Q.   Can you turn to -- or can you scroll down to
10      Subsection D that says Investigation Report.
11 A.   Okay.
12 Q.   Are you there?
13 A.   I'm there.
14 Q.   Okay.  This says -- this section is about the
15      investigation report; correct?
16 A.   Hold on.  Go ahead.  Say that again.
17 Q.   This section is about the investigation report;
18      correct?
19 A.   Yes.
20 Q.   Okay.  In the second sentence, it says In
21      addition, the investigation report shall provide
22      for each separate allegation of research
23      misconduct identified during an investigation a
24      finding as to whether research misconduct did or

1      first draft of the report, was that in a meeting
2      or over email; if you recall?
3  A.  I don't remember.
4  Q.  Okay. Did you understand what would be contained
5      in that first draft of the report?
6  A.  No, because we didn't go forward with a first
7      draft; so there was no discussion about format,
8      content, nothing; so we -- the committee made
9      the -- the committee made the decision to
10     disband.
11 Q.  And you -- sorry. Go on.
12 A.  Including myself.
13 Q.  When you say including yourself, what --
14     including -- what do you mean including yourself?
15 A.  Myself, Andrew, and Prasad all resigned.
16 Q.  You all resigned?
17 A.  Yes.
18 Q.  Okay. When did you resign from the committee?
19 A.  I don't know. Sometime in -- I don't know.
20          You have the -- I don't remember the exact
21     dates, but it was probably Spring -- sometime
22     around Spring of 2024.
23 Q.  Why did you resign from the committee?
24 A.  It came to our attention that there was a lawsuit

1        that had been filed against Dartmouth by
2        Professor Farid that we were completely unaware
3        of, and we decided at that point that, based on
4        the voluminous document that he provided that
5        we've already discussed and the fact that we
6        became -- we were made aware of this additional
7        suit, we said, okay, we're done.
8   Q.   And what -- what about the lawsuit made you want
9        to resign?
10  A.   I can tell you from my own perspective.
11  Q.   I don't want you to talk for anyone else.  I want
12       you to tell me why you resigned.
13  A.   Right.  So in policies at Case Western Reserve
14       University when there are issues between a
15       faculty member and a student or a faculty member
16       and another faculty member or a faculty member
17       and the administration, these are internal
18       processes, which is what I viewed we had.
19            The minute outside counsel gets engaged,
20       these processes immediately stop, and now it
21       becomes something that faculty -- you know,
22       that -- you know, I did not want to be engaged
23       with, and so -- and I think Andrew felt the same
24       way and so did Prasad.

```
 1  Q.  When you say outside -- the minute outside --
 2      what was the word you used?
 3  A.  Outside counsel.
 4  Q.  You mean -- counsel; you mean like lawyers?
 5  A.  Yes.
 6  Q.  Okay.  Are you referring to people like me and
 7      Attorney Chabot?
 8  A.  I'm talking about lawyers, yes.
 9  Q.  Okay.
10  A.  Because it's an internal process, and it's meant
11      to be an internal process.
12  Q.  Okay.  And did you inform Dartmouth that you
13      wanted to resign?
14  A.  Yes.  We all three resigned.
15  Q.  Okay.  And did -- does Dartmouth accept your
16      resignation?
17  A.  They did.
18  Q.  At some point, did you become involved again in
19      the committee?
20  A.  Yeah, they asked me.  They came back and they
21      said would you be willing -- as a good academic
22      citizen, would you be willing to help.
23          I said I don't feel that comfortable about
24      what's going on, and they said don't worry; it's
```

1           okay, these are separate issues.  I said I
2           understand that.  And they said that's okay.
3               I said, well, all right.  If you can
4           reconstitute a committee and you can get me
5           re-engaged and I feel comfortable with a
6           reconstituted committee, as a good citizen, I'm
7           willing to help out.
8    Q.    And who contacted you on behalf of Dartmouth?
9    A.    My conversations have only been with Henrike.
10              I don't deal with anybody else except Henrike
11          and of course Andrew and Prasad.
12   Q.    And how long after you resigned did Ms. Frowein
13          contact you about rejoining?
14   A.    Maybe it was a month or two.  I don't remember
15          the exact time period.
16   Q.    And --
17   A.    It's all in the records.
18   Q.    Well, not actually all in the records, but that's
19          okay.
20              Considering you felt so strongly about
21          wanting to resign, how come you rejoined so
22          quickly?
23              MR. CHABOT:  Object to the form.
24              You can answer.

1  A.  What do you mean "quickly"?
2  BY MR. SULMAN:
3  Q.  Under two months seems pretty quick to me, but --
4  A.  Henrike -- I'm sorry.
5        MR. CHABOT:  I'm objecting to the form.
6        You can go ahead.  I'm sorry.
7  A.  Okay.  Henrike got back to me and said that would
8      I be willing to help, and I said, well, I'll make
9      that decision after I understand what the next
10     committee that's constituted looks like and
11     issues that I have how -- you know, in particular
12     with respect to how this very voluminous document
13     would be meticulously reviewed so that all of the
14     facts that were contained in there would be
15     available in a form that I could easily review
16     and understand because I'm not spending hours and
17     hours and days and days to go through that
18     document.  That's -- you know, I've got a life.
19        And so if you can reconstitute a committee
20     and you can guarantee me that things will be done
21     in a way that the facts will ultimately be what
22     drives the conclusion, then I can help you.
23 Q.  Okay.  And so -- okay.  Was this a conversation
24     over the phone?

