Page 182

VOL. 2

PAGES 182 - 278

EXHIBITS 25 - 27

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF NEW HAMPSHIRE

Civil Action 1:23-cv-00426-SM

----------------------------------------

AMRO FARID,                              )

            Plaintiff            )

v.                                       )

TRUSTEES OF DARTMOUTH COLLEGE,           )

            Defendant            )

----------------------------------------

CONTINUED VIDEOCONFERENCE DEPOSITION OF

JOHN MARK BARNES

Tuesday, April 22, 2025

12:03 p.m. - 2:41 p.m.

THE WITNESS APPEARED REMOTELY FROM

Boston, Massachusetts

Reporter: Lauren M. Mitchell, CSR, RPR, CRR

(RSA 310-A:179)

License No. 157



Page 189

1     A.  I do not recall that, no, I don't, but I

2  mean, you asked me a lot of questions that day.  So,

3  I don't recall you asking me specifically about

4  this.

5     Q.  Well, do you recall in sending the draft

6  investigation report to Dean Madden, that the

7  Committee comprised of you and Professor Loparo made

8  some recommendations to the provost?

9          MR. CHABOT:  I'll object to the form.

10          You can answer, sir.

11     A.  A draft report is a draft report.  The draft

12  report is not directly making recommendations to the

13  provost.  It's a draft.

14     Q.  Do you recall that the draft report states

15  that there are recommendations to the provost?

16     A.  If you want to show them to me, then that's

17  fine.  Then I'll say -- you know, I'm not sure why

18  you need me to say what's already on the page, but

19  if you want to point it out, then I'll look at it.

20     Q.  Attorney Barnes, I will scroll down to Page

21  19 of this draft report, and do you see the Section

22  VI, Conclusion?

23     A.  I see it.



1        Q.   And under Section VI, there's the second

2    paragraph where it says, "We did, however, find

3    Professor Farid's behavior toward his student

4    reprehensible" --

5        A.   Yes, I see that.

6        Q.   -- "and his submission of a collaborative

7    work without proper authorship attribution a breach

8    of professional ethics."

9             Do you see that?

10       A.   Yes.

11       Q.   Then it says, "The Committee resolves that

12   Mr. Hegde deserves authorship credit for his months

13   of hard work and overall contribution to the

14   Manuscript."

15            Do you see that?

16       A.   Yes.  It says that.

17       Q.   And then it says, "We therefore recommend

18   that Professor Farid be given ten days after receipt

19   of the final report to approach IEEE Access and

20   request that Mr. Hedge be added as coauthor."

21            My question is, where in the Dartmouth

22   research misconduct policy does it state that the

23   investigating committee makes recommendations to the



Page 191

1  provost?

2          MR. CHABOT:  Objection to the form.

3          You can answer.

4     A.  I'm sorry.  Say that again.

5     Q.  Where in the Dartmouth research misconduct

6  policy does it state that the Investigation

7  Committee makes recommendations to the provost?

8          MR. CHABOT:  Same objection.

9          You can answer.

10    A.  Where does -- I mean, that is a compound

11  question.

12    Q.  No, it isn't.  It's a single question.

13          Where in the policy does it say --

14    A.  You said "where," which presumes that it

15  exists in the policy.  You say "where," so, that's a

16  compound question.

17    Q.  You were working under the research

18  investigation policy in this investigation, weren't

19  you?

20          MR. CHABOT:  Object to the form.

21    A.  We were, as I have said to you before, and I

22  do recall I said this multiple times to you, we were

23  working under the research misconduct policy in



1    order to evaluate allegations about the work of

2    Professor Farid.  That's what we were doing.

3        Q.  Does the research misconduct policy call

4    upon the Investigation Committee to make

5    recommendations to the provost?

6        A.  I don't have the policy in front of me, but

7    I can tell you that in general, yes, there are

8    recommendations -- recommendations in any research

9    misconduct policy are ultimately made by either an

10   inquiry committee or, in this case, an Investigation

11   Committee to the person who is the deciding official

12   for research misconduct at the institution.  That's

13   the way it works under any research policy that

14   conforms to the federal guidelines.

