1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

*********************************

AMRO FARID

     vs.                                    23-cv-426-SM

TRUSTEES OF DARTMOUTH COLLEGE

*********************************

DEPOSITION BY ZOOM OF DAVID KOTZ, a witness called on behalf of the Plaintiff, pursuant to the Rules of Civil Procedure, before Karen D. Pomeroy, Registered Diplomate Reporter and Licensed Court Reporter (No. 71) in and for the State of New Hampshire, at 14 North Main Street, Hanover, New Hampshire, on Friday, March 28th, 2025, commencing at 10:01 a.m.

```
 1   APPEARANCES:
 2   JOSEPH L. SULMAN, ESQUIRE
 3   Law Office of Joseph L. Sulman
 4   255 Bear Hill Road, Suite 204
 5   Waltham, Massachusetts 02451
 6   For the Plaintiff
 7
 8
 9   STEPHEN ZAHARIAS, ESQUIRE
10   Devine Millimet
11   111 Amherst Street
12   Manchester, New Hampshire 03101
13   For the Defendant
14
15
16
17
18
19
20
21
22
23
24
```

```
                                                              3
 1                        INDEX
 2  DEPOSITION OF DAVID KOTZ                          PAGE
 3  Examination by Mr. Sulman                         4
 4
 5
 6
 7                       EXHIBITS
 8  Number                                            Page
 9  Exhibit 1    Research Misconduct Policy and
                 Procedures                           93
10  Exhibit 2    4/1/24 Research Misconduct Policy
                 and Procedures                       93
11  *Exhibit 3   2/2/22 Email Chain                   93
    *Exhibit 4   3/22/22 Email Chain                  93
12  *Exhibit 5   7/25/22 Memorandum                   93
    Exhibit 6    8/10/22 Letter                       93
13  Exhibit 7    Kotz Dartmouth Website Page          93
    Exhibit 8    12/12/24 Memorandum                  93
14  Exhibit 9    2/12/25 Letter                       93
    Exhibit 10   9/6/22 Email Chain                   93
15  Exhibit 11   2/21/25 Letter                       93
16
17  *Denotes exhibits requested to be deemed confidential
18
19  The following page/line designations refer to
    portions of testimony requested to be deemed
20  confidential:
21           28/22, 29/15, 36/13
22
23
24  Exhibits Attached
```

4

```
 1                      STIPULATIONS
 2        It is stipulated by and between counsel for
 3    the respective parties that the deposition
 4    transcript is to be read and signed by the
 5    deponent under the pains and penalties of
 6    perjury; and that the sealing and filing thereof
 7    are waived; and that all objections, except as to
 8    form, and motions to strike are reserved until
 9    the time of trial; and that the witness may be
10    sworn remotely.
11                        * * *
12                      DAVID KOTZ,
13    having been duly remotely sworn by the
14    reporter, was deposed and testified as
15    follows:
16                      EXAMINATION
17  BY MR. SULMAN:
18  Q.  Professor, good morning.
19  A.  Good morning.
20  Q.  Can you state and spell your name for the record,
21      please.
22  A.  David Kotz.  D-a-v-i-d K-o-t-z.
23  Q.  And so --
24          MR. ZAHARIAS:  Joe, sorry to interrupt, but I
```

1       just want to make sure on the record that we have
2       the same stipulations as we've been agreeing to
3       for all the other depositions.
4              MR. SULMAN:  Yes, Counsel.  We'll agree to
5       the same stipulations as to the deposition on
6       Tuesday and Wednesday for Dean Abramson.
7              Karen, can you get those?  Thank you.
8              MR. ZAHARIAS:  Thank you.
9  BY MR. SULMAN:
10 Q.   Professor Kotz, where are you located today?
11 A.   In Hanover, New Hampshire.
12 Q.   Are you at Dartmouth facilities?
13 A.   Yeah, I'm at the provost office.  Literally in
14      the Office of the Provost.
15 Q.   Okay.  Do you have any documents in front of you
16      that you're going to be looking at to help you
17      today?
18 A.   No.
19 Q.   Okay.  Have you ever had your deposition taken
20      before?
21 A.   Yes, but only as an expert witness.  Not as a
22      fact witness.
23 Q.   What was the -- what subject was your expertise
24      in?