1  A.  This was a conversation, I believe so.
2  Q.  Okay.  Do you recall anything else that you said
3      to her or she said to you in this conversation?
4  A.  No.  She said she really appreciated that I would
5      even consider because I was pretty clear when we
6      disbanded -- we all three were, and -- you know,
7      there were -- so I said okay.  I'll be willing to
8      help to try to close this out and come to a
9      reasonable conclusion for both Prabhat and
10     Professor Farid.
11 Q.  Okay.  And so is it fair to say at the end of
12     this conversation, was there any -- strike that.
13         At the end of this conversation, was any
14     decision made?
15 A.  I told you that until she reconstituted a
16     committee and I had an opportunity to meet with
17     those people and we came to an understanding as
18     to how the process needed to continue going
19     forward in order that I would even be willing to
20     engage, I would not commit.
21 Q.  Okay.  So is the answer no, at the end of the
22     meeting there was no decision made?
23 A.  No, I just -- I agreed to meet with whoever would
24     be on the committee going forward and, after that

```
1       meeting and a discussion and my understanding of
2       how the process would go forward, I would then
3       make a decision.
4   Q.  Okay.  What was the next step in your process
5       that led to your rejoining this committee?
6       Whether it was a meeting or conversation or what
7       have you.
8   A.  She introduced me to Mark Barnes.
9   Q.  And how -- how long was that after your
10      conversation with Director Frowein?
11  A.  Yes.
12  Q.  No.  How long after?
13  A.  Oh, I don't know.
14  Q.  Okay.  And how were you introduced to
15      Mark Barnes?  Was it over a Zoom?  In person?
16      How?
17  A.  She introduced us through email, and then --
18  Q.  Do you recall --
19          MR. CHABOT:  Joe, he was still talking I
20      think.
21          THE WITNESS:  Pardon?
22          MR. CHABOT:  Were you still trying to answer?
23          THE WITNESS:  I was.
24          MR. CHABOT:  Okay.  Let him finish.
```

1  A.  She introduced us through email, and then Mark
2      and I had a private Zoom meeting between the two
3      of us.
4  BY MR. SULMAN:
5  Q.  Okay. On that email, do you recall if anyone
6      else was on that email besides you, Mark Barnes,
7      and Director Frowein?
8  A.  I don't know.
9  Q.  Do you recall was any attorney on that email?
10 A.  I don't think so. I don't know. I don't know.
11 Q.  Was any --
12 A.  All I know --
13 Q.  Was any general counsel?
14 A.  All I know was an introduction to Mark Barnes.
15         MR. SULMAN: Well, we don't have any emails
16     from Mark Barnes you produced; so ....
17         MR. CHABOT: Yeah, Joe, I disagree with you.
18     I've seen them. I've seen them with Bates
19     numbers. I don't know what to tell you.
20 BY MR. SULMAN:
21 Q.  And what did you understand Mark Barnes' role to
22     be on the committee?
23 A.  Pardon me?
24 Q.  What did you understand Mark Barnes's role to be

```
 1        on the committee?
 2   A.   He was a committee member.
 3   Q.   Did you know Mark Barnes before this?
 4   A.   Nope.
 5   Q.   Were you familiar with Mark Barnes' work?
 6   A.   I had no idea who he was.  I had never met him
 7        and never heard of him.  I knew nothing.
 8   Q.   Can you describe the nature of your work with
 9        Mark Barnes on the --
10   A.   I'm sorry?
11   Q.   Can you describe the nature of your work with
12        Mark Barnes on the investigation.
13   A.   We were the same as committee members in the
14        original investigation.
15             We were just both committee members.  That's
16        it.
17   Q.   No, I understand that.  But what was the -- what
18        work did you do together on the investigation?
19             MR. CHABOT:  Object to the form.
20             You can answer.
21   A.   We reviewed material, discussed what we felt, and
22        came to a conclusion.
23   BY MR. SULMAN:
24   Q.   How many meetings did you have with Mark Barnes?
```

112

1  A.  Yes.
2  Q.  The first full paragraph on page 3 starts On
3      July 11th, 2023, Dartmouth's external litigation
4      counsel responded to Professor Farid's
5      objections -- strike that.  I'm sorry.
6  A.  Okay.
7  Q.  I wanted to strike that.
8  A.  Pardon me?
9  Q.  I'm -- ignore that.
10 A.  Ignore that?
11 Q.  Yes.
12         MR. CHABOT:  Yes.
13         THE WITNESS:  Okay.
14 BY MR. SULMAN:
15 Q.  Would you turn to page 3, please.
16 A.  I'm on page 3.
17 Q.  Okay.  The second half of the page it says In
18     early June 2024, two committee members,
19     Drs. Jayanti and Campbell, resigned from the
20     committee.
21         Do you see that?
22 A.  I do.
23 Q.  You also resigned from the committee initially;
24     correct?

113

1  A.  I did, but then I joined, right.
2  Q.  But you also resigned initially; correct?
3  A.  I did.
4  Q.  Then it says the resignation related to three key
5      events, and the third one is -- says instead of
6      agreeing to appear before the committee to
7      discuss allegations, Professor Farid sent a
8      311-page document to the committee without
9      explaining what the documentation was or how it
10     related to the proceeding.
11         Do you see that?
12 A.  I do.
13 Q.  Okay.  And you believe that Professor Farid did
14     not explain what the -- what his submission was
15     or how it related to the proceeding?
16         MR. CHABOT:  Object to the form.
17         You can answer.
18 A.  I think I told you earlier that it was impossible
19     to digest and that that statement there is simply
20     just what the committee felt at that time.
21 BY MR. SULMAN:
22 Q.  In -- during the investigation, when did the
23     committee provide Professor Farid with access to
24     the Overleaf repository controlled by