15            I mean, if you want to show me the

16   research misconduct policy, I can look at that too.

17       Q.  I will.  I'm sharing with you what's

18   previously been marked Exhibit 7 in this deposition.

19            (Witness provided Barnes Exhibit 7.)

20       Q.  This is the Dartmouth College research

21   misconduct policy and procedures that you've already

22   testified about.

23            MS. GUGEL:  Joe, are you asking him



Page 193

1   about a specific portion of the policy?

2          MR. SULMAN:  I'm going to get to those

3   questions, thank you.

4      Q.  On Page 17 of the pdf, and I'll scroll up to

5   show you what this is, this is under the Section VI

6   Investigation.

7          Do you see that?

8      A.  I see that, yes.

9      Q.  It says, Section D, Investigation Report, do

10  you see that?

11     A.  Yes.

12     Q.  Can you read what's included under Section

13  Investigation Report to yourself?

14     A.  Yeah, but I think you should let me read

15  above where it says what the investigation is

16  supposed to consist of.

17     Q.  There you go.  Sure.

18     A.  Thank you.  "Includes examination of all

19  research records and evidence relevant to reaching a

20  decision on the merits of the allegations."

21     Q.  Where are you reading?

22     A.  I'm reading B(1)(a).  "Maintain detailed

23  records, interview the Respondent and Complainant."



Page 194

1              Respondent didn't want to be

2    interviewed.

3         Q.  You also left off, "And any other available

4    person who has been reasonably identified as having

5    information regarding any relevant aspects."

6              MR. CHABOT:  I'll just object to the

7    form.

8         A.  "Pursued diligently all significant issues

9    and leads discovered, including" -- doesn't say

10   limited to -- "including any evidence of additional

11   instances of possible research misconduct and

12   continue the investigation to completion."

13             Okay.  So, I see that.

14             So, what's your question?

15        Q.  Do you see anywhere where it says the

16   Investigation Committee shall make recommendations?

17        A.  The Investigation Committee, that's the

18   point -- I mean, you can call it anything you want

19   to.  A report, in my world, makes recommendations,

20   summarizes findings and it makes recommendations.

21        Q.  Can you look at Section VII here where it

22   says, "College Administrative Action As a Result of

23   Investigation"?



1       A.  Yes, I see that.

2       Q.  Here it says, "If it is determined that

3  research misconduct occurred, the Provost, in

4  consultation with the Dean and other responsible

5  College officials, shall recommend the appropriate

6  actions to be taken according to applicable College

7  disciplinary procedures for faculty, staff, and

8  students."

9            Do you see that?

10      A.  Yes.

11      Q.  Okay.  And did you read the policy before

12  you wrote your, before you helped draft the report?

13           MR. CHABOT:  Object to the form.  I'm

14  sorry, Attorney Barnes.  Object to the form.

15           Go ahead.

16      A.  I'm familiar with the policy.  And I, in

17  general, but I haven't read it in the last few

18  weeks, and I believe I was familiar with it at the

19  time that I worked on the committee as a member of

20  the committee.

21      Q.  So, even though the policy talks about the

22  provost making recommendations, you believe that it

23  was also appropriate for the Investigation Committee



Page 196

1    to makes recommendations.

2              MS. GUGEL:  Objection to form.

3              And, Joe, are you asking about this

4    specific section that you're showing?

5              MR. SULMAN:  I'm talking about the full

6    policy.

7              MS. GUGEL:  Well, then you should please

8    give him an opportunity to review the entire policy.

9              MR. SULMAN:  I can give him whatever he

10   wants.

11       A.  I don't understand.  What's your question?

12   What's your question?

13       Q.  The question is, the policy specifically

14   talks about the provost making recommendations for

15   appropriate actions.

16              In that light, you also believe that the

17   policy allows the Investigation Committee to make

18   recommendations?

19              MS. GUGEL:  Objection to form.

20       A.  Why don't you go down and let me finish

21   reading it.  Okay.  Keep going.