1  A.  Well, I've done this work in a couple of
2      different topics, but largely in wireless
3      networks, mobile computing, parallel computing.
4          Computer science very broadly.
5  Q.  Okay. So you've never had your deposition taken
6      before in the context of your employment at
7      Dartmouth?
8  A.  Correct.
9  Q.  Okay. Well, let me just explain the process here
10     a little bit.
11         As you know, I represent former
12     Professor Amro Farid in a lawsuit against
13     Dartmouth. You're here to answer questions about
14     your knowledge of certain facts. You've taken an
15     oath to answer the questions truthfully to the
16     best of your abilities.
17         Is there anything today other than simple
18     memory issues that may make it difficult for you
19     to answer the questions?
20 A.  Nope.
21 Q.  Okay. A couple pointers to help you along here
22     today.
23         It's important that you answer the questions
24     I ask you verbally rather than with a head nod or

1  head shake so the court reporter can take
2  everything down.
3      Is that okay?
4  A. Okay.
5  Q. Great. It's also important that you understand
6  all the questions I ask you; so if I ask a
7  question and it's not clear, it's confusing, or
8  if it simply doesn't come through clearly because
9  I mumble or the technology makes it just, you
10 know, not come through, because we're on Zoom,
11 please ask me to rephrase the question.
12     Otherwise, when you answer the question, it's
13 going to appear in the transcript as if you
14 understood the question.
15     Is that okay?
16 A. Okay.
17 Q. Great. Also it's important that -- unlike a
18 regular conversation, that we don't speak over
19 each other. Otherwise, it will make it difficult
20 for the court reporter to take everything down;
21 so I'll ask you to do your best to let me finish
22 my question fully to the punctuation, and,
23 likewise, I'll do my best to let you finish your
24 answer to the -- fully to the period so she can

```
 1      take everything down.
 2           Okay?
 3  A.  Okay.
 4  Q.  Great.  Also, if you need to take a break for any
 5      reason -- stretch your legs, use the restroom --
 6      that's fine.
 7           I just ask if there's a question pending,
 8      please answer the question first before you take
 9      a break.
10           Okay?
11  A.  Okay.
12  Q.  Can you take me through your education up through
13      your Ph.D.
14  A.  Well, so where do you want me to start?  High
15      school?
16  Q.  College, please.
17  A.  So I went to Dartmouth College 1982 to 1986;
18      graduated with an AB degree in 1986.
19           Went straight off to Duke University as a
20      Ph.D. student in computer science.  Graduated
21      there in 1991.
22           Came straight back to Dartmouth to join the
23      faculty in 1991.
24  Q.  In the computer science department?
```

1  A.  I was -- as an undergraduate I was a computer
2      science and physics double major, and as a
3      graduate student, Ph.D. in computer science, and
4      I'm on the faculty of computer science.
5  Q.  And when did you obtain tenure?
6  A.  Six years after arrival; so 1997.
7  Q.  And when did you become provost?
8  A.  Well, so I first became interim provost in 2017
9      and served for 11 months until late 2018, and
10     then when the subsequent provost left, I was
11     asked to come back as interim provost in the
12     summer of 2021, and about six months later,
13     President Hanlon asked me to stay on as provost;
14     so the precise answer to your question would be
15     2022, of 2022.
16 Q.  But you had a previous stint as interim provost?
17 A.  Correct.
18 Q.  Okay.  Who was the provost before you served as
19     interim provost in 2017?
20 A.  Carolyn Dever.
21 Q.  And the permanent provost after your first time
22     as interim provost, that was Joseph Helble?
23 A.  Correct.
24 Q.  Okay.  In your current position as provost, do

1       you continue to have any teaching
2       responsibilities?
3 A. No.
4 Q. Okay.  Is that your choice?
5 A. Yes.
6 Q. What are you duties and responsibilities as
7       provost?
8 A. Well, the way I usually explain it is that the
9       provost is the chief academic officer of the
10      college and the chief budget officer of the
11      college.
12         So I oversee all aspects of academic
13      operations including the, you know, graduate,
14      professional undergraduate schools, and also many
15      academic units like the library; and as the chief
16      budget officer, I collaborate closely with the
17      finance office to arrange the annual budget and
18      to monitor our financial situation.
19 Q. Does the provost office have any role in
20      promotion decisions for faculty?
21         MR. ZAHARIAS:  Objection.  Form.
22 A. It depends on the school.  So in -- we have four
23      different faculties, arts and science, medical,
24      engineering, and business, and the role of the