22              Is that the end of the policy?

23       Q.  I believe so.



Page 197

1        A.   Okay.  So, tell me the question again.

2    What's the question?

3             MR. SULMAN:  Ms. Mitchell, can you read

4    back the question?

5             (Last question read back by Reporter.)

6        Q.   I meant to say in that policy.

7        A.   I'm sorry.  I'm confused about what you're

8    asking.  Why don't you just say it from the top

9    exactly the question that you want me to answer

10   because you qualified it in different ways.  So, I

11   don't know what I'm answering.

12       Q.   Considering that the policy specifically

13   references the provost recommending appropriate

14   actions to be taken, is it your position that the

15   Investigation Committee can also recommend

16   appropriate actions according to this policy?

17            MS. GUGEL:  Objection to form.

18       A.   Whether the Investigation Committee can make

19   recommendations or not is not dependent on whether

20   the provost makes recommendations.  They're two

21   separate issues.

22            So, I don't know why you're calling my

23   attention to this when you're asking about the



1    other.

2       Q.   Well, so, is your answer then, yes, you

3    believe that the Investigation Committee can make

4    recommendations for actions consistent with this

5    policy?

6       A.   I think that an Investigation Committee that

7    goes through all the evidence and tries to make a

8    determination on whether something is research

9    misconduct or not, I think that at the end of it, a

10   peer review committee like that or review committee

11   like that finds all sorts of things and cannot

12   ignore the things that it finds in the course of

13   doing what it does, in the same way that if someone,

14   that if someone is looking for X and they find Y

15   along the way, they're not silent about it if it's

16   important.

17              This is an academic proceeding.  And,

18   so, we look at, in order to resolve the research

19   misconduct allegation, we try to look at the entire

20   context of what happened between the two parties.

21              So, you can call it a recommendation.

22   You can call it a rooster crowing at midnight.  We

23   gave a report that said what we thought about what



Page 199

1    had happened here.

2        Q.   Did anyone associated with Dartmouth ever

3    ask the Committee to make recommendations?

4        A.   Well, the whole point was to make a finding

5    about research misconduct as the core thing.  So, of

6    course they asked us that.

7             See, you're asking these questions that

8    are like blue-sky questions, they don't make any

9    sense.

10       Q.   Do you understand the difference between a

11   finding and a recommendation?

12       A.   Why don't you tell me what the difference is

13   between a finding and a recommendation if you're so

14   certain here?

15       Q.   I don't answer questions here.

16            Do you understand the difference between

17   making a finding whether research misconduct

18   occurred or not and making a recommendation for

19   remedial action in light of the findings you made?

20            MR. CHABOT:  Object to the form.

21            MS. GUGEL:  Objection to the form.

22       A.   In any situation in research misconduct, the

23   Investigation Committee, like the Inquiry Committee,



Page 200

1    it draws up a report of what it found.  It

2    recommends or does not recommend certain things

3    based on what it found, and it sends the

4    recommendation to the deciding official of the

5    university or other research institution, and that's

6    what we tried to do.  I've said that many times.

7        Q.  Listen to the question.

8            Did anyone at Dartmouth ask you, ask the

9    Committee to make recommendations for remedial

10   actions, any type of actions after making factual

11   findings?

12           MR. CHABOT:  Object to the form.

13           You can answer.

14       A.  I don't know whether they asked us to do

15   that or not.  I don't remember what was, what I was

16   asked to do, not to do.

17           I will tell you, you're not going to

18   believe this but I'll tell you that in research

19   misconduct proceedings, investigation committees,

20   after they make their findings, they make many

21   recommendations.  That is not atypical, not

22   atypical.