1      provost differs in those four cases.
2  BY MR. SULMAN:
3  Q.  So what about for the Thayer School?  Does the
4      provost have any role in that school?
5  A.  And the question was about tenure; correct?
6  Q.  So my question was specific to promotion, but,
7      yes, promotion to --
8  A.  Promotion.
9  Q.  But I'm talking about promotion for tenure.
10 A.  Okay.  No formal role in that process.
11 Q.  What about an informal role in promotion to
12     tenure at Thayer?
13 A.  So the provost is invited each year by courtesy
14     from the committee advisory to the president to
15     sit in on their meetings where cases for
16     promotion and tenure are held for faculty in the
17     arts and sciences, which includes tenure-line
18     faculty in the Thayer School of Engineering.
19 Q.  Did you sit in on the CAP meeting when they
20     discussed for Professor Farid's tenure position?
21        MR. ZAHARIAS:  Objection.  Form.
22 A.  I actually don't remember whether I was in the
23     room on that particular case.
24 BY MR. SULMAN

1  Q. When I say in the room, I meant via Zoom or
2     otherwise?
3  A. Yes. I mean, in the meeting, I don't remember.
4     I'm sorry.
5  Q. Okay. Did you have a voting -- did you have a
6     role in voting?
7  A. No.
8  Q. Do you have a vote?
9  A. No, I do not.
10 Q. Okay.
11 A. The provost does not.
12 Q. Do you recall if you had any discussions with
13    members of the CAP about Professor Farid's tenure
14    decision?
15 A. No.
16 Q. You don't recall one way or the other?
17 A. Correct.
18 Q. Okay. Regarding appeals of tenure decisions, do
19    you have any roles when a faculty member wants to
20    appeal a tenure decision?
21 A. No.
22 Q. You don't. All right. Are you aware of the fact
23    that, in this case, Professor Farid was denied
24    tenure and appealed that decision?

1      MR. ZAHARIAS: Objection. Form.
2  A.  I don't recall -- I do recall that there was an
3      appeal.
4          I -- I had no formal role in -- I wouldn't
5      have any formal role in that appeal in any case.
6  BY MR. SULMAN:
7  Q.  Did you have any informal role in that appeal?
8  A.  Well, that's what I'm trying to remember is --
9      because I recall hearing that there was an
10     appeal, and I think I was only involved in maybe
11     some conversations about process but certainly
12     not in the outcome.
13 Q.  Okay. Do you -- you have no role in approving or
14     denying a procedural or otherwise appeal of a
15     tenure decision?
16          MR. ZAHARIAS: Objection. Form.
17 A.  Right.
18 Q.  I'm sorry?
19 A.  Correct.
20 Q.  Okay. Just to clarify, sometimes your attorney's
21     going to object, and it helps for the court
22     reporter if you can pause a second so she can
23     hear your answer so you don't speak over each
24     other.

14

1  A.  Right.  So I should pause every time to see if he
2      want to jump in?
3  Q.  That's right.
4          MR. ZAHARIAS:  Thank you, Dave.  And thanks,
5      Joe.
6  BY MR. SULMAN:
7  Q.  What is the provost office role when either a
8      student or another -- any individual brings
9      allegations involving a professor's research?
10         MR. ZAHARIAS:  Objection.  Form.
11 A.  So Dartmouth has a research misconduct policy,
12     and it's overseen by staff in my office.
13 Q.  And does the actual provost, your position,
14     specifically have any role in that?
15 A.  Yes.  According to the policy, there are points
16     at which the provost would have a role.
17 Q.  And what points are those?
18 A.  Well, it's a complex policy with many different
19     steps, and so it depends.
20 Q.  I've just sent you Exhibit 1 in the chat box.
21     Let me know if you get it and can open it up.
22 A.  Okay.  I've got it.
23 Q.  Is this Dartmouth College Research Misconduct
24     Policy and Procedures?