23       Q.  Back to, I'm sharing Exhibit 24 again.



Page 201

```
1      A.   Okay.

2      Q.   On Page 4, you mentioned or the Committee

3  mentions that Professor Farid's attorney sent a --

4  threatened litigation against the Complainant.

5                Do you see is that?

6      A.  I see that.

7      Q.  Why did the Committee mention that in the

8  draft complaint?

9      A.   Well, I would say that, as I have said many

10 times before as you have asked me questions, that in

11 order to try to understand a research misconduct

12 allegation, one tries as a committee member to

13 understand the entire context of the interactions of

14 the parties.

15     Q.   This interaction occurred well after

16 Mr. Hegde had left Professor Farid's lab, correct?

17             MR. CHABOT:  Object to the form.

18             You can answer.

19     A.   I don't know.  Your threatening letter to

20 him, if it was you who threatened him, I don't have

21 it in front of me.

22     Q.   So, you didn't know when you wrote this

23 draft complaint whether the letter was sent during
```



Page 202

1    Mr. Hegde's time in the lab or afterwards?

2              MS. GUGEL:  Object to form.

3        A.  I don't remember everything that I wrote,

4    that I edited, that I saw.  It's been a year or more

5    ago now.  I don't remember.

6        Q.  How did that relate to investigating whether

7    Professor Farid engaged in research misconduct?

8              MR. CHABOT:  Objection.

9              You can answer.

10       A.  Well, I think that the two committee members

11   were very concerned about the kind of relationship

12   that Professor Farid had with Mr. Hegde and how he

13   had acted toward him.  And when one looks at a

14   course of behavior, even if it comes after the

15   alleged incident of research misconduct, that kind

16   of course of behavior can allow one to assess things

17   like credibility, honesty.  It can be a check on

18   what kind of character anyone is, any witness or

19   respondent or complainant.

20              So, we try to look at the totality of

21   the interactions of the parties to understand so

22   that we can understand what happened.  It's not a

23   court of law.  It's a peer-review process.



Page 203

1      Q.  A process determining whether Mr. Hegde --

2  well, first, it was a process to determine whether

3  Professor Farid committed research misconduct,

4  correct?

5           MR. CHABOT:  Object to the form.

6           You can answer.

7      Q.  You're not determining whether he's a good

8  person, are you?

9           MR. CHABOT:  Same objection.

10           You can answer.

11      A.  Look, I've already answered that --

12      Q.  No, no.  Answer that question.

13           You're not determining whether he's a

14  good person, are you?

15           MR. CHABOT:  Same objection.

16           You can answer.

17      A.  I can't even tell what you're asking.  What

18  are you asking?

19      Q.  Are you determining whether Professor Farid

20  is a good person?

21      A.  That is not the goal.  It's to understand

22  the character and responsibilities, duties,

23  obligations, course of conduct, credibility of the



Page 204

1   parties who are involved.  That's what one does.

2       Q.  You're determining his character?

3       A.  You're trying to take it into account in

4   trying to assess the allegation of research

5   misconduct.

6       Q.  Now, going back to Page 3 of the October 18

7   draft report, after talking about how Professor

8   Farid's attorney sent a letter threatening

9   litigation, you talk, a couple lines down, about

10  how, instead of agreeing to appear before the

11  Committee, Professor Farid sent a 311-page document

12  to the Committee without explaining what the

13  documentation was or how it related to the

14  proceeding, correct?  Correct?

15      A.  I'm sorry.  You were just reading something

16  of the text.  The text says what the text says.  You

17  read it.

18      Q.  Thank you.  Did you or anyone from the

19  Committee ever seek out Professor Farid to ask him

20  questions about the submission?

21      A.  Did we seek him out?  We invited him to come

22  and talk to the Committee, and he declined to do so.

23      Q.  After you received this submission, did



1    anyone from the Committee ever seek him out and ask

2    him questions about the submission?

3        A.   He had an open invitation to come talk to

4    the Committee.  He chose not to.

5        Q.   I don't think you're responding to my

6    question.

7                After you received what you described

8    here as a 311-page submission, did the Committee

9    ever send an e-mail or contact him with any

10   questions about it?

11               MR. CHABOT:  Objection to the form.

12               You can answer.

13       A.   We did not contact him because it was an

14   undifferentiated mass of documents.

15       Q.   What do you mean by -- that's a term that

16   was also used in the report.

17               What do you mean by "undifferentiated

18   mass of documents"?