1  A.  That's what it says.
2  Q.  Okay.  And was it the applicable policy during
3      the time that the allegations against
4      Professor Farid were under review?
5          MR. ZAHARIAS:  Objection.  Form.
6  A.  You know, I can't confirm that because this -- I
7      see this was accepted in 2005.
8          Without doing some research, I couldn't
9      confirm that it was the one in effect at the
10     time.
11 BY MR. SULMAN:
12 Q.  Your office was in charge of that investigation;
13     correct?
14 A.  Correct.
15 Q.  Okay.  So what policy -- was the policy updated
16     when -- during the time of Professor Farid's
17     investigation?
18 A.  Not that --
19          MR. ZAHARIAS:  Objection.  Form.
20 A.  Sorry.  Not that I'm aware of, but, again, I --
21     so I don't know.
22 Q.  Okay.  Were you involved in any update of the
23     research misconduct policy?
24 A.  Not recently anyway.

```
                                                          16
 1   Q.   Not in the past couple years?
 2   A.   Not that I recall.
 3   Q.   I just sent you Exhibit 2.  Let me know when you
 4        have it open.
 5   A.   Okay.  I have it open.
 6   Q.   Okay.  Exhibit 2 is a document entitled Dartmouth
 7        Research Misconduct Policy and Procedures.
 8           On the right-hand side you'll see it says
 9        Effective Date, June 10th of '05.  Last Revised
10        Date, April 1, 2024.
11           Does that read correctly?
12   A.   I see that.
13   Q.   Okay.  Were you aware that this policy was
14        revised on or about April 1st, 2024?
15   A.   I don't recall.
16   Q.   Okay.  And below that, it says Division, Office
17        of the Provost; correct?
18   A.   Correct.
19   Q.   Okay.  And you weren't involved in any revision
20        of this policy?
21   A.   I can't recall.
22   Q.   So sitting here today, are you able to tell me
23        how this policy was revised in the past five
24        years?
```

17

1  A.  Are you asking to summarize the changes in the
2      policy in previous revisions?
3  Q.  Yes.
4  A.  No, I don't remember.  Sorry.
5  Q.  Well, are you -- do you remember that there were
6      changes in this policy in the past five years?
7  A.  It -- honestly, it wouldn't surprise me, and
8      obviously --
9  Q.  I'm not asking you what you guess.  I'm asking if
10     you know.
11         Do you know if --
12 A.  No, I don't recall.  I'm sorry.
13 Q.  Do you recall that there were changes to the
14     policy?
15 A.  No, I don't recall.
16 Q.  So there may not have been or there may have
17     been; you just don't know?
18 A.  There may have been changes, but I don't recall.
19 Q.  Or there may not have been?
20 A.  There may not have been; there may have been.
21         According to the document you just sent me,
22     there apparently were changes in April of 2024; I
23     just don't recall what they were and being --
24     whether I was involved.

1  Q.  Okay.  Outside of Professor Farid's case, what is
2      your position's involvement in a research
3      misconduct investigation?
4  A.  Generally the Vice Provost for Research,
5      Dean Madden, would bring it to my attention, and
6      he would summarize the process and the steps that
7      he recommends taking, and, in most cases, I
8      delegate to him the authority to do that where
9      it's necessary per the policy.
10 Q.  So is it your testimony that where the policy
11     says the provost shall do something, you
12     generally delegate that step to Dean Madden or
13     the Vice Provost for Research?
14         MR. ZAHARIAS:  Objection.  Form.
15 A.  You know, I think the policy mentions the
16     provost's role in several places; and so I'm not
17     sure I could answer that in a categorical, but I
18     have -- I definitely recall delegating
19     authority -- certain authorities to the
20     vice provost for many cases.
21 BY MR. SULMAN:
22 Q.  Not just Amro Farid?
23         MR. ZAHARIAS:  Objection.  Form.
24 A.  Yes, other cases.

                                                              19

1  Q.  And is that -- is that because of a conflict?  Or
2      simply for efficiency purposes or non-conflict
3      reasons?
4          MR. ZAHARIAS:  Objection.  Form.
5  A.  Efficiency.
6  BY MR. SULMAN:
7  Q.  Okay.  So I'm going to turn your attention on
8      Exhibit 1 here to page 11; a section that says
9      Preliminary Assessment of Allegations.
10 A.  Page 11.  Yes.
11         MR. ZAHARIAS:  And, Joe, is that page 11 of
12     the PDF or page 11 of the document itself or is
13     it the same?
14         MR. SULMAN:  It's actually the same on this
15     document.
16         MR. ZAHARIAS:  All right.  Thank you.
17 A.  So I see Section B, Preliminary Assessment of
18     Allegation to Determine if Inquiry is Warranted.
19         Is that what you're --
20 Q.  That's right.
21 A.  Okay.
22 Q.  So do you see where it says Upon receiving an
23     allegation of research misconduct, the provost
24     and the responsible dean shall?