19       A.   Neither I nor Ken Loparo -- and Ken is much,

20   is an expert in this area; I'm not an expert in the

21   subject matter area of AC optimal power flow, but

22   neither Ken nor I could understand anything about

23   the submission.  We couldn't understand what it



Page 206

1    meant, what it was, what it signified.  He had

2    declined to come and talk to the Committee, though

3    invited several times.

4              So, that's -- and he also received a

5    copy of the draft report.  So, if he had wanted in

6    his response to the draft report to have explained

7    in detail what in the world it meant, I guess he

8    could have done that.

9    Q.   I'm asking about your use of the term

10   "undifferentiated."  What do you mean by that?

11   A.   I mean that it didn't make any sense.

12   Q.   Did anyone from Dartmouth tell you that they

13   had attempted to hire a consultant to look at the

14   report?

15             MR. CHABOT:  I will object to the form.

16             You can answer.

17   A.   To my knowledge, I've never heard that

18   before.

19   Q.   Did you ever, did anyone else from your firm

20   review the submission, the 311-page submission?

21             MR. CHABOT:  Object to the form.

22   A.   Did anyone else at my firm?  I think I told

23   you that a woman named Evelyn Jackson, who is an



1  associate here, who acted as our scribe in this

2  process, she organized exhibits, and I believe that

3  she, in all likelihood, looked at the 300 pages, but

4  I didn't ask anyone else here to look at that.

5      Q.  And did you have discussions with Evelyn

6  about her impressions of the submission?

7              MR. CHABOT:  Object to the form.

8              You can answer.

9      A.  Yes.

10     Q.  And what was --

11     A.  Yes, I believe I did.  I don't recall the

12  exact conversations, but I believe I did.

13     Q.  What do you recall about those discussions?

14     A.  What I recall about the discussions is her

15  agreeing that she tried to look at it and understand

16  what it all meant, and she couldn't make heads or

17  tails of it either just like Ken couldn't and I

18  couldn't.

19     Q.  Did you and/or Attorney Jackson ever present

20  any analysis of the submission in meetings with

21  Professor Loparo?

22             MR. CHABOT:  Object to the form.

23             You can answer.



Page 208

1      A.   Did we ever present -- I think that, I think

2   that Ken and I discussed it because he had looked at

3   it as well.

4      Q.   And can you describe those discussions?

5      A.   Well, I think Ken said that he had looked at

6   it, and the two previous Committee members had

7   looked at it, and they couldn't make heads or tails

8   of it.  It didn't seem to correspond to what the

9   issues were.  And it was, again, an undifferentiated

10  mass of documents without a clear line of

11  argumentation in it.  I think that's what he said.

12     Q.   And what did you and Attorney Jackson say to

13  him?

14          MR. CHABOT:  Object to the form.

15     A.   I do not remember what we said to him, but I

16  tried to listen to Ken because Ken is an expert in

17  this area.

18     Q.   Did you present any type of analysis or

19  opinion on the submission by Professor Farid other

20  than this is an undifferentiated mass of documents

21  or words to that effect?

22          MR. CHABOT:  Same objection.

23          You can answer.



Page 209

1       A.   I think I've -- you've asked me what our

2   conversations were, Ken and my conversations.   I

3   think I've answered that question.

4       Q.   I understand.   I'm just asking.

5            Now, do you recall presenting any

6   information to Professor Loparo other than the fact

7   that you did not understand the submission?

8            MR. CHABOT:   Same objection.

9            You can answer.

10      A.   I don't know.   I don't remember everything

11  that I said to Ken and he said to me.   We had

12  multiple phone calls and Zoom meetings, so, I don't

13  know.   I don't remember.   They weren't recorded, I

14  don't know.   I know we talked about, as I've said, I

15  know we talked about the submission.

16      Q.   Now, presenting to you what I'm going to

17  mark as Exhibit 25 in this.   And I'll send it to the

18  court reporter later.

19           (Marked, Exhibit 25, document titled "A

20  Definitive Analysis of the Provenance of 'A

21  Profit-Maximizing Security-Constrained IV-AC Optimal

22  Power Flow Model and Global Solution,' by Amro M.

23  Farid," dated October 15, 2023.